**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| *IN RE SYNGENTA AG MIR 162 CORN  LITIGATION* | Master File No. 2:14-MD-02591-JWL-JPO |
| THIS DOCUMENT RELATES TO: | MDL No. 2591 |
| *Louis Dreyfus Company Grains Merchandising LLC v. Syngenta AG,* No. 2:16-cv-02788-JWL-JPO | |

**SYNGENTA'S MEMORANDUM IN SUPPORT OF**
**ITS PARTIAL MOTION TO DISMISS COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ................................................................................. 1

BACKGROUND .................................................................................. 5

CHOICE OF LAW ................................................................................ 6

ARGUMENT ...................................................................................... 9

I.     LDC's Lanham Act Claim Fails As A Matter Of Law. ....................................... 9

     A.     Two Of The Four Statements LDC Has Identified Are Not Actionable "Commercial Advertising Or Promotion" Under The Lanham Act. ........................ 10

     B.     Three Of The Four Statements Are Not Plausibly Alleged To Contain False Or Misleading Statements Of Fact. ......................................................... 13

     C.     LDC Fails To Plausibly Allege Causation For Any Of The Statements. .................. 15

II.    LDC's Claim For Fraudulent Misrepresentation Fails As A Matter Of Law ..................... 20

III.   The Petition Clause Bars Liability Based On Statements Made In Syngenta's Deregulation Petition To The USDA Or In Syngenta's *Bunge* Lawsuit ............................. 25

IV.   All Claims Fail To The Extent That They Are Based On Or Seek Damages For Supposed Physical Injury. .................................................................. 27

V.    The Contractual ELD Bars LDC's Claim Based On Costs Due To Rejected, Delayed, Or Diverted Shipments Of U.S. Corn That Allegedly Contained MIR162. .................................................................................... 30

VI.   The Court's Prior Rulings Apply To Require Partial Dismissal Of LDC's Claims. ............. 38

     A.     LDC's Negligence Claim Must Be Dismissed To The Extent That It Is Based On Misrepresentations. .................................................................. 38

     B.     All Of LDC's State Law Claims Must Be Dismissed To The Extent That They Rely On Any Claim That Syngenta Had A Duty To Segregate Viptera, Which Is Preempted By The Grain Standards Act. ................................ 39

     C.     LDC's State Law Claims Must Be Dismissed To The Extent That They Are Based On A Voluntary Undertaking Theory. .......................................... 42

VII.  Syngenta Preserves The Arguments The Court Has Already Addressed. ...................... 45

CONCLUSION .................................................................................. 46

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*456 Corp. v. United Natural Foods, Inc.*,
    No. 3:09-cv-1983 (JBA), 2011 WL 87292 (D. Conn. Jan. 11, 2011)......................................24

*Adcock v. S. Austin Marine, Inc.*,
    No. 2:08-cv-263KS-MTP, 2009 WL 3633335 (S.D. Miss. Oct. 30, 2009)............................37

*Ahmed v. Hosting.com*,
    28 F. Supp. 3d 82, 91 (D. Mass. 2014) ................................................................................17

*Aliki Foods, LLC v. Otter Valley Foods*,
    726 F. Supp. 2d 159 (D. Conn. 2010) ...................................................................................31

*Anderson v. Scheffler*,
    811 P.2d 1125 (Kan. 1991) ...................................................................................................45

*Annett Holdings, Inc. v. Kum & Go, L.C.*,
    801 N.W.2d 499 (Iowa 2011) ...............................................................................................34

*Ark. Carpenters' Health & Welfare Fund v. Philip Morris Inc.*,
    75 F. Supp. 2d 936 (E.D. Ark. 1999) ....................................................................................43

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................................................17, 21

*Bailey Farms, Inc. v. NOR-AM Chem. Co.*,
    27 F.3d 188 (6th Cir. 1994) ..................................................................................................37

*Bailey v. Edward Hines Lumber Co.*,
    719 N.E.2d 178 (Ill. App. Ct. 1999) .....................................................................................45

*Bartolotta v. Liberty Mut. Ins. Co.*,
    411 F.2d 115 (2d Cir. 1969)..............................................................................................43, 44

*Barton v. City of Bristol*,
    967 A.2d 482 (Conn. 2009) ..................................................................................................39

*Baryo v. Philip Morris USA, Inc.*,
    435 F. Supp. 2d 961 (W.D. Mo. 2006) .................................................................................44

*Bass v. Coupel*,
    671 So. 2d 344 (La. Ct. App. 1995).......................................................................................14

*Bayer CropScience LP v. Schafer,*
    385 S.W.3d 822 (Ark. 2011).........................................................................30

*BE & K Constr. Co. v. N.L.R.B,*
    536 U.S. 516 (2002)..............................................................................25, 27

*BNP Paribas Mortg. Corp. v. Bank of Am.,*
    949 F. Supp. 2d 486 (S.D.N.Y. 2013).......................................................43

*Boerner v. Brown & Williamson Tobacco Corp.,*
    260 F.3d 837 (8th Cir. 2001) ..............................................................43, 44

*Bowers v. Fed. Internationale de l'Automobile,*
    489 F.3d 316 (7th Cir. 2007) ..............................................................37, 45

*Branscum v. Am. Cmty. Mut. Ins. Co.,*
    984 P.2d 675 (Colo. Ct. App. 1999) ..........................................................20

*C5 Med. Werks, LLC v. Ceramtec GmbH,*
    No. 14-CV-00643-RBJ, 2016 WL 4092955 (D. Colo. June 10, 2016) .................17

*California Motor Transp. Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972)....................................................................................27

*Capital Motor Lines v. Detroit Diesel Corp.,*
    799 F. Supp. 2d 11 (D.D.C. 2011)............................................................35

*Caplinger v. Medtronic, Inc.,*
    921 F. Supp. 2d 1206 (W.D. Okla. 2013),
    *aff'd,* 784 F.3d 1335 (10th Cir. 2015).....................................................42

*Case Orlando Apts., Ltd. v. Fed. Nat'l Mortg. Ass'n,*
    624 F.3d 185 (5th Cir. 2010) ......................................................................7

*Catheter Connections, Inc. v. Ivera Med. Corp.,*
    No. 2:12-CV-748, 2012 WL 4341743 (D. Utah Sept. 21, 2012)............................18

*Center for Food Safety v. Vilsack,*
    718 F.3d 829 (9th Cir. 2013) ................................................................26, 29

*Chandler v. Gene Messer Ford, Inc.,*
    81 S.W.3d 493 (Tex. Ct. App. 2002) .........................................................37

*Chanoff v. U.S. Surgical Corp.,*
    857 F. Supp. 1011 (D. Conn. 1994),
    *aff'd,* 31 F.3d 66 (2d Cir. 1994)...............................................................38

*Cheminor Drugs, Ltd. v. Ethyl Corp.,*
    168 F.3d 119 (3d Cir. 1999)..................................................................25, 26

*Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*,
 831 F. Supp. 1516 (D. Colo. 1993) ........................................................27

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
 776 F.3d 1343 (Fed. Cir. 2014) ............................................................27

*Cottrell, Ltd. v. Biotrol Int'l*,
 191 F.3d 1248 (10th Cir. 1999) ............................................................13

*Desfosses v. Wallace Energy, Inc.*,
 836 F.2d 22 (1st Cir. 1987) ..................................................................20

*Dobco, Inc. v. Williams Dev. Co.*,
 No. X07-CV-990072152S, 2002 WL 1332227
 (Conn. Super. Ct. May 17, 2002) .........................................................31

*Doe v. Hunter Oaks Apartments, L.P.*,
 105 So. 3d 422 (Miss. Ct. App. 2013) ..................................................45

*Dorf v. City of Evansville*,
 No. 11-CV-351-S, 2012 WL 1440343 (D. Wyo. Apr. 22, 2012),
 *aff'd*, 531 F. App'x 836 (10th Cir. 2013) .............................................18

*Duty Free Ams., Inc. v. Estée Lauder Cos.*,
 No. 12- 60741, 2014 WL 1329359 (S.D. Fla. Mar. 31, 2014),
 *aff'd*, 797 F.3d 1248 (11th Cir. 2015) ............................................2, 13, 24

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*,
 476 U.S. 858 (1986) .......................................................................31, 36

*East Point Sys., Inc. v. Steven Maxim, S2k, Inc.*,
 133 F. Supp. 3d 430, 437 (D. Conn. 2015) ..............................14, 15, 22, 23, 24

*Enyart v. Transamerica Ins. Co.*,
 985 P.3d 556 (Ariz. Ct. App. 1998) ......................................................20

*Feldman v. Am. Dawn, Inc.*,
 849 F.3d 1333 (11th Cir. 2017) ............................................................20

*General Cigar Holdings, Inc. v. Altadis, S.A.*,
 205 F. Supp. 2d 1335 (S.D. Fla. 2002),
 *aff'd*, 54 F. App'x 492 (11th Cir. 2002) ................................................14

*In re Genetically Modified Rice Litig.*,
 666 F. Supp. 2d 1004 (E.D. Mo. 2009) .................................................30

*GFF Corp. v. Assoc. Wholesale Grocers, Inc.*,
 130 F.3d 1381 (10th Cir. 1997) ............................................................21

*Goldsmith v. Polygram Diversified Ventures Inc.*,
No. 94 CIV. 8888 (DLC), 1995 WL 614560 (S.D.N.Y. Oct. 19, 1995) ...............................12

*Gunkel v. Renovations, Inc.*,
822 N.E.2d 150 (Ind. 2005) ........................................................................33, 36, 37

*Hall v. Assoc. Int'l Ins. Co.*,
494 F. App'x 902 (10th Cir. 2012) ...........................................................................19

*HDM Flugservice GmbH v. Parker Hannifan Corp.*,
332 F.3d 1025 (6th Cir. 2003) ..................................................................................34

*Hininger v. Case Corp.*,
23 F.3d 124 (5th Cir. 1994) ......................................................................................35

*Honeycutt By & Through Phillips v. City of Wichita*,
836 P.2d 1128 (Kan. 1992) .......................................................................................44

*Hoskinson v. High Gear Repair, Inc.*,
982 F. Supp. 2d 1210 (D. Kan. 2013) .......................................................................43

*Hutchinson v. Pfeil*,
211 F.3d 515 (10th Cir. 2000) ..................................................................................19

*Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*,
929 N.E.2d 722 (Ind. 2010) ............................................................................30, 31, 32

*Indy Lube Invs., L.L.C. v. Wal-Mart Stores, Inc.*,
199 F. Supp. 2d 1114 (D. Kan. 2002) .......................................................................13

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*,
638 F. App'x 778 (10th Cir. 2016) ...........................................................................13

*Jepson v. Gen. Casualty Co. of Wis.*,
513 N.W.2d 467 (Minn. 1994) ...............................................................................6, 8

*Johnson v. Continental Airlines Corp.*,
964 F.2d 1059 (10th Cir. 1992) .................................................................................6

*Jordan v. NUCOR Corp.*,
295 F.3d 828 (8th Cir. 2002) ....................................................................................43

*Khalik v. United Air Lines*,
671 F.3d 1188 (10th Cir. 2012) ................................................................................14

*King v. Hilton-Davis*,
855 F.2d 1047 (3d Cir. 1988) ...................................................................................35

*Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*,
 24 F. Supp. 2d 755 (W.D. Ky. 1998) ....................................................................44

*Laurent v. Flood Data Servs.*,
 766 N.E.2d 221 (Ohio Ct. App. 2001) ..................................................................34

*Lawrence v. O&G Indus., Inc.*,
 126 A.3d 569 (Conn. 2015) ...................................................................................30

*Lerner v. Fleet Bank, N.A.*,
 459 F.3d 273 (2d Cir. 2006).................................................................................22

*Lexington Ins. Co., Inc. v. W. Roofing Co.*,
 316 F. Supp. 2d 1142 (D. Kan. 2004) ...................................................................32

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
 134 S. Ct. 1377 (2014) ................................................................................15, 16

*Luscko v. S. Container Corp.*,
 408 F. App'x 631 (3d Cir. 2010) ..........................................................................20

*Marx v. Mack Affiliates*,
 265 A.D.2d 202 (N.Y. App. Div. 1999) ................................................................14

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
 674 F.3d 369 (4th Cir. 2012) ...............................................................................22

*McDonald v. Ford Motor Co.*,
 326 N.E.2d 252 (Ohio 1975) .................................................................................37

*McDonald v. Smith*,
 472 U.S. 479 (1985) (Brennan, J., concurring)......................................................26

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
 641 F.3d 834 (7th Cir. 2011) .........................................................................25, 26

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
 761 F.3d 1109 (10th Cir. 2014) ............................................................................13

*Miller Int'l, Inc. v. Clinch Gear, Inc.*,
 No. 10-CV-01167-WDM-CBS, 2010 WL 4318806 (D. Colo. Oct. 25, 2010)........18

*Mitchell v. Sanchez*,
 No. 14-0996-CV-ODS, 2015 WL 1393266 (W.D. Mo. Mar. 25, 2015),
 *aff'd*, 652 F. App'x 491 (8th Cir. 2016)................................................................17

*Montpetit v. Allina Health Sys., Inc.*,
 No. C2-00-571, 2000 WL 1486581 (Minn. Ct. App. Oct. 10, 2000) .......................8

*Mourad v. Marathon Petroleum Co. LP*,
 654 F. App'x 792 (6th Cir. 2016) ...................................................21

*Munro v. Lucy Activewear, Inc.*,
 No. 16-79, 2016 WL 5660422 (D. Minn. Sept. 29, 2016) .....................................42

*Mutual Pharm. Co., Inc. v. Bartlett*,
 133 S. Ct. 2466 (2013) ........................................................41

*N.A.A.C.P. v. Claiborne Hardware Co.*,
 458 U.S. 886 (1982) ..........................................................25

*Neonatal Prod. Grp., Inc. v. Shields*,
 No. 13-cv-2601-DDC-KGS, 2014 WL 6685477 (D. Kan. Nov. 26, 2014) ...........................12

*New York Times v. Sullivan*,
 376 U.S. 254 (1964) ..........................................................26

*Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*,
 604 N.W.2d 91 (Minn. 2000) ....................................................7, 8

*Nw. Ark. Masonry, Inc. v. Summit Specialty Prods., Inc.*,
 31 P.3d 982 (Kan. Ct. App. 2001) .................................................34

*Osmanski v. Way*,
 No. A14-2117, 2015 WL 4508423 (Minn. Ct. App. July 27, 2015).........................45

*In re Paige*,
 106 B.R. 346 (Bankr. D. Conn. 1989) .............................................24

*Phillips v. Phillips*,
 922 A.2d 1100 (Conn. App. Ct. 2007)..........................................20, 24

*PhotoMedex, Inc. v. Irwin*,
 601 F.3d 919 (9th Cir. 2010) ...................................................13

*Pine Tel. Co. v. Alcatel Lucent USA Inc.*,
 617 F. App'x 846 (10th Cir. 2015) ..............................................20

*Pittway Corp. v. Lockheed Aircraft Corp.*,
 641 F.2d 524 (7th Cir. 1981) ....................................................8

*Prairie Prods., Inc. v. Agchem Division-Pennwalt Corp.*,
 514 N.E.2d 1299 (Ind. Ct. App. 1987) ..........................................5, 34

*Precision Safety Innovations, Inc. v. Branson Ultrasonic Corp.*,
 No. CV 04-6981 GPS, 2005 WL 5801513 (C.D. Cal. Aug. 4, 2005)..........................33

*Proctor & Gamble Co. v. Haugen,*
    222 F.3d 1262 (10th Cir. 2000) ................................................................10, 11

*Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.,*
    508 U.S. 49 (1993) .........................................................................................27

*Progressive Ins. Co. v. GM Corp.,*
    749 N.E.2d 484 (Ind. 2001) ...........................................................................34

*Progressive Ins. Co. v. Monaco Coach Corp.,*
    No. 1:05-CV-37-DMR-JMR, 2006 WL 839520 (S.D. Miss. Mar. 29, 2006) ........35

*Pulse Health LLC v. Akers Biosciences, Inc.,*
    No. 3:16-cv-01919-HZ, 2017 WL 131272 (D. Or. Apr. 14, 2017) .......................17

*Riegel v. Medtronic, Inc.,*
    552 U.S. 312 (2008) .......................................................................................42

*Rinsley v. Brandt,*
    700 F.2d 1304 (10th Cir. 1983) ...............................................................13, 24

*Rodriguez v. ECRI Shared Servs.,*
    984 F. Supp. 1363 (D. Kan. 1997) ..................................................................38

*Rose v. Utah State Bar,*
    471 F. App'x 818 (10th Cir. 2012) ..................................................................21

*Sample v. Monsanto,*
    283 F. Supp. 2d 1088 (E.D. Mo. 2003) ......................................................28, 30

*Schatz v. Republican State Leadership Comm.,*
    669 F.3d 50 (1st Cir. 2012) .............................................................................22

*Schumacher v. Schumacher,*
    676 N.W.2d 685 (Minn. Ct. App. 2004) .........................................................6, 8

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994) ............................................................................23

*Shipco 2295, Inc. v. Avondale Shipyards, Inc.,*
    825 F.2d 925 (5th Cir. 1987) ..........................................................................35

*Sigma Dynamics, Inc. v. E Piphany, Inc.,*
    No. C 04-0569 MJJ, 2004 WL 2648370 (N.D. Cal. June 25, 2004) ...................12

*Solis v. Lincoln Elec. Co.,*
    No. 1:04-CV-17363, 2006 WL 1305068 (N.D. Ohio May 10, 2006) ...................44

*Sports Unlimited, Inc. v. Lankford Enters., Inc.*,
  275 F.3d 996 (10th Cir. 2002) ......................................................................12

*St. Paul Fire & Marine Ins. Co. v. Steeple Jac, Inc.*,
  352 N.W.2d 107 (Minn. Ct. App. 1984) ......................................................35

*Star City Sch. Dist. v. ACI Bldg. Sys., LLC*,
  844 F.3d 1011 (8th Cir. 2017) ......................................................................14

*In re StarLink Corn Prods. Liab. Litig.*,
  212 F. Supp. 2d 828 (N.D. Ill. 2002) ....................................................30, 35

*Sunflower Pork, Inc. v. Consol. Nutrition, L.C.*,
  No. 03-2045-JAR, 2004 WL 1212052 (D. Kan., June 1, 2004) ...................13

*Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*,
  773 F.3d 58 (8th Cir. 2014) ..........................................................................25

*Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*,
  820 F. Supp. 2d 953 (N.D. Iowa 2011).........................................................27

*Synygy, Inc. v. Scott-Levin, Inc.*,
  51 F. Supp. 2d 570 (E.D. Pa. 1999),
  *aff'd*, 229 F.3d 1139 (3d Cir. 2000) ............................................................12

*Tarpley v. Keistler*,
  188 F.3d 788 (7th Cir. 1999) ........................................................................25

*Tercica, Inc. v. Insmed Inc.*,
  No. C 05-5027 SBA, 2006 WL 1626930, at *18 (N.D. Cal. June 9, 2006) ...............12

*Tomka v. Hoescht Celanese Corp.*,
  528 N.W.2d 103 (Iowa 1995) .......................................................................35

*Trade Fin. Partners, LLC v. AAR Corp.*,
  573 F.3d 401 (7th Cir. 2009) ........................................................................20

*Triton Envtl., Inc. v. Dalton Enters., Inc.*,
  38 Conn. L. Rptr. 518, No. 3482647, 2005 WL 375331
  (Conn. Super. Ct. Jan. 10, 2005)...................................................................36

*Tyler v. Gibbons*,
  857 N.E.2d 885 (Ill. App. Ct. 2006) .............................................................39

*Ulbrich v. Groth*,
  78 A.3d 76 (Conn. 2013) .........................................................................32, 36

*Victory v. Smith*,
  392 S.W.3d 892 (Ark. Ct. App. 2012) ..........................................................20

ix

*Waters v. Autuori*,
676 A.2d 357 (Conn. 1996) ...........................................................43

*Weigold v. Patel*,
840 A.2d 19 (Conn. App. Ct. 2004) ...............................................43

*In re Welding Fume Prods. Liab. Litig.*,
No. 1:03-CV-17000, 2010 WL 7699456 (N.D. Ohio June 4, 2010) ......................................44

*Worldwide Pres. Servs., L.L.C. v. IVth Shea, L.L.C.*,
No. X-05-CV-980167154S, 2001 WL 34093945
(Conn. Super. Ct. Feb. 1, 2001) .....................................................33

*Wright v. Brooke Grp. Ltd.*,
652 N.W.2d 159 (Iowa 2002) ........................................................44

*Zoller Labs., LLC v. NBTY, Inc.*,
111 F. App'x 978 (10th Cir. 2004) .................................................15

**Statutes and Regulations**

7 C.F.R. § 340.1 ...............................................................................29

7 C.F.R. § 810.402(c)(1) ..................................................................28

7 U.S.C. § 7702(14) .........................................................................29

**Rules**

Fed. R. Civ. P. 8 ........................................................................21, 22

Fed. R. Civ. P. 9(b) ........................................................................21

**Other Authorities**

Restatement (Second) of Conflicts
§ 145(2) cmt. f.................................................................................7

Restatement (Second) of Torts
§ 323.......................................................................................43, 45
§ 324A.........................................................................................43
§ 552 cmt. a...................................................................................38

## INTRODUCTION

Although Louis Dreyfus Co. ("LDC") has not conformed its complaint to any master complaints in this MDL, LDC primarily asserts the same causes of action—supported by largely the same allegations—that the Court has already addressed in ruling on prior motions.  Indeed, LDC not only makes similar allegations, it even incorporates wholesale many of the allegations from the Non-Producer Plaintiffs' Third Amended Master Complaint.  *See* Compl., ECF No. 1, Case No. 2:16-cv-2788-JWL-JPO ("Compl.") at 2 n.1; *see, e.g., id.* ¶¶ 2, 20, 31, 33, 45, 49-53, 55-56, 63, 65-66, 68, 71.  As a result, the Court's prior rulings dismissing claims in whole or in part as a matter of law apply equally here.   In particular, three of LDC's claims—the Lanham Act claim, fraudulent misrepresentation, and negligence based on misrepresentations—necessarily fail, because the Court has already ruled that materially indistinguishable allegations fail to state a claim as a matter of law or has entered rulings on similar claims that logically foreclose the cause of action as pled here.[1]  Where the Court has made such rulings, LDC bears the burden as a "newly added party" to "demonstrate[] why its case is distinguishable."  Scheduling Order No. 1 ¶ 5(h), ECF No. 123.  LDC cannot make that showing.  In addition, as explained below, LDC's complaint raises a new issue with respect to the contractual economic loss doctrine (ELD).  The Court previously rejected application of that doctrine solely under the law of three States based on principles that are inapplicable here.  Under the majority rule applied by the relevant States here, LDC's negligence claim fails in its entirety because it is barred by the contractual ELD.

*First*, LDC fails to state a claim under the Lanham Act.  LDC bases its Lanham Act claim on four statements.  Three of those statements—the March 2014 "Plant With Confidence" Fact Sheet, April 2012 Earnings Call, and August 2011 Letter—were also identified by the Producers and Non-

---

[1]      Pursuant to the Court's Scheduling Order, *see* Scheduling Order No. 1 ¶ 5(h), ECF No. 123, Syngenta does not repeat arguments that the Court has already rejected and instead incorporates those arguments by reference solely to preserve issues for appeal.  *See infra* Part VII.

Producers as the basis for the now-dismissed Lanham Act claim.  The fourth is a statement made in a "July 12, 2011 conference call" between LDC and Syngenta representatives in which Syngenta indicated that Chinese import approval for MIR162 was expected in March 2012.  Compl. ¶ 67.  The Court has already held that indistinguishable allegations about the Earnings Call failed to establish that it constituted actionable "commercial advertising or promotion" as required under the Lanham Act, both because the Earnings Call was not made "for the purpose of influencing customers" and because it was not "sufficiently disseminated to the [purchasing] public."  MTD Order 85-86 (emphasis deleted).  As the Court explained previously, "[p]laintiffs have not pleaded that Mr. Mack's statement [during the Earnings Call] actually reached some significant portion of the relevant public (customers of Syngenta)."  MTD Order 86.  The same analysis and the same holding apply equally here to bar LDC's reliance on the Earnings Call.  And the same rationale also forecloses a claim based on the one-off, private call between LDC and Syngenta representatives in July 2011.  There are no allegations here to suggest that call was directed at Syngenta's consumers or "disseminated to the [purchasing] public" either.

LDC's complaint also fails to establish that the April 2012 Earnings Call, August 2011 Letter, and July 2011 Conference Call contain false statements of *fact*.  As this Court has recognized, the settled rule is that predictions about future events are generally not actionable statements of fact.  There is only a limited exception where the prediction was subjectively "known at that time by the speaker to be false" or the speaker "lack[ed] a good faith belief in the truth of the statement."  *Duty Free Ams., Inc. v. Estée Lauder Cos.*, No. 12- 60741, 2014 WL 1329359, at *18 (S.D. Fla. Mar. 31, 2014), *aff'd*, 797 F.3d 1248 (11th Cir. 2015).  LDC does not make any factual allegations even purporting to raise a plausible inference that the speakers making these predictions actually did not expect approval to come in March 2012 or did not genuinely believe in the predicted March 2012 approval date.  The facts alleged in the complaint are equally consistent with the predictions being

good-faith projections that simply ended up being incorrect.  Absent any facts alleged to plausibly raise an inference of each speaker's subjective knowledge of falsity, the complaint fails to cross the line from merely alleging facts that could *possibly* set out a claim (with the addition of further facts) and a complaint that *plausibly* states a claim on its face.

Finally, LDC's complaint fails to allege causation for all four statements.  LDC alleges the same theory of harm as the now-dismissed Lanham Act claim—namely, that farmers (the relevant purchasers for Viptera seeds) "read and were influenced by [each of the statements] and that the impact of the [statements] was great enough to cause the embargo that allegedly caused the price drop in this country."  Order on Mots. for Summ. J., ECF No. 3051 ("Summ. J. Order") at 6.  Just as there was no evidence to support that theory of injury at summary judgment, LDC fails to present a single factual allegation to support any of the steps in that causal chain.  To make such a causal theory plausible at the pleading stage would require factual allegations showing at least that: (1) growers relied on the each of the four statements about the timing of Chinese approval on which LDC bases its Lanham Act claim, and (2) it was the incremental sales of Viptera seeds attributable to reliance on those statements—as opposed to Syngenta's prior widespread commercialization in 2011—that produced a sufficient volume of Viptera corn in the U.S. corn supply for MIR162 to end up in shipments to China.  The complaint would thus have to offer facts plausibly showing that farmers relied on Syngenta's statements about the timing of Chinese approval in buying more Viptera seeds *and* that LDC's "injuries would not have occurred but for increased sales traced to" these statements.  Summ. J. Order 6.  But LDC's sole allegations on causation are conclusory assertions that "[o]n information and belief, Syngenta's statements were made to influence purchasing decisions by domestic corn producers" and that "LDC's damages were proximately caused by Syngenta's misleading representations."  Compl. ¶¶ 94, 99.  Such conclusory assertions, devoid of any facts and merely reciting the required element of causation, cannot sustain a claim.

*Second*, LDC tries to repackage the April 2012 Earnings Call, August 2011 Letter, and July 2011 Conference Call into a new state-law claim for fraudulent misrepresentation.  But one of the same flaws that forecloses a Lanham Act claim also bars a fraud claim: all three statements are non-actionable predictions about future events (when China would approve MIR162 for import).  As explained with respect to the Lanham Act claim, LDC does not allege any facts that could plausibly raise an inference that the speaker making each of these predictions subjectively knew at the time that the prediction was false or lacked a good-faith belief in the prediction.  For this exact reason, courts routinely dismiss similar fraud claims based on mistaken predictions as a matter of law.

*Third*, LDC purports to base its negligence claim on alleged misrepresentations.  *See* Compl. ¶ 81.  Every court that has addressed this issue in the Viptera litigation—including this Court—has held as a matter of law that misrepresentations *cannot* be the basis for liability on a general negligence claim.  Instead, to rely upon misrepresentations, a plaintiff must adequately plead facts supporting the elements of the separate tort of negligent misrepresentation.  Here, LDC does even attempt to assert a negligent misrepresentation claim, and the allegations in the complaint could not satisfy the elements of that tort in any event.  Among other things, LDC does not allege that Syngenta is in the business of providing information for the guidance of others in their business transactions.  Accordingly, as with the Producer Plaintiffs' claim, the Court should dismiss LDC's negligence claim to the extent it relies on misrepresentations as the basis for liability.

*Fourth*, the contractual ELD bars LDC's negligence claim.  To protect the ability of parties linked by contracts to allocate risks by contract, the contractual ELD bars claims in tort for purely economic loss and instead relegates parties to the allocation of economic risk that they have reached in their agreements.  LDC is linked to Syngenta by a chain of contracts—contracts, for example, with grain elevators that, in turn, have contracts with farmers who, in turn, have contracts with Syngenta for corn seed.  LDC asks the Court to upset the bargains and allocations

of risk that have been struck in this chain of contracts and to reach back up the chain to Syngenta in tort to "recover economic losses in the form of lost profits when the alleged economic loss flows from the failure of a product to perform as it was expected." *Prairie Prods., Inc. v. Agchem Division-Pennwalt Corp.*, 514 N.E.2d 1299, 1304-05 (Ind. Ct. App. 1987). That is exactly what the contractual ELD prevents.

The Court's previous analysis with respect to the contractual ELD was limited to the observation that Louisiana does not apply the ELD and the holding that, under Minnesota and Mississippi law, the contractual ELD is limited to claims about defective products and does not apply to remote purchasers (*i.e.,* those who did not purchase directly from the defendant). *See* MTD Order 46-47. That analysis does not apply here. The majority of States apply the contractual ELD to bar the claims of any entity connected to the defendant in a chain of contracts, including remote purchasers, and to bar claims for economic loss even when they are not based on the concept of a "defect" found in product-liability cases.

## BACKGROUND

Plaintiff LDC is an international agribusiness that, among other things, "operate[s] interior and export grain elevators, and buy[s], sell[s] and export[s] U.S. grains, including corn intended for shipment to buyers in China." Compl. ¶ 10. LDC alleges (1) direct damages both for its U.S. corn shipments that were rejected by China allegedly due to the presence of MIR162, *id.* ¶¶ 70-72, and for other U.S. corn shipments that were delayed or redirected because of the Chinese rejections, *id.* ¶¶ 72-73, and "increased expenses associated with the delay and diversion of the affected corn shipments," *id.* ¶ 74; and (2) indirect damages for lost profits associated with the "closure of the China export market," *id.* ¶¶ 75-78. LDC asserts four causes of action: negligence, false advertising under the Lanham Act, fraudulent misrepresentation, and tortious interference. *See* Compl. ¶¶ 79-120.

In October 2016, LDC initiated this case in the U.S. District Court for the District of Minnesota.  The case was subsequently transferred to this MDL proceeding, *see* Conditional Transfer Order 74, ECF No. 14, Case No. 2:16-cv-02788-JWL-JPO.  LDC has not conformed its complaint to any of the master complaints.  *See* Compl. at 2 n.2.

## CHOICE OF LAW

Minnesota's choice-of-law rules apply because this case was originally filed in the District of Minnesota.  *See Johnson v. Continental Airlines Corp.*, 964 F.2d 1059, 1063 n.5 (10th Cir. 1992) (MDL court applies the choice-of-law rules of the State where the case was originally filed); MTD Order 7 (same).  Minnesota looks to five factors to determine which State's law applies: "(1) predictability of result; (2) maintenance of interstate order; (3) simplification of judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law." *Schumacher v. Schumacher*, 676 N.W.2d 685, 690 (Minn. Ct. App. 2004).  Based on information in the Complaint, these factors point to Connecticut law as the governing law.

First, as the Minnesota court has explained, the predictability of result factor often "has little bearing on a tort case," Minn. MTD Order 15, because predictability of result "is not of great importance in situations" where a person is injured as a result of an unplanned event that makes the location of the injury fortuitous, *Jepson v. Gen. Casualty Co. of Wis.*, 513 N.W.2d 467, 470 (Minn. 1994).  Here, no single State has a particularly strong connection to Syngenta's alleged activity in selling Viptera seeds, which occurred throughout the United States, *see, e.g.*, Compl. ¶¶ 2, 54 (alleging widespread commercialization "to approximately 12,000 corn producers with a projected yield estimated in September 2011 of 250 million bushels").  Syngenta would thus expect that its "business-related . . . activity," *Schumacher*, 676 N.W.2d at 690, would be governed by each of the States where the sales occurred.  The same is true of LDC's activity in (1) purchasing and exporting U.S. corn containing MIR162 to China to the extent that LDC seeks damages for shipments allegedly

rejected by China for the presence of MIR162, *see* Compl. ¶¶ 69-74, and (2) exporting U.S. corn generally to the extent that LDC seeks damages for the alleged closure of the Chinese market to all U.S. corn shipments, *see id.* ¶¶ 75-78.   LDC "purchases or receives corn from a number of states across the country, and exported such corn to China," *id.* ¶ 19, and would thus expect that its purchase and export of U.S. corn would be governed by each of the States where the purchases and exports occurred.[2]   The location of each party's relevant business activity is thus not determinative. Moreover, the Complaint does not provide specifics on where LDC's activities took place; instead the only State identified by the complaint at this stage is Connecticut, where LDC is headquartered, *see id.* ¶ 10; *cf.* Minn. MTD Order 15 ("This factor does not weigh in favor of Minnesota law or the home state law.").

The second factor, which requires the Court to weigh each State's governmental interest, *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 95 (Minn. 2000), favors applying the law of Connecticut where LDC operated its business and allegedly suffered financial harm.   *See* Compl. ¶ 10 (alleging that LDC has its headquarters in Wilton, Connecticut, and that "[a]ll damages complained of herein were suffered by LDC directly and/or by virtue of an assignment of claims from LDC Asia"); *see also, e.g.*, Restatement (Second) of Conflicts § 145(2) cmt. f (general rule is that "[t]he effect of [a] loss, which is pecuniary in nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business"); *cf. Case Orlando Apts., Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 191 (5th Cir. 2010) ("[F]inancial injuries occur[] in the states where

---

[2]    Similarly, the predictability-of-results factor is indeterminate for Syngenta's three predictions of Chinese import approval of Viptera, which LDC alleges as the basis for its fraud claim.   The statement of Syngenta AG's then-CEO Michael Mack in an April 2012 earnings call, *see* Compl. ¶ 104, involved Mack participating in that call from Switzerland as the CEO of a Swiss company, as this Court has already held.   *See, e.g.*, MTD Order 100; Ex. 5 at 1 (2012 Q1 Trading Statement (Apr. 18, 2012) ("Basel, Switzerland")).   The July 11, 2011 conference call occurred between numerous Syngenta and LDC representatives, Compl. ¶ 104, and the complaint does not allege where any of those individuals were calling from or which of the Syngenta representatives supposedly made the prediction. And the complaint likewise does not indicate where the August 2011 letter to LDC, *id.*, was sent from or where it was sent to.

plaintiffs maintain their principal places of business."); *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 528 (7th Cir. 1981) ("The harm that [plaintiff] suffered and for which it seeks to be compensated was purely economic and as such was sustained in Illinois, where [plaintiff's] principal place of business is located . . . .").

The third factor "is not significant" here because no single State's law on the limited issues raised by this motion is more difficult to apply. *Jepson*, 513 N.W.2d at 472.

Fourth, "Minnesota's interest in allowing recovery for persons injured within its boundaries" does not extend to LDC, which has its headquarters in Connecticut and not Minnesota. *Montpetit v. Allina Health Sys., Inc.*, No. C2-00-571, 2000 WL 1486581, at *3 (Minn. Ct. App. Oct. 10, 2000). In general, other factors being equal, the state where the injury occurred has the strongest governmental interest, and its law should be applied. *Nodak Mut. Ins. Co.*, 604 N.W.2d at 96. At least at the pleadings stage, LDC's allegations identify only one state—Connecticut where LDC is headquartered—as the location where LDC felt its alleged economic loss, as explained above. As a result, Connecticut has an "interest in allowing recovery" for one of its residents. *Montpetit*, 2000 WL 1486581, at *3.

Because the other factors favor LDC's home State of Connecticut, the Court need not consider the fifth factor. *See Schumacher*, 676 N.W.2d at 691-92.

As a result, the only significant factors that can be discerned from the allegations are the maintenance of the interstate order and competing States' interests, both of which—at least based on the information in the complaint—tend to point to Connecticut where LDC is headquartered and where any alleged economic injury would be felt. Syngenta therefore generally cites Connecticut precedent along with other exemplar cases from other jurisdictions, because—given the limited and narrowly focused issues raised on this motion—the legal principles principles governing the common law claims at issue would be similar in all potentially relevant States. *Cf., e.g.*, MTD Order 7 ("The

Court agrees that, under *any* applicable choice-of-law rule, each plaintiff's state-law claims would be governed by the plaintiff's state of residence . . . .") (emphasis added); Minn. MTD Order 13 ("[T]he substantive law of each Plaintiff's home state applies to the Plaintiffs' common law claims."). Syngenta believes, however, that a final choice-of-law analysis will have to await discovery, which will shed more light on issues such as where relevant business activities took place.

## ARGUMENT

## I.   LDC's Lanham Act Claim Fails As A Matter Of Law.

LDC asserts the same Lanham Act theory based on three of the same statements as other plaintiffs' Lanham Act claim that this Court has now dismissed in its entirety as a matter of law. The Court's rulings dismissing the Producer Plaintiffs' Lanham Act claim apply equally here and require dismissal of LDC's Lanham Act claim in its entirety.

As an initial matter, LDC bases its Lanham Act claim solely on "(1) statements in marketing materials published on the Internet such as [Syngenta's] 'Plant With Confidence' fact sheet, and (2) statements indicating that approval from China for MIR162 corn was expected at times when Syngenta knew it was not." Compl. ¶ 88. The only specific example of "marketing materials" identified in the complaint is the passing reference to the "Plant With Confidence" Fact Sheet, and the only predictions of approval for MIR162 identified in the complaint are:

(a) An August 2011 letter from Syngenta to LDC stating that Chinese approval for Viptera is "expected late first quarter of 2012," Ex. 1 at 1; Compl. ¶ 66;

(b) Allegedly "similar representations directly to LDC representatives" during a July 12, 2011 conference call stating that Syngenta expected approval of MIR162 for import by 2012, Compl. ¶ 67; and

(c) Statements by Syngenta's then-CEO during an April 18, 2012 earnings call that "[t]here is an outstanding approval for China, which we expect to have quite frankly within the matter of a couple of days," followed by the express caution to listeners that "the regulatory authorities are not something that we can handicap definitively" and preceded by the "usual customary statement" that the "presentation contains forward-looking statements, which can be identified by terminology such as" the

word "*expect*."  Ex. 2 at 1, 12.

LDC does not allege any other statements as the basis for its Lanham Act claim and makes no attempt to allege facts showing that any other statements satisfy the Tenth Circuit's four-part definition of "commercial advertising or promotion" as necessary to state a false advertising claim under the Lanham Act.  *See* MTD Order 81; *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000).   The Court should thus hold that LDC's Lanham Act claim is "properly considered as relying only on" these four statements—the March 2014 Plant With Confidence Fact Sheet, August 2011 Letter, July 2011 Conference Call, and April 2012 Earnings Call—just as the Court held in limiting the now-dismissed Lanham Act claim to the statements specifically identified in the Producer and Non-Producer Plaintiffs' complaint.  MTD Order 81.[3]

### A. Two Of The Four Statements LDC Has Identified Are Not Actionable "Commercial Advertising Or Promotion" Under The Lanham Act.

To the extent the Lanham Act claim is based on the April 2012 Earnings Call and the July 2011 Conference Call, it must be dismissed because statements made on those calls do not constitute "commercial advertising or promotion" under the Lanham Act.  Under the Tenth Circuit's four-part test, a representation qualifies as "commercial advertising or promotion" only if it is "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services;" and (4) "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."

---

[3]    Unlike the prior Lanham Act claim, LDC's claim does not rely on statements in Syngenta's 2007 petition to the USDA for deregulation of MIR162 or on the request form for biosafety certificates.  *See* Compl. ¶ 47 (describing Deregulation Petition).  In any event, this Court's dismissal of both the Deregulation Petition and the Request Form as a basis for the prior Lanham Act claim would apply equally to any similar claim raised by LDC.  *See* MTD Order 83-84 (dismissing Deregulation Petition as basis for Lanham Act claim for failing to satisfy the "commercial advertising or promotion" requirement because "representations intended to influence government action are not generally intended to influence customers" and the "statements in the petition were not disseminated sufficiently to constitute commercial promotion"); *id.* at 86-87 (dismissing Request Form as basis for Lanham Act claim for failing to satisfy the "commercial advertising or promotion" requirement because the form was "intended for use by exporters to China" and the form was not "disseminated among (and not just available to) the relevant segment of the public, namely Syngenta's customers").

*Proctor & Gamble Co.*, 222 F.3d at 1273-74; MTD Order 82.

The Court has already held that the April 2012 Earnings Call does not meet this test based on indistinguishable allegations about the Earnings Call in Producer Plaintiffs' complaint.  MTD Order 85-86.  As the Court explained, the Producer and Non-Producer Plaintiffs' complaints did not plausibly allege that statements on the Earnings Call were made to influence Syngenta's customers (farmers who purchase corn seed).  To the contrary, "[o]ne would not ordinarily expect a quarterly earnings call to be made for the purpose of influencing customers, and as Syngenta points out, the website referenced in the complaint [containing the transcript for call] lists only nine analysts as the non-Syngenta participants in the call."  *Id.* at 85.  Without "allegations of fact supporting the inference that Mr. Mack's statement was for the purpose of influencing customers (and not for some purpose of educating investors and analysts, for instance)," this Court "conclude[d] that plaintiffs have not stated a plausible claim based on Mr. Mack's statement."  *Id.*  Likewise, "there is no basis for a plausible inference that Mr. Mack's statement was sufficiently disseminated to the [purchasing] public" because its mere availability on the Internet cannot be "equate[d] with dissemination to the public" and "[p]laintiffs have not pleaded that Mr. Mack's statement actually reached some significant portion of the relevant public (customers of Syngenta)."  *Id.* at 86 (emphasis deleted).  The same rulings apply equally to LDC's allegations about the Earnings Call, and it is LDC's burden as a "newly added party" to "demonstrate[] why its case is distinguishable."  Scheduling Order No. 1 ¶ 5(h), ECF No. 123.  Because LDC's complaint contains no additional allegations plausibly suggesting that the earnings call was directed at consumers or disseminated to consumers, the Court's prior ruling applies here and the Earnings Call should be dismissed as a basis for the Lanham Act claim.

For the same reasons, unidentified representations that Syngenta supposedly made to LDC during the July 2011 Conference Call, *see* Compl. ¶ 67, do not amount to "commercial advertising or

promotion."  There is no allegation that any of Syngenta's unidentified statements during the call were made for the purpose of influencing Syngenta's customers.  To the contrary, the complaint alleges that this call occurred only between "Syngenta representatives" and "LDC representatives," *id.*—and thus that the representations could not have been made to farmers or other buyers of Viptera seed who constitute Syngenta's purchasing public.  *Id.*  There is also no allegation that these representations were "sufficiently disseminated" to "some significant portion of the relevant public (customers of Syngenta)."  MTD Order 86; *see also, e.g., Neonatal Prod. Grp., Inc. v. Shields*, No. 13-cv-2601-DDC-KGS, 2014 WL 6685477, at *13 (D. Kan. Nov. 26, 2014) (a statement must actually reach members of the relevant purchasing public to support a Lanham Act claim).  Such a one-off, private call between LDC and Syngenta does not qualify as sufficient dissemination as a matter of law.  *See generally Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 1005 (10th Cir. 2002) ("[T]hese terms ["commercial advertising or promotion")] by their plain, everyday meaning connote *some* level of *public* dissemination of information.") (emphasis in original); *see, e.g., Sigma Dynamics, Inc. v. E Piphany, Inc.*, No. C 04-0569 MJJ, 2004 WL 2648370, at *3 (N.D. Cal. June 25, 2004) (dismissing Lanham Act claims as to statements made during conference calls because "the complaint contains no allegations that consumers [] attend the conference calls"); *Tercica, Inc. v. Insmed Inc.*, No. C 05-5027 SBA, 2006 WL 1626930, at *18 (N.D. Cal. June 9, 2006) (similar); *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 577 (E.D. Pa. 1999) (holding that an "isolated, individualized, informal and oral" statement was not actionable under the Lanham Act), *aff'd*, 229 F.3d 1139 (3d Cir. 2000); *Goldsmith v. Polygram Diversified Ventures Inc.*, No. 94 CIV. 8888 (DLC), 1995 WL 614560, at *7 (S.D.N.Y. Oct. 19, 1995) (holding that "a single letter to a publisher cannot constitute 'advertising or promotion'").

The Court should thus dismiss Lanham Act claims based on the 2012 Earnings Call and July 2011 Conference Call because, as a matter of law, those calls are not actionable "commercial

advertising or promotion."

### B.      Three Of The Four Statements Are Not Plausibly Alleged To Contain False Or Misleading Statements Of Fact.

LDC's Lanham Act claim must also be dismissed because three of the four statements—the July 2011 Conference Call, August 2011 Letter, and April 2012 Earnings Call— are alleged only to contain *predictions* of future government approval and not any actionable false statements of *fact* as required to state a Lanham Act claim.  *See, e.g., Cottrell, Ltd. v. Biotrol Int'l*, 191 F.3d 1248, 1252 (10th Cir. 1999).  "Whether a given statement constitutes an assertion of fact or an opinion is a question of law to be determined by the [c]ourt."  *Rinsley v. Brandt*, 700 F.2d 1304, 1309 (10th Cir. 1983).  It is well settled that predictions are not actionable because they are not representations of *fact*.  As a result, the predictions about Chinese approval are not actionable unless there are factual allegations plausibly showing that the statements were subjectively "known at the time by the speaker to be false" or that the speaker "lack[ed] a good faith belief in the truth of the statement."  *Duty Free Ams., Inc.*, 2014 WL 1329359, at *18, *aff'd*, 797 F.3d 1248 (11th Cir. 2015); *see also, e.g., PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 931 (9th Cir. 2010) (similar).[4]  This Court has already adopted the same rule of law, holding that predictions of Chinese approval can "constitute misrepresentations of fact" only insofar as they implicitly represent "Syngenta's present expectations" and only if the speaker did not actually expect approval to come in March 2012 when the statement was made.   MTD Order 87-88.   Applying this rule, courts routinely hold that

---

[4]     This approach is consistent with the Tenth Circuit's approach to misrepresentations under the Securities Act and under state law governing fraud and negligent misrepresentation, both of which the Tenth Circuit has looked to in interpreting the Lanham Act. *See, e.g., Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 788 (10th Cir. 2016); *cf. MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1119-21 (10th Cir. 2014) (prediction in offering statement that company expected a rebound in its portfolio was an opinion, not a statement of fact, and therefore could not be proven false or misleading); *Indy Lube Invs., L.L.C. v. Wal-Mart Stores, Inc.*, 199 F. Supp. 2d 1114, 1123 (D. Kan. 2002) (it is "well settled that a negligent misrepresentation claim cannot be based on a future event"); *Sunflower Pork, Inc. v. Consol. Nutrition, L.C.*, No. 03-2045-JAR, 2004 WL 1212052, at *15 (D. Kan., June 1, 2004) ("[A] negligent misrepresentation claim may only be based on a 'misrepresentation of pre-existing or present fact.'"); *see infra* pp.14-15, 20 & n.9, 24 (collecting additional cases).

13

statements predicting future government action, like these, are non-actionable opinions as a matter of law. *See, e.g.*, *Marx v. Mack Affiliates*, 265 A.D.2d 202, 203 (N.Y. App. Div. 1999) ("[D]efendants' optimistic projection that governmental approvals for the site plan would be secured shortly when, in fact, they were not secured for over a year, provides no basis for an action for fraud. This was no more than a prediction or opinion, not a misrepresentation of fact.").[5]

There are no factual allegations even purporting to raise a plausible inference that the speakers making these predictions actually did not expect approval to come in March 2012 or did not genuinely believe in the predicted March 2012 approval date. *See, e.g.*, *Star City Sch. Dist. v. ACI Bldg. Sys., LLC*, 844 F.3d 1011, 1016-17 (8th Cir. 2017) ("A statement of future events may constitute fraud if the statement is false and the person making the representation or prediction knows it to be false at the time it is made. The exception requires actual knowledge of falsity."). Based on the lack of any such allegations in the complaint, it is—at a minimum—equally possible based on the allegations that the predictions were good-faith projections that ended up being incorrect. As a result, the complaint fails to cross the line from merely alleging facts that could *possibly* set out a claim (with the addition of further facts) and a complaint that *plausibly* states a claim on its face. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (complaint must contain sufficient factual allegations to "nudge his claims across the line from conceivable to plausible in order to survive a motion to dismiss"); *see, e.g.*, *East Point Sys., Inc. v. Steven Maxim, S2k, Inc.*, 133 F. Supp. 3d 430, 437 (D. Conn. 2015) (applying the general rule against treating predictions as actionable statements of fact and refusing to "allow plaintiffs to proceed with allegations based on 'fraud by hindsight'").

---

[5] *See also, e.g.*, *General Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1357 (S.D. Fla. 2002) (statements "about the effect that a lifting of the Cuban embargo restrictions would have on the trademark rights of Plaintiff" are not actionable false statements of fact), *aff'd*, 54 F. App'x 492 (11th Cir. 2002); *Bass v. Coupel*, 671 So. 2d 344, 351 (La. Ct. App. 1995) (promise that "a subdivision would be approved by the Iberville Parish Police jury" cannot support a fraud claim).

There are no factual allegations, for example, that the predictions "were contradicted by or inconsistent with information available to the [defendant] at the time they were made." *East Point Sys.*, <u>133 F. Supp. 3d at 437</u> (dismissing fraud claim based on predictions). Instead, all that LDC alleges is that the Chinese government raised some "additional issues" with Syngenta's application in 2012. Compl. ¶ 68. To start, that allegation about the issues raised in *2012* cannot possibly show the requisite bad faith as to the alleged predictions made in the July *2011* Conference Call or the August *2011* Letter. More importantly, the mere fact that there may have been some alleged challenges (such as issues raised by the Chinese government in 2012) does not satisfy the bad-faith requirement for asserting a fraud claim based on predictions. "So long as the projections were consistent with data reasonably available to [Syngenta], and there is no particularized allegation that they were not," the complaint fails to plausibly allege that predictions about future Chinese government action were false statements. *East Point Sys., Inc.*, <u>133 F. Supp. 3d at 436-37</u>. There are no such factual allegations in LDC's complaint, and LDC's Lanham Act claim must be dismissed as to the July 2011 Conference Call, August 2011 Letter, and April 2012 Earnings Call.

### C.     LDC Fails To Plausibly Allege Causation For Any Of The Statements.

LDC also has not plausibly alleged that any of Syngenta's four statements *caused* LDC injury. *See Zoller Labs., LLC v. NBTY, Inc.*, <u>111 F. App'x 978, 982</u> (10th Cir. 2004). As both the Supreme Court and this Court have explained, "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, <u>134 S. Ct. 1377, 1395</u> (2014); Summ J. Order 5 (citing *Lexmark*). To show proximate cause, a "plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing *directly* from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark*, <u>134 S. Ct. at 1391</u>. Because the only theories of

injury that LDC asserts are direct expenses from China's rejection of its U.S. corn shipments and indirect lost profits from closure of China as an export market for U.S. corn, *see* Compl. ¶¶ 69-78, LDC necessarily alleges the same theory of Lanham Act harm that the Producer Plaintiffs asserted in their complaint—namely, that the relevant purchasing public for Viptera seeds, "farmers[,] read and were influenced by [each of the statements] and that the impact of the [statements] was great enough to cause the embargo that allegedly caused the price drop in this country."  Summ. J. Order 6.

Because LDC, as a downstream purchaser of harvested corn grain, does not compete with Syngenta, it is necessarily more difficult for LDC to allege causation for a Lanham Act claim.  As the Supreme Court recognized, "a plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation."  *Lexmark*, 134 S. Ct. at 1392.  Just as there was no evidence from the Producer Plaintiffs to support that theory of injury at summary judgment, there is not a single factual allegation in LDC's complaint to support any of the steps in that causal chain. *See, e.g.*, *id.* at 1391 n.6 (holding, as to the Lanham Act, that "like any other element of a cause of action, [proximate cause] must be adequately alleged at the pleading stage in order for the case to proceed," and "[i]f a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed").  To make such a causal theory plausible at the pleading stage, there would have to be factual allegations showing at least that: (1) growers relied on the each of the four statements about the timing of Chinese approval on which LDC bases its Lanham Act claim, and (2) the incremental sales of Viptera seeds attributable to that reliance were the critical factor that produced a sufficient volume of Viptera corn in the U.S. corn supply for MIR162 to end up in shipments to China.  The complaint would thus have to offer facts plausibly showing that farmers relied on Syngenta's statements about the timing of Chinese approval in buying more Viptera seeds *and* that LDC's "injuries would not have occurred but for increased sales traced to" each of the statements.  Summ. J. Order 6.

But LDC's complaint does not contain *any* factual allegations on that score. As the District of Colorado recently explained in dismissing a Lanham Act claim for failure to plausibly plead causation, to make the alleged causal theory here plausible, "the Court would have to infer [several] facts not alleged in [the] [c]omplaint," which the Court "may not" do "in analyzing whether there is a causal connection" on the pleadings and which makes the allegations "insufficient to demonstrate causation." *C5 Med. Werks, LLC v. Ceramtec GmbH*, No. 14-CV-00643-RBJ, 2016 WL 4092955, at *4 (D. Colo. June 10, 2016). LDC's sole allegations on causation are a conclusory and generic assertion (made solely on "information and belief") that the challenged statements were *intended* to influence farmers' purchases, *see* Compl. ¶ 94 ("On information and belief, Syngenta's statements were made to influence purchasing decisions by domestic corn producers."), and a conclusory assertion restating the elements of the cause of action by asserting that "LDC's damages were proximately caused by Syngenta's misleading representations as described herein," *id.* ¶ 99. Neither of those fact-free assertions is enough under the plausibility pleading standard mandated by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and courts consistently dismiss Lanham Act claims for failure to "plead[] facts that . . . demonstrate proximate causation." *Ahmed v. Hosting.com*, 28 F. Supp. 3d 82, 91 (D. Mass. 2014); *see also, e.g.*, *Pulse Health LLC v. Akers Biosciences, Inc.*, No. 3:16-cv-01919-HZ, 2017 WL 131272, at *8 (D. Or. Apr. 14, 2017); *Mitchell v. Sanchez*, No. 14-0996-CV-ODS, 2015 WL 1393266, at *2 (W.D. Mo. Mar. 25, 2015), *aff'd*, 652 F. App'x 491 (8th Cir. 2016). In fact, the allegation based solely on "information and belief" that "Syngenta's statements were made to influence" purchasing decisions does not even allege that the statements *did* or were likely to influence a significant portion of farmers' purchasing decisions—precisely because the complaint does not allege any facts even suggesting that the status of Chinese import approval was material to a significant portion of farmers' seed purchasing decisions when each of the statements was made in July 2011, August 2011, April 2012, and March 2014. And courts in the Tenth Circuit routinely hold

17

that such "information and belief" pleading without any factual allegations to support the asserted belief are deficient as a matter of law.[6]

Indeed, the allegations on causation are particularly deficient for several additional reasons.

*First*, as noted above, LDC has not even alleged that two of the four statements were disseminated to the purchasing public—farmers buying seed. Without that threshold allegation, the complaint cannot raise an inference that those statements influenced purchasing decisions.

*Second*, as to the August 2011 letter, this Court has already explained why any assertion of causation based on that letter makes no sense, and LDC has not provided any factual allegations to overcome the Court's straightforward analysis. As the Court has recognized, LDC's complaint does not present an ordinary theory of injury like the typical Lanham Act claim between competitors in which any increase in a defendant's sales may cause a decrease in plaintiff's sales and each increment could potentially show further damages. Instead, LDC's theory, like the Producer Plaintiffs' failed theory, rests on an unprecedented view of causation under the Lanham Act under which injury is triggered once a threshold amount of Viptera hits the market. As the Court has explained, however, that theory is not viable when based on a letter sent in the summer of 2011, because by the time of the first alleged statement in July 2011, "Syngenta had been selling Viptera for many months and planting for the 2011 season had been completed." Summ. J. Order 6. While the Court reached that conclusion on summary judgment, the same analysis applies here because LDC's own allegations in the complaint equally foreclose the idea that a letter in August 2011 (or a

---

[6]     *See, e.g., Miller Int'l, Inc. v. Clinch Gear, Inc.*, No. 10-CV-01167-WDM-CBS, 2010 WL 4318806, at *2 (D. Colo. Oct. 25, 2010) (allegations provided "upon information and belief" with "no facts from which one could discern what information has led [plaintiff] to believe" that wrongful conduct has occurred are "the type of speculative, conclusory allegations that are insufficient to state a claim"); *Catheter Connections, Inc. v. Ivera Med. Corp.*, No. 2:12-CV-748, 2012 WL 4341743, at *1 (D. Utah Sept. 21, 2012) (dismissing patent infringement claim based on "information and belief" allegation that defendant was making infringing product); *Dorf v. City of Evansville*, No. 11-CV-351-S, 2012 WL 1440343, at *4 (D. Wyo. Apr. 22, 2012) (dismissing claim where "the 'facts' alleged upon information and belief are so generic and vague as to encompass a wide range of conduct," some of which would not be actionable), *aff'd*, 531 F. App'x 836 (10th Cir. 2013).

conference call in July 2011), *after* Viptera had already been planted in the spring of 2011, was the cause for the spread of Viptera.  *See* Compl. ¶¶ 2, 54 (alleging widespread commercialization "to approximately 12,000 corn producers with a projected yield estimated in September 2011 of 250 million bushels"); *id.* ¶ 4 (alleging that Syngenta's commercialization of Viptera "left LDC (and other stakeholders) in a position where, regardless of their actions, the contamination of the U.S. corn market was *inevitable*" and that "[c]ross-pollination, coupled with Syngenta's failure to implement other protective measures *ensured* widespread contamination") (emphasis added).  As a result, "under plaintiffs' own theory of liability here (under which contamination of the entire corn supply through cross-pollination and commingling was inevitable without additional safeguards), there was already more than enough corn containing MIR162 in the system to cause the alleged trade disruption."  Summ. J. Order 7.[7]

*Third*, the "Plant With Confidence" Fact Sheet cited by LDC[8] states on its face that the document did not even come into existence until March 2014—months after China had begun rejecting U.S. corn in November 2013.  *See* Ex. 3 at 2 (Fact Sheet copyrighted in 2014); *Hall v. Assoc. Int'l Ins. Co.*, 494 F. App'x 902, 905-06 (10th Cir. 2012) (affirming district court's reliance on copy of document alleged as the basis for fraudulent misrepresentation claim and affirming dismissal of claim).  Statements that were not made until March 2014 could not possibly have caused an event four months earlier.  Indeed, when Syngenta pointed out that impossibility as to the Producer Plaintiffs' Lanham Act claim, the Producer Plaintiffs "withdrew [the] Plant with Confidence Fact

---

[7]   LDC cannot invoke any presumption of causation.  As this Court explained in rejecting Producer Plaintiffs' attempt to invoke a presumption of causation, a "presumption of causation arises only 'when the defendant has explicitly compared its product to the plaintiff's or the plaintiff is an obvious competitor with respect to the misrepresented product.'"  Summ. J. Order 5 (quoting *Hutchinson v. Pfeil*, 211 F.3d 515, 522 (10th Cir. 2000)).  There is no allegation that Syngenta's statements compared Viptera to some product of LDC's or that LDC competes with Syngenta.  Thus, no presumption of causation applies.  *See, e.g.*, *Hutchinson*, 211 F.3d at 522 (where plaintiff "has no product in competition with" the defendant's product, there is no presumption of injury).

[8]   Compl. ¶ 223 (incorporating Non-Producer 3d. Am. Compl. ¶¶ 214-236); *see* Non-Producer 3d Am. Compl. ¶ 223 (citing http://www.syngenta-us.com/viptera_exports/images/agrisure-viptera-fact-sheet.pdf).

Sheet as a basis for Lanham Act liability."  Summ. J. Order at 4 n.2.

*Fourth,* and finally, all of these deficiencies in LDC's complaint are particularly telling given that LDC had the benefit of all the discovery that had taken place in these coordinated actions when it drafted and filed its complaint in October 2016.  There is certainly no justification for the Court to allow a Lanham Act claim that has already been dismissed as a matter of law when raised by the Producer Plaintiffs to go forward on the basis of LDC's complaint when—despite having access to complete discovery—LDC has not offered any better allegations of causation and has failed to address the defects in causation the Court has already found.

## II.    LDC's Claim For Fraudulent Misrepresentation Fails As A Matter Of Law.

For its fraudulent misrepresentation claim to survive dismissal, LDC must allege facts plausibly establishing the following four elements: "(1) a false representation was made as to a false statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his injury."  *Phillips v. Phillips,* 922 A.2d 1100, 1104 (Conn. App. Ct. 2007).[9]  LDC fails to plausibly allege several of these elements as a matter of law.

*First*, LDC's fraudulent misrepresentation claim should be limited to just three statements. The complaint lists only three statements as the basis for the claim: (1) a prediction during a July 11, 2011 conference call with LDC "that Syngenta fully expected Chinese approval of MIR162 for import by the 2012 U.S. planting season," Compl. ¶ 104; (2) a prediction in an August 2011 letter

---

[9]    The same basic principles apply under the common laws of other potentially applicable States.  *See, e.g.,* *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1345 (11th Cir. 2017) (affirming dismissal of fraud claim because "[f]raud cannot be predicated upon statements which are promissory in nature as to future acts unless there was a present intention not to perform or present knowledge that the future event will not occur"); *Pine Tel. Co. v. Alcatel Lucent USA Inc.*, 617 F. App'x 846, 859-60 (10th Cir. 2015); *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009);  *Luscko v. S. Container Corp.*, 408 F. App'x 631, 635 (3d Cir. 2010); *Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 30 (1st Cir. 1987); *Victory v. Smith*, 392 S.W.3d 892, 894 (Ark. Ct. App. 2012); *Branscum v. Am. Cmty. Mut. Ins. Co.*, 984 P.2d 675, 680 (Colo. Ct. App. 1999); *Enyart v. Transamerica Ins. Co.*, 985 P.3d 556, 562 (Ariz. Ct. App. 1998).

stating "that Chinese approval of MIR162 would be forthcoming in March of 2012," *id.*; and (3) a

prediction during an April 18, 2012 earnings call in which Syngenta's then-CEO stated that:

> There is an outstanding approval for China, which we expect to have
> quite frankly within the matter of a couple of days.  That remains on
> track for approval to the very best of our ability.  Of course, the
> regulatory authorities are not something that we can handicap
> definitively, but we know of no issue with that whatsoever . . . .

*Id.*; *see also* Ex. 2 at 12 (transcript of April 18, 2012 Earnings Call).   The Earnings Call was

preceded by the "usual customary statement" that the "presentation contains forward-looking

statements, which can be identified by terminology such as" the word "*expect*."  Ex. 2 at 1.[10]  The

claim is properly limited to those three statements.  *Cf.* MTD Order 81 (limiting Producer Plaintiffs'

Lanham Act claim to five sets of statements identified in the complaint).

  *Second*, the complaint does not plausibly allege facts showing that Syngenta had the requisite

fraudulent intent when it made each of the three statements.   While Rule 9(b) permits intent to be

"alleged generally," the pleading standard under Rule 8 still applies and still requires the complaint to

allege facts plausibly showing fraudulent intent.   As the Supreme Court explained in *Iqbal*, as used in

Rule 9(b), the term "'generally' is a relative term."   556 U.S. at 686-87.   This language in "Rule 9

merely excuses a party from pleading discriminatory intent under an elevated pleading standard.   It

does not give him license to evade the less rigid—though still operative—strictures of Rule 8"

requiring plausible factual pleading.  *Id.*; *see, e.g.*, *Mourad v. Marathon Petroleum Co. LP*, 654 F.

App'x 792, 798 (6th Cir. 2016) ("While Rule 9(b) clearly dictates that allegations regarding a

defendant's mental state are not subject to the heightened pleading requirements imposed on claims

for fraud or mistake, Appellants fail to recognize that pleadings regarding the conditions of a

---

[10] *See, e.g.*, *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (documents "referred to in the complaint and central to the plaintiff's claim" are properly considered in ruling on a motion to dismiss); *Rose v. Utah State Bar*, 471 F. App'x 818, 820 (10th Cir. 2012) (matters of government and public record are properly subject to judicial notice in ruling on a motion to dismiss).

person's mind, including malice and intent, remain bound by the plausibility requirement of Rule 8."); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) (similar); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) (similar). As a result, a complaint asserting a fraud claim under Connecticut law "must allege facts giving rise to a strong inference of fraudulent intent, which may include facts showing that the defendant(s) had both motive and opportunity to commit fraud, or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *East Point Sys., Inc.*, 133 F. Supp. 3d at 434 (dismissing Connecticut fraud claims for, among other things, inadequate pleading of fraudulent intent) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).

LDC's complaint does not present a "strong inference" of fraudulent intent by alleging facts showing either (1) that Syngenta had motive and opportunity to lie when it made each of these predictions or (2) "conscious misbehavior" or recklessness in making these predictions. As to the motive-and-opportunity prong, the complaint contains no allegations plausibly suggesting why Syngenta would set out to defraud LDC. As the court overseeing Cargill's parallel litigation against Syngenta has recognized, Syngenta and LDC are not competitors and Syngenta has no reason to engage in conduct that would impose losses on LDC. The same deficiency (the failure to allege any facts showing motive) led that court to dismiss Cargill's parallel fraud claim with prejudice. *See* Ex. 6 (Judgment at 15-16, *Cargill, Inc. v. Syngenta AG*, No. 67601 (40th Jud. Dist. Ct., La. June 13, 2012)) (dismissing fraud claim "due to the requisite missing intent"). That court "agree[d] with" Syngenta that Cargill's "allegation of fraud does not suggest a specific intent to gain an unfair advantage or to cause loss or inconvenience to Cargill." *Id.* at 15. As that court explained, the complaint alleges that the "parties are participants in an interconnected industry, but they are not competitors," and thus "[n]othing would be gained by Syngenta having an unfair advantage over Cargill" and Syngenta would not "benefit from a loss by Cargill." *Id.* at 16.

Similarly, the complaint also does not allege facts showing that each of the predictions identified by LDC was the product of conscious misbehavior.  Courts have dismissed fraud claims where the complaint does not allege facts showing that the statements "were contradicted by or inconsistent with information available to the [defendant] at the time they were made."  *East Point Sys., Inc.*, 133 F. Supp. 3d at 437; *see also, e.g.*, *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal of Connecticut fraud claim where the "allegations do not say [] that the company's [statements] were inconsistent with current data").  At the very most, LDC's complaint suggests only that LDC expected Syngenta to be "more skeptical" of its ability to get approval by March 2012, *Shields*, 25 F.3d at 1129, given that China raised "additional issues" with its application in 2012, Compl. ¶ 68.  To start, issues raised in summer *2012* cannot possibly serve as the basis for suggesting conscious misbehavior by speakers months earlier in July 2011, August 2011, or March 2012.  Moreover, the mere fact that China raised "issues" is not enough, because fraud law does not require companies "to take a gloomy, fearful or defeatist view of the future," and permits them, "subject to what current data indicates . . . to be confident about their stewardship and the prospects of the business they manage."  *Shields*, 25 F.3d at 1129-30 (affirming dismissal of Connecticut fraud claim).  Similarly, LDC's boilerplate allegations that Syngenta supposedly "knew" that its predictions "were false or knew it was without a sufficient basis for the representations," Compl. ¶ 104, are exactly the kind of allegations about intent that "so broad and conclusory as to be meaningless," *Shields*, 25 F.3d at 1129 (holding that allegations "that Defendants 'knew but concealed' some things, or 'knew and were reckless in not knowing' other things" are too "conclusory" to satisfy pleading standards).

*Third*, and relatedly, none of Syngenta's three statements predicting Chinese import approval for MIR162 is an actionable false statement of *fact*.  *See Phillips*, 922 A.2d at 1104.  "Whether a given statement constitutes an assertion of fact or an opinion is a question of law to be determined by

23

the [C]ourt." *Rinsley*, 700 F.2d at 1309. The three predictions on which LDC bases its fraud claim are not actionable false statements of fact for the same reason described above in addressing the Lanham Act claim: predictions of future events are not actionable as fraud because they are not representations of *fact*, unless there are factual allegations showing that the statements were subjectively "known at that time by the speaker to be false" or that the speaker "lack[ed] a good faith belief in the truth of the statement." *Duty Free Ams., Inc.*, 2014 WL 1329359, at *18, *aff'd*, 797 F.3d 1248 (11th Cir. 2015); MTD Order 87-88; *see supra* Part I.B. Courts routinely apply this rule to bar fraud claims based on predictions of future government approval. *See supra* p.14 & n.5 (collecting cases). This fundamental common law rule applies to fraud claims under Connecticut law. *See, e.g.*, *In re Paige*, 106 B.R. 346, 350 (Bankr. D. Conn. 1989) ("There can be no statement of fact as to a future event."); *cf. 456 Corp. v. United Natural Foods, Inc.*, No. 3:09-cv-1983 (JBA), 2011 WL 87292, at *3-4 (D. Conn. Jan. 11, 2011) (dismissing fraud claim under Connecticut law because "even though these promises were representations of fact, without a present intent not to fulfill the promises, they could not be *mis*representations of fact," and the complaint did not allege "sufficient factual matter to plausibly suggest that at the time Defendants promised to support the Program they intended not to fulfill the promise") (emphasis in original). For the same reasons explained above in addressing the Lanham Act claim, LDC's complaint does not contain any factual allegations plausibly showing that the speakers making each of these predictions concerning March 2012 approval acted in bad faith or without a genuine belief in the prediction. *See supra* Part I.B. The fraud claim must therefore be dismissed. *See East Point Sys., Inc.*, 133 F. Supp. 3d at 437 (dismissing Connecticut fraud claim based on predictions); *see supra* pp. 14-15, 20 & n.9 (collecting additional authority).

### III.   The Petition Clause Bars Liability Based On Statements Made In Syngenta's Deregulation Petition To The USDA Or In Syngenta's *Bunge* Lawsuit.

LDC appears to base its negligence theory in part on Syngenta's lawsuit against exporter Bunge[11] and on statements in Syngenta's petition to the USDA for deregulation of MIR162.[12]  But any theory of liability based on the *Bunge* lawsuit or statements in the Deregulation Petition must be dismissed for an additional reason: the lawsuit and the petition are constitutionally protected forms of petitioning under the First Amendment's Petition Clause and cannot serve as the basis for liability. *See, e.g.*, *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982); *Tarpley v. Keistler*, 188 F.3d 788 (7th Cir. 1999).[13]

The Deregulation Petition is a paradigmatic petition seeking government action beneficial to the petitioner.  *See, e.g.*, *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 525 (2002).  Speech in such a petition is protected even if it is inaccurate or alleged to be a misrepresentation, and "neither inadvertent misrepresentations, nor misrepresentations lacking any ascertainable effect on the proceedings," are actionable.  *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011) (statements were immunized under the Petition Clause, even "assum[ing] that all of the statements challenged . . . were in fact false"); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124, 128-29 (3d Cir. 1999) (dismissing state tort claims and holding that immunity applies where defendant's petition was not a sham, despite containing alleged misrepresentations); *see also*

---

[11]   *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58 (8th Cir. 2014).

[12]   *See* Compl. 22 & ¶ 60 (pointing to the *Bunge* lawsuit as a way in which "Syngenta [a]cted to [f]rustrate LDC's [i]ndependent [a]ttempts to [a]void [p]urchasing" corn containing MIR162"); *id.* ¶ 47 (alleging that "[i]n its deregulation petition, Syngenta stated that there would be no adverse effects either within or outside the U.S.  Syngenta also indicated that application for approval of the new GM trait was 'in process' in several export markets, including China." (quoting Order on Syngenta's Exception of No Cause of Action at 4, *Cargill, Inc. v. Syngenta*, No. 67061 (40th Jud. Dist. Ct., La. June 15, 2016))).

[13]   Although Syngenta has raised the Petition Clause before, the Court has not yet ruled on immunity under the Petition Clause in addressing Syngenta's prior motions.  *See* Summ. J. Order 7, 9 (noting that "Syngenta argues that such representations are protected by the Constitution's Petition Clause," but not reaching the question because the Court concluded that "alleged misrepresentations cannot be part of the conduct the reasonableness of which the jury determines" on a negligence claim).

*McDonald v. Smith*, 472 U.S. 479, 487 (1985) (Brennan, J., concurring). "The First Amendment requires that we extend substantial 'breathing space' to such expression, because a rule imposing liability whenever a statement was accidently or negligently incorrect would intolerably chill 'would-be critics of official conduct ... from voicing their criticism.'" *McDonald*, 472 U.S. at 486-487 (Brennan, J., concurring) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 272, 279 (1964)); *see also, e.g.*, *Mercatus*, 641 F.3d at 847. As the Seventh Circuit and other courts have explained, an exception to immunity under the Petition Clause could apply "only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding" before the USDA, *Mercatus*, 641 F.3d at 841, 843; *see also Cheminor*, 168 F.3d at 124.

The complaint does not allege that either part of this two-prong test is satisfied. Statements to the USDA about export markets or expected economic effects of commercializing Viptera could not have been material as a matter of law because the USDA "has no power to regulate the adverse economic effects that could follow [a GM trait's] deregulation." *Center for Food Safety v. Vilsack*, 718 F.3d 829, 841 (9th Cir. 2013); MTD Order 15 (holding that the USDA's approval did not "extend[] to the area of the financial impacts in the market of any decision by Syngenta regarding commercialization of the products"). Further, as explained above, predictions about future events— such as future economic effects—are generally not actionable unless the speaker subjectively knew the prediction to be false at the time or lacked a good faith belief in the truth of the statement. *See supra* pp.13-15, 20 & n.9, 24. LDC does not plausibly allege that Syngenta lacked a good faith basis in 2010 to 2011 for its prediction of Chinese approval of MIR162 or the future economic effects of commercialization.

Lawsuits (like the *Bunge* lawsuit) are also a protected form of petitioning, and neither the fact of bringing a lawsuit nor statements made in the course of the litigation can be used as the basis for

liability in tort.[14]  This immunity can be overcome only if LDC alleges facts plausibly raising an inference that the lawsuit was both "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," *Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.*, 508 U.S. 49, 60 (1993), and that the litigant acted subjectively with an intent merely to use the process of the lawsuit itself to harm others (as opposed to seeking a favorable outcome from the lawsuit), *id.; see also BE & K Constr. Co.*, 536 U.S. at 525-26.  LDC does not allege that Syngenta's *Bunge* lawsuit was either "objectively baseless" or subjectively intended as an abuse of process.  Indeed, LDC could not make such a claim, given that the district court in *Bunge* expressly recognized that Syngenta's suit was *not* baseless and went out of its way to "encourage Syngenta, as the losing party, to consider an immediate appeal" because the court "recogniz[ed] that judges might differ on" the court's decision.  *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 820 F. Supp. 2d 953, 991 n. 11 (N.D. Iowa 2011).  As a result, outright dismissal foreclosing any claim in this case basing liability on the *Bunge* lawsuit is warranted.  *See, e.g.*, *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1525 (D. Colo. 1993).

## IV.    All Claims Fail To The Extent That They Are Based On Or Seek Damages For Supposed Physical Injury.

Any theory of liability or damages based on supposed physical injury must be dismissed, because the complaint alleges only economic losses.

*First*, to the extent LDC relies on a so-called "indirect" damages theory—that it lost profits because of the supposed closure of the Chinese export market to U.S. corn and the alleged effect on the price of *all* U.S. corn, *see id.* ¶¶ 75-78—that is the same market-loss theory that this Court has already held is "not derived from [any] physical harm."  MTD Order 20.  The Court's rationale with respect to Producer Plaintiffs' claims applies equally to LDC's claims—under the "indirect" damage

---

[14]    *See, e.g.*, *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1350 (Fed. Cir. 2014).

theory, LDC "suffered the same injury (the same lower prices) whether or not [its] corn was contaminated by Viptera." *Id.* The claim is thus not based on physical injury at all.

*Second*, to the extent that LDC asserts that it suffered "direct" damage because MIR162 corn was present in some of its U.S. corn shipments to China (which allegedly resulted in costs for rejected, delayed, or diverted shipments), *see* Compl. ¶¶ 69-74, that is also insufficient to plausibly allege any *physical harm* to LDC's corn or other property and still amounts to a claim solely for economic losses.  As a threshold matter, to the extent that LDC asserts it had Viptera corn in its shipments of U.S. corn to China, that means that LDC purchased corn containing Viptera.  That places LDC's claims squarely in the contractual ELD analysis addressed below, and LDC cannot sidestep the ELD on the theory that it is asserting physical injury because it plainly has not asserted any physical effect on property *other than* the corn that it purchased.  *See infra* Part IV.

In addition, the mere presence of MIR 162 corn in some of LDC's U.S. corn shipments could not qualify as physical *damage* to its property in any event, because Viptera was fully approved by the U.S. government.  Any corn produced from Viptera could be sold for the same uses and at the same price as all other corn because, upon federal deregulation of MIR162, corn grown from Viptera was a lawful part of the U.S. corn supply under the USDA's broad regulatory definition of "[y]ellow corn."[15]  LDC's only complaint is that it incurred expenses from rejected, delayed, and diverted U.S. corn shipments to China.  *See* Compl. ¶¶ 69-78.  That is the paradigm of pure economic loss.

As *Sample v. Monsanto* held in identical circumstances, there is no physical injury "*even if* GM seeds were 'commingled' with non-GM seeds" precisely because commingling did not render the crop unfit for human consumption and thus did not cause physical harm.  *Sample v. Monsanto*, 283 F. Supp. 2d 1088, 1093 & n.2 (E.D. Mo. 2003) (emphasis added).  The court in *Hoffman*

---

[15]  *See* 7 C.F.R. § 810.402(c)(1) (defining "yellow corn" as "[c]orn that is yellow-kerneled," including "yellow kernels of corn with a slight tinge of red," and that "contains not more than 5.0 percent of corn of other colors").

considered similar allegations about "contamination" of canola with an approved GM trait and reached the same result.  *See Hoffman I*, 2005 SK.C. LEXIS 330, *aff'd*, *Hoffman II*, 2007 SK.C. LEXIS 194.  There, the plaintiffs claimed that GM canola had cross-pollinated with their non-GM crops, which they hoped to sell at a premium as organic crops and on the European market.  The court held that, where a GM seed has been approved for human consumption, "the alleged damage is not of physical harm . . . , but arises from the alleged inability to meet the requirements of organic certifiers or of foreign markets for organic canola."  *Hoffman I*, 2005 SK.C. LEXIS 330 ¶ 72.

Indeed, the USDA's decision deregulating a GM trait like Viptera is itself a determination that the trait "cross-pollinat[ing] with and alter[ing] the genetic structure of other plants . . . [is not] a plant pest harm" because it does "not constitute physical damage or injury to other plants."  *Center for Food Safety v. Vilsack*, 718 F.3d 829, 840 (9th Cir. 2013); *cf. id.* at 835 (explaining that USDA regulates "organisms that cause physical harm to plants through injury, damage, or disease"); *see also* 7 U.S.C. § 7702(14); 7 C.F.R. § 340.1.  In approving Viptera, the USDA concluded that Viptera did not pose a risk of physical harm.  *See also Ctr. for Food Safety*, 718 F.3d at 841 (economic losses due to cross-pollination of GM crops with non-GM crops "are not the result of plant pest harms" because they are not the result of physical injury).  As the Southern District of Illinois recently held, "Viptera was fully deregulated by the U.S. Department of Agriculture in April 2010, meaning that it could be sold without restriction within the United States, including for human consumption," and thus the "Court cannot agree with plaintiffs' implications that Viptera corn is harmful to health."  *In re Syngenta Actions*, No. 3:15-cv-01221-DRH, 2017 WL 1277898, at *12 (S.D. Ill. Apr. 3, 2017) (Herndon, J.).

Cases finding physical harm in the context of *unapproved* GM traits are irrelevant.  As *StarLink* explained, crops are "damaged when they are pollinated" by corn with an unapproved trait (like StarLink) because it "renders what would otherwise be a valuable food crop unfit for human

29

consumption." *In re StarLink Corn Prods. Liab. Litig.*, <u>212 F. Supp. 2d 828, 841</u> (N.D. Ill. 2002). The fact that rendering crops unfit for human consumption may constitute physical "harm" says nothing about the situation here, in which MIR162 was fully approved. In fact, *Sample* distinguished *StarLink* on exactly that basis. *See* <u>283 F. Supp. 2d at 1093</u> n.2.[16]

## V.     The Contractual ELD Bars LDC's Claim Based On Costs Due To Rejected, Delayed, Or Diverted Shipments Of U.S. Corn That Allegedly Contained MIR162.

To the extent that LDC bases its negligence claim on damages for U.S. corn shipments that were rejected, delayed, or diverted because of the presence of MIR162 corn in those shipments, *see* Compl. ¶¶ 69-74, the contractual ELD bars that claim.  As explained below, the Court previously addressed the contractual ELD based solely on state-specific restrictions under the laws of only three states, one of which (Louisiana) does not apply the ELD and another of which (Minnesota) has supplanted the common law rule by statute.  *See* MTD Order 46-47 (addressing Louisiana, Minnesota, and Mississippi law).  Under Connecticut law and the majority rule in other States, the contractual ELD applies here and bars LDC's claim.

The contractual ELD bars unintentional tort claims for economic losses arising from the assertion that goods do not have the value or the qualities that a purchaser expected.  The "long established common law rule . . . is that in the absence of privity of contract between the plaintiff and [the] defendant, or of an injury to the plaintiff's person or property, a plaintiff may not recover in negligence for a purely economic loss." *Lawrence v. O&G Indus., Inc.*, <u>126 A.3d 569, 578</u> (Conn. 2015) (alteration in original); *see also, e.g.*, *Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*, <u>929 N.E.2d 722, 728</u> (Ind. 2010).  That rule reflects the fundamental point that "[t]he common law duty to avoid causing purely economic loss arises only in the context of a breach of

---

[16]     *Bayer CropScience LP v. Schafer*, <u>385 S.W.3d 822, 833</u> (Ark. 2011), and *In re Genetically Modified Rice Litig.*, <u>666 F. Supp. 2d 1004, 1013</u> (E.D. Mo. 2009), are distinguishable on the same basis because the GM Rice cases involved an unapproved trait.

contract," and "[b]ecause no duty to refrain from activity which results in mere economic injury attaches[] but for the existence of a contract, the injured party is limited to contractual remedies." *Dobco, Inc. v. Williams Dev. Co.*, No. X07-CV-990072152S, 2002 WL 1332227, at *1 (Conn. Super. Ct. May 17, 2002).

Like the stranger rule, the contractual ELD precludes the open-ended liability that would result if a manufacturer could be held liable for the spreading economic consequences of some failure of its product to meet expectations. It forecloses "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Charlier*, 929 N.E.2d at 730. It also preserves the distinct roles of tort and contract law. Tort law is concerned with duties to prevent physical harm. By contrast, claims that a "product has not met the customer's expectations" or "that the customer has received 'insufficient product value'" are the concern of "express and implied warranties." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872 (1986); *see also, e.g.*, *Aliki Foods, LLC v. Otter Valley Foods*, 726 F. Supp. 2d 159, 165 (D. Conn. 2010) ("[E]conomic losses resulting from a product failure are barred because they do not implicate the safety concerns of tort law."). Restricting parties to their contract remedies prevents tort law from swallowing contract law and preserves the ability of parties to allocate risks by contract and first-party insurance.

Here, any claim by LDC for economic losses resulting from the alleged presence of MIR162 in its own U.S. corn shipments is barred by the contractual ELD. LDC's fundamental claim is that it was disappointed when the corn it purchased yielded a product (commingled U.S. corn) that could not successfully be imported into China. That is a paradigmatic claim for economic loss by a purchaser disappointed that the goods he purchased do not have the qualities and value he had hoped for.

The policies behind the ELD also apply with particular force here, because LDC could have protected against losses through provisions in its contracts for purchasing corn, including by seeking

warranties that the corn it bought would be suitable for export to China.  Similarly, LDC could have protected itself in its contracts for *selling* the corn to Chinese purchasers by allocating any risk of rejection to the purchaser.  LDC apparently chose to do neither.  As the Connecticut Supreme Court has stated, LDC was "free to allocate the risks, insure against potential losses, and adjust the contract price as [it] deemed most wise," and thus there is "no reason to extricate" LDC from its bargains. *Ulbrich v. Groth*, 78 A.3d 76, 94 (Conn. 2013).  Allowing LDC recovery in tort would permit it to avoid the terms of the bargain it made (and the limited warranties it received) when it purchased corn, as well as avoiding whatever limited warranties grain elevators received when they purchased corn from farmers and that farmers received when they purchased seed from Syngenta.  Allowing LDC to reach back through that chain of contracts, ignoring the limited warranties in each one, to impose liability on Syngenta would eliminate incentives for exporters like LDC (and everyone else in the chain) to rely on contracts to address risks related to export approvals and prevent the entire system of contracts in the industry from ever developing to address such economic risks.  That is exactly the result the contractual ELD is designed to avoid.  The contractual ELD is premised on the view that "commercial entities [are] quite capable of bargaining for express warranties" and courts should not permit tort actions to remove incentives to do so.  *Lexington Ins. Co., Inc. v. W. Roofing Co.*, 316 F. Supp. 2d 1142, 1149 (D. Kan. 2004).

Plaintiff also cannot sidestep the ELD by claiming physical injury to property.  *See supra* Part IV.  As explained above, contact with U.S.-approved Viptera cannot be characterized as causing physical "damage" to Plaintiff's product in any event.

Physical injury suffices to avoid the contractual ELD only where the purchased product "causes personal injury or damage to property *other than* the product . . . itself."  *Indianapolis-Marion Cty. Pub Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010) (emphasis added); *see also Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 154 (Ind. 2005) (ELD

"permits tort recovery only for personal injury or damage to 'other property'").  Where the only injury is to the good itself, the ELD applies.  Here, LDC is complaining about injury to the corn it purchased—namely, that the corn it bought and exported to China contained MIR162.  That involves no injury to *other* property; it simply involves the GM traits in Viptera corn remaining in the corn throughout LDC's export process.

Indeed, Connecticut courts have recognized that the Connecticut legislature, by statute, has determined that purely economic loss may not be recovered through tort by a commercial party such as LDC.  Connecticut General Statute 52-572n(c) provides that "[a]n action for commercial loss caused by a product may be brought *only* under, and shall be governed by, title 42a, the Uniform Commercial Code."  That statute reflects a "legislative policy determination that a distinction exists between a claim for commercial loss sustained by a commercial party and claims for personal injury, death, or property damage."  *Worldwide Pres. Servs., L.L.C. v. IVth Shea, L.L.C.*, No. X-05-CV-980167154S, 2001 WL 34093945, at *9 (Conn. Super. Ct. Feb. 1, 2001).  "[T]he clear language of section 52-572n(c)" establishes "that a legal action for recovery of commercial losses may be brought only under Connecticut's version of the UCC, not under a negligence theory."  *Precision Safety Innovations, Inc. v. Branson Ultrasonic Corp.*, No. CV 04-6981 GPS (PLAX), 2005 WL 5801513, at *8 (C.D. Cal. Aug. 4, 2005).  Because this case "involves pure economic loss, precisely the type of loss recoverable only through principles of contract law," "section 52-572n(c) precludes" LDC's claim "as it[] states a common law negligence claim for the recovery of commercial loss."  *Id.*  In addition, the statute provides "further foundation" for application of the economic loss doctrine under Connecticut law.  *Worldwide Pres. Servs., L.L.C.*, 2001 WL 34093945, at *9.

Although this Court previously identified state-specific reasons for holding that the contractual ELD under three *other* States' laws did not bar negligence claims brought by grain

elevators that had purchased corn grown from Viptera, neither of those reasons applies here.[17]  First, this Court held that the contractual ELD did not apply because the grain elevators had not purchased Syngenta's own product—Viptera *seed*—directly from Syngenta.  Instead, (like LDC here) they had purchased harvested corn from other intermediaries.  *See* MTD Order 47.  Under Connecticut law and the majority approach, however, it is settled the ELD applies to remote purchasers who did not purchase directly from the defendant *and* applies where the defendant made only a component or ingredient incorporated into the product purchased by the plaintiff (like seed incorporated into harvested corn).  Multiple cases have applied the contractual ELD even where the plaintiff purchases a product from an intermediary (not directly from the defendant)[18] and where the plaintiff purchased a finished good that contained the defendant's product as an input (and thus the plaintiff did not purchase simply the defendant's product at all).  As the Iowa Supreme Court has explained, "[w]hen parties enter into a chain of contracts, even if the two parties at issue have not actually entered into an agreement with each other, courts have applied the 'contractual economic loss rule' to bar tort claims for economic loss, on the theory that tort law should not supplant a consensual network of contracts."  *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 501-02 (Iowa 2011).  Any other rule would produce the anomalous result that those purchasing directly from the defendant *could not* recover in tort for economic losses, but those who happened to purchase from

---

[17]    Syngenta preserves its arguments that the contractual ELD applies under those States' laws, but takes the Court's prior rulings as a given for purposes of this motion.

[18]    *See also, e.g.*, *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025 (6th Cir. 2003) (applying contractual ELD to bar claim by purchaser against remote manufacturer where there was no contractual privity); *Nw. Ark. Masonry, Inc. v. Summit Specialty Prods., Inc.*, 31 P.3d 982, 988-89 (Kan. Ct. App. 2001) (explaining that "consumers are not typically in privity of contract with the manufacturer when they purchase products from retailers or wholesalers," but that "[n]evertheless, the economic loss rule applies"); *Progressive Ins. Co. v. GM Corp.*, 749 N.E.2d 484, 489-90 (Ind. 2001) (applying ELD even though purchasers did not buy cars directly from General Motors); *Prairie Production, Inc. v. Agchem Div.—Pennwalt Corp.*, 514 N.E.2d 1299, 1301, 1304-05 (Ind. Ct. App. 1987) (applying ELD to claim against a "remote manufacturer" where plaintiff purchased from an intermediary); *Laurent v. Flood Data Servs.*, 766 N.E.2d 221, 226-27 (Ohio Ct. App. 2001) (applying ELD to bar claim by homeowners against third party service provider which contracted with the homeowners' bank even though that the homeowners "did not have a contractual relationship" with the third party, and explaining that the ELD is a "general rule applicable to situations in which privity of contract is lacking").

intermediaries *could*. As the Third Circuit has explained, that is not the law and the contractual ELD bars a claim against the manufacturer of a component part in the finished product purchased by the plaintiff even though the plaintiff did not purchase that input directly from the defendant. As that court put it, there is "no principled basis for affording the purchaser of a defective product greater relief against the manufacturer of a component part . . . than against the manufacturer of the assembled defective product." *King v. Hilton-Davis*, 855 F.2d 1047, 1051 (3d Cir. 1988). Just as a claim against the seller of the finished product is barred by the ELD, so is a claim against the remote component maker. Nothing in the situation of a remote component supplier could justify "permitting a tort recovery that will allow a purchaser to reach back up the production and distribution chain, thereby disrupting the risk allocations that have been worked out in the transactions comprising that chain." *Id.* at 1054; *see also, e.g.*, *StarLink*, 212 F. Supp. 2d at 839-40 (if the ELD did not apply to a remote purchaser, "then manufacturers would become liable for economic expectations of secondary purchasers"); *Tomka v. Hoescht Celanese Corp.*, 528 N.W.2d 103, 108 (Iowa 1995) (refusing to allow recovery of purely economic losses "to non-privity buyers" because doing so "would seriously hamper the ability of remote sellers to disclaim warranties as allowed by the Uniform Commercial Code").[19]

Thus, it is well settled that the contractual ELD applies where a plaintiff sues the maker of a component or ingredient (like Viptera seed) in a purchased product (like harvested corn). Indeed, the U.S. Supreme Court's seminal decision on the contractual ELD involved exactly such a scenario—a charterer sued the manufacturer of the turbines in a vessel. *See Transamerica Delaval, Inc.*, 476 U.S.

---

[19]    This is the rule generally applied across jurisdictions. *See, e.g.*, *Hininger v. Case Corp.*, 23 F.3d 124, 127 (5th Cir. 1994) (under Texas law, consumer cannot recover economic losses in tort in action against a supplier of a component part in the product the consumer purchased); *accord Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925 (5th Cir. 1987) (suit against designer of steering mechanism in ship) *Progressive Ins. Co. v. Monaco Coach Corp.*, No. 1:05-CV-37-DMR-JMR, 2006 WL 839520, at *3 (S.D. Miss. Mar. 29, 2006) (suit against maker of water heater in motor home); *Capital Motor Lines v. Detroit Diesel Corp.*, 799 F. Supp. 2d 11, 17 (D.D.C. 2011) (suit against maker of engine in a motor coach); *St. Paul Fire & Marine Ins. Co. v. Steeple Jac, Inc.*, 352 N.W.2d 107 (Minn. Ct. App. 1984) (suit against maker of defective gear box incorporated into window washing unit).

at 860-61.  Even though the charterer had not purchased the turbines (or anything else) directly from the defendant, the Supreme Court held that the ELD applied.  *See id.* at 871-72.  As courts have explained, the ELD applies where the plaintiff purchases a "finished product that includes a component supplied by the defendant where the purchaser had no dealings with the defendant." *Gunkel*, 822 N.E.2d at 156.  As *Gunkel* explained, the "central theory" behind the ELD is that "the law should permit the parties to a transaction to allocate the risk that an item sold . . . does not live up to expectations" *Id.* at 155.  As a result, where "a component is sold . . . as part of a finished product, the consequences of its failure [*i.e.,* the failure of the component to meet expectations] are fully within the rationale of the economic loss doctrine"—that is, the purchaser could bargain for guarantees about the product it is purchasing, including all components in it.  *Id.*  Here, corn seed is a component or input that directly affects the qualities of the finished product (harvested corn), and the rationale of the contractual ELD fully applies because LDC could have bargained for some guarantees about the GM traits of the corn it was purchasing.

Second, this Court held that the contractual ELD under Mississippi and Minnesota law did not apply because plaintiffs had not asserted that Viptera was "defective" and the ELD in those two States applies solely to product defect claims.  MTD Order 47.  That holding also does not reflect Connecticut law or the majority rule.  The plaintiffs in *Ulbrich* made the same argument that the contractual ELD "applies only to the delivery of defective goods that have been sold pursuant to the [Uniform Commercial Code]," but the Connecticut Supreme Court rejected that argument.  78 A.3d at 97; *see also, e.g.*, *Triton Envtl., Inc. v. Dalton Enters., Inc.*, 38 Conn. L. Rptr. 518, No. 3482647, 2005 WL 375331, at *5 (Conn. Super. Ct. Jan. 10, 2005) (applying ELD to service contracts).  So, too, have other courts in major corn-producing states where LDC is likely to have purchased corn for export.  For example, as the Seventh Circuit has made clear, the ELD bars claims based on any product or service that did not meet the plaintiff's economic expectations, and applies even where

36

those unmet expectations have no relationship whatsoever to the notion of "defect" found in product liability cases.  *See Bowers v. Fed. Internationale de l'Automobile*, 489 F.3d 316, 325 (7th Cir. 2007) (contractual ELD bars negligence claim by spectators of a race "that was not up to snuff" because racing federation barred teams from using certain tires and thus fewer than all advertised drivers participated).  Likewise, the Indiana Supreme Court has made clear that the "central theory" behind the ELD is that "the law should permit the parties to a transaction to allocate . . . risk" by contract. *Gunkel*, 822 N.E.2d at 155.  Nothing in that rationale restricts the ELD to product "defect" claims. As *Gunkel* explained, "[c]onstruction claims are not necessarily based on defective goods or products, but nonetheless are subject to the economic loss doctrine." *Id*.[20]  Whether or not a claim meets a particular definition for asserting a "defect" is irrelevant; instead, the majority rule is that, "[i]n general, a claim that a product or service did not perform as expected is best left to contract law remedies." *Id*.[21]

Here, LDC asserts solely disappointed commercial expectations and its claim is at the heart of the ELD.  If LDC could escape the ELD simply by avoiding the word "defect," artful pleading would gut the doctrine.  In any event, the substance of LDC's claim is that Viptera seed was not fit for its ordinarily intended purposes, and that is, in essence, a defect claim.[22]

---

[20]   *See also, e.g., Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994) (rejecting the argument that the ELD "extends only to damages caused by *defective products*" and explaining that it applies whenever the plaintiff "purchased products which proved inadequate for [his] purposes, causing [him] lost profits") (emphasis in original); *Adcock v. S. Austin Marine, Inc*., No. 2:08-cv-263KS-MTP, 2009 WL 3633335, at *5 (S.D. Miss. Oct. 30, 2009) (applying ELD where plaintiff complained, not that a product was defective, but that plaintiff was sent the *wrong* product)

[21]   *Gunkel* also made clear that the contractual ELD is not limited to "sale of goods" cases, and the "concepts" behind the doctrine "apply equally in other contexts"—such as contracts for services.  *Gunkel*, 822 N.E.2d at 155. Given that instruction, it would make no sense to restrict the ELD to a particular *type of claim* (product defect) arising solely in cases about goods.

[22]   *See, e.g., Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493 (Tex. Ct. App. 2002) (breach of warranty of fitness for ordinary purpose is a "defect"); *McDonald v. Ford Motor Co.*, 326 N.E.2d 252, 254 (Ohio 1975) (same).

**VI.     The Court's Prior Rulings Apply To Require Partial Dismissal Of LDC's Claims.**

**A.     LDC's Negligence Claim Must Be Dismissed To The Extent That It Is Based On Misrepresentations.**

In the Producer Plaintiffs' case, the Court has already dismissed as a matter of law negligence claims that are "based in whole or in part on any alleged misrepresentations, including any misrepresentation made in the deregulation petition or the *Bunge* suit." Summ. J. Order 9.  As the Court explained, "[t]he law sets forth certain requirements for liability based on negligence with respect to representations, and plaintiffs may not circumvent those requirements by basing an ordinary negligence claim on alleged misrepresentations."  *Id.* at 8; *see also* Minn. Order on Syngenta's Mot. for Partial Judgment on Pleadings at 14-15 (attached as Ex. 7) (agreeing that "Plaintiffs are thus precluded from asserting claims for negligence on the basis of misrepresentations"); *see also* Minn. Order Bifurcating *Mensik* Trial at 2-3 (attached as Ex. 8) (agreeing with Syngenta that trial of plaintiff's negligence claim, which cannot be based on misrepresentations, must be bifurcated from his consumer protection claim, which is based on misrepresentations and carries no jury-trial right, due to unfair prejudice); *Rodriguez v. ECRI Shared Servs.*, 984 F. Supp. 1363, 1368 (D. Kan. 1997) ("to hold otherwise would allow plaintiff to circumvent the more stringent requirements of the torts of defamation, negligent misrepresentation, and tortious interference").  That conclusion flows from the more stringent requirements of the tort of negligent misrepresentation, which the Restatement makes clear exist "because of the extent to which misinformation may be . . . circulated, and the magnitude of the losses" that may follow, and to limit the scope of a defendant's duty to use reasonable care in making statements or providing information to others.  Restatement (Second) of Torts § 552 cmt. a; *see, e.g., Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011, 1022 (D. Conn. 1994) ("Connecticut follows the common law elements of negligent misrepresentation as set forth in the Restatement (Second) of Torts § 552."), *aff'd*, 31 F.3d 66 (2d

Cir. 1994); *Barton v. City of Bristol*, 967 A.2d 482, 494 (Conn. 2009) (same).

Like the negligence claims of Producer Plaintiffs that this Court dismissed insofar as they were based on any alleged misrepresentations, the negligence claims in LDC's complaint are based in part on alleged misrepresentations and the complaint does not assert a negligent misrepresentation claim.[23]  Nor could LDC satisfy the stringent requirements of the tort of negligent misrepresentation. LDC does not allege any facts showing, for example, that Syngenta is in the business of providing information for the guidance of others or that any statements Syngenta supposedly provided about its Viptera and Duracade products were supplied for the guidance of business transactions by exporters such as LDC.  To the contrary, LDC alleges that Syngenta is *not* in the business of providing information because it is only a product "develop[er]" and manufacturer.  Compl. ¶ 19 (alleging that "Syngenta develops and commercializes genetically engineered seeds for sale in the U.S."); *see, e.g.*, MTD Order 90-91 (dismissing negligent misrepresentation theory under parallel circumstances by exporter Trans Coastal); *Tyler v. Gibbons*, 857 N.E.2d 885, 888-89 (Ill. App. Ct. 2006) (dismissing negligent-misrepresentation claim against provider of "chemical products and equipment to agricultural producers" because it was not in the business of providing information).  The Court should thus apply its prior holding that negligence cannot be based on misrepresentations and dismiss any negligence claim to the extent LDC purports to base such a claim on misrepresentations.

**B.    All Of LDC's State Law Claims Must Be Dismissed To The Extent That They Rely On Any Claim That Syngenta Had A Duty To Segregate Viptera, Which Is Preempted By The Grain Standards Act.**

The Court has already agreed with Syngenta that "the GSA preempts any claim against Syngenta based on a duty to make sure that Viptera is kept segregated from other corn" and

---

[23]   *See* Compl. ¶ 81 (alleging that Syngenta "breached its duties" in negligence by "[w]ithholding information regarding the location of Viptera or available testing methodologies from LDC that could have assisted LDC in efforts to avoid purchasing corn containing the MIR162 genetic trait," "[d]istributing misleading information about the importance of the Chinese market," and "[d]istributing misleading information regarding the timing of China's approval of Viptera and/or Duracade").

explained that any claim against Syngenta "based on a duty to assist in channeling or segregation of corn (through contract requirements, education, inspection, or tracing the product through the supply chain) is preempted." Rule 12(c) Order, ECF No. 2426 at 19, 25. Like the Producer Plaintiffs' and Phipps' Plaintiffs' negligence claims that the Court held partially preempted under the GSA, LDC's negligence claim similarly asserts that Syngenta had a duty to ensure that corn grown from Viptera would be kept out of export channels. *See, e.g.*, Compl. ¶ 81 (alleging that Syngenta "s[old] Viptera and/or Duracade to thousands of corn farmers with knowledge that they lacked the mechanisms, experience, ability and/or competence to effectively isolate those products to their home states"). Although LDC apparently acknowledges the GSA's preemptive effect on its claims by noting in a footnote that its claims about "stewardship practices relate only to pre-harvest stewardship practices," *id.* ¶ 2 n.2, the complaint *also* still repeatedly alleges that Syngenta was negligent by "[w]ithholding information regarding . . . available testing methodologies from LDC" that it would have used to test corn grain "in efforts to avoid purchasing corn containing the MIR162 genetic trait," *id.* ¶ 81. But requiring Syngenta to assist LDC in testing corn for the presence of Viptera is exactly a requirement to assist in inspecting corn that is preempted by the Grain Standards Act. *See* Rule 12(c) Order, ECF No. 2426 at 13 (holding that the GSA preempts a "requirement [that] would require testing or inspection or description of the corn as Viptera- or Duracade-free"); *id.* at 25 (holding that "any claim based on a duty *to assist in the channeling or segregation of corn* (through contract requirements, education, inspection, or tracing the product through the supply chain) is preempted" (emphasis added)). For the avoidance of doubt, the Court should make clear that its ruling on Syngenta's motion for partial judgment on the pleadings, ECF No. 2426, equally constrains the scope of LDC's claims here.

   The Court should also hold that the GSA equally preempts all of LDC's state-law claims, not just its negligence claim, to the extent the claims rely on imposing a duty on Syngenta that is

preempted under the GSA.[24]   Judge Sipkins in Minnesota has held that the GSA's express preemption clause "applies equally to" all of a plaintiffs' state-law causes of action.  *See* Minn. Preemption Order 15 ("The GSA preempts any portions of these claims that impose a duty requiring the inspection or description of corn according to the presence of MIR162 as a condition of shipment or sale of the corn in interstate or foreign commerce.").  As the Supreme Court has explained, the scope of preemption does not depend on the particular labels that state law uses to describe a cause of action. Instead, preemption depends on whether liability under state law "signals the breach of a duty" and how the duty imposed by state law "can be satisfied."  *Mutual Pharm. Co., Inc. v. Bartlett*, 133 S. Ct. 2466, 2473-74 (2013).   A court must analyze preemption with respect to each of the plaintiff's particular theories as to how the defendant could have "escape[d] liability."  *Id.*  If a particular theory would impose a requirement that is prohibited under federal law, then that theory for establishing liability is preempted. *Id.* at 2745.  This Court has twice taken the same approach.  *See* Rule 12(c) Order, ECF No. 2426 at 23-25 (analyzing preemption with respect to each particular theory of liability asserted by the complaint); Third-Party MTD Order, ECF No. 1803 at 7 (courts must "determine . . . whether the imposition of such a [general] duty [of reasonable care] in the circumstances of this case (as set forth in the pleadings) would fall within the scope of the GSA's preemption provision").

LDC asserts that Syngenta was under legal duties that constrained Syngenta's conduct under a variety of causes of action—negligence, tortious interference, and fraudulent misrepresentation.  All of these claims are equally preempted to the extent they would impose duties requiring the testing, inspection, description, segregation, or channeling of harvested corn based on the characteristic whether it contains the MIR162 trait.  As the Supreme Court has explained, regardless of the particular form of action, "common-law liability is premised on the existence of a legal duty, and a tort judgment therefore

---

[24]   The Court previously refrained from addressing the scope of GSA preemption with respect to claims other than negligence in the Producer Plaintiffs' complaint solely because the Court interpreted Syngenta's motion for partial judgment on the pleadings as limited to the Producer Plaintiffs' negligence claim.  *See* Rule 12(c) Order 19 n.7.

establishes that the defendant has violated a state-law obligation" to carry out the actions required to avoid liability. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008). Such obligations constitute state-imposed "requirements" that are preempted under federal laws—like the GSA—that expressly prohibit States from "requiring" particular actions. *Id.* Courts have consistently held that negligence, tortious interference, and fraudulent misrepresentation claims rest upon state-imposed duties that may be preempted under federal law. *See, e.g., id.* (negligence claims preempted); *Munro v. Lucy Activewear, Inc.*, No. 16-79 (JRT/KMM), 2016 WL 5660422, at *9 (D. Minn. Sept. 29, 2016) (tortious interference claim preempted); *Caplinger v. Medtronic, Inc.*, 921 F. Supp. 2d 1206, 1219 (W.D. Okla. 2013) (fraudulent misrepresentation claim preempted), *aff'd*, 784 F.3d 1335 (10th Cir. 2015).[25] All of LDC's state-law claims are thus preempted to the same extent by the GSA.

### C.    LDC's State Law Claims Must Be Dismissed To The Extent That They Are Based On A Voluntary Undertaking Theory.

In addressing the claims of the Kansas Class, the Court has already rejected as a matter of law the theory that a voluntary undertaking can provide an "alternative basis for a duty" supporting claims against Syngenta. Summ. J. Order 9-10. The exact same analysis applies here and similarly requires rejecting the theory of voluntary undertaking. Like the Kansas Class, LDC alleges that Syngenta is liable because it supposedly breached duties that it assumed by issuing press releases or adopting corporate policies supporting certain industry guidelines or by making promises in other public statements. *See* Compl. ¶¶ 33-35, 41-44. That theory must be dismissed for four reasons.[26]

*First*, under the Restatement (Second) of Torts, which Connecticut follows, liability for voluntary undertakings "requires a showing of physical harm and is not satisfied by pure economic

---

[25]    Although LDC's fraudulent misrepresentation claim relies on only three statements predicting Chinese import approval of MIR162 in March 2012 and does not currently seem to assert any preempted duty involving the inspection or description of corn, Syngenta includes it here out of an abundance of caution.

[26]    Although the Court originally stated that it was not necessary to rule on voluntary undertaking at the pleadings stage, *see* MTD Order 14 n.6, the Court subsequently made clear that any voluntary undertaking theory is an "alternative basis for a duty" and subject to dismissal as a matter of law. Summ J. Order 9-10. It is thus appropriate to rule on LDC's voluntary-undertaking theory on this motion. *See id.* at 13 (similarly "reject[ing] plaintiffs' argument that Syngenta may not seek summary judgment" on plaintiffs' "alternative theory" of limited launch).

loss." *BNP Paribas Mortg. Corp. v. Bank of Am.*, 949 F. Supp. 2d 486, 518 (S.D.N.Y. 2013). Connecticut applies the same rule. *See, e.g.*, *Waters v. Autuori*, 676 A.2d 357, 363 (Conn. 1996) (dismissing voluntary-undertaking "claim for commercial loss" because "[s]uch a claim does not fall within the confines of 'physical harm' as that term is used in § 324A," and explaining that "[t]he Restatement's express limitation on the type of injury that may constitute 'physical harm' within § 324A is fully in accordance with our own case law"); *Bartolotta v. Liberty Mut. Ins. Co.*, 411 F.2d 115, 119 (2d Cir. 1969) (similar, applying Connecticut law); *see also* Restatement (Second) of Torts §§ 323 & 324A; *see generally Weigold v. Patel*, 840 A.2d 19, 28 (Conn. App. Ct. 2004) (applying Restatement). As this Court held in addressing the claims of the Kansas class, a voluntary-undertaking theory fails as a matter of law "because plaintiffs have not sought to recover for physical harm." Summ. J. Order 10. The same is true here: LDC does not allege any physical harm to its own property, and as explained above, any such theory fails as a matter of law. *See supra* Part IV.

*Second*, Syngenta's policies, press statements, and other "unilateral public statements" do not constitute undertakings as a matter of law. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 849 (8th Cir. 2001). An undertaking requires that the defendant "must have agreed to perform a certain act and have assumed the performance of that act." *Jordan v. NUCOR Corp.*, 295 F.3d 828, 838 (8th Cir. 2002); *see also Hoskinson v. High Gear Repair, Inc.*, 982 F. Supp. 2d 1210, 1223 (D. Kan. 2013) ("Such undertakings are not commonly found."). Courts applying the Restatement (Second) of Torts §§ 323 and 324A have thus universally refused to find an undertaking based on general corporate statements and policies.[27] Likewise, Syngenta's corporate statements expressing

---

[27]  *See, e.g.*, *Ark. Carpenters' Health & Welfare Fund v. Philip Morris Inc.*, 75 F. Supp. 2d 936, 944-45 (E.D. Ark. 1999) ("This Court finds no Arkansas case even remotely suggesting that one can assume the sort of 'special responsibility' plaintiff describes simply by placing advertisements or issuing corporate statements."); *Solis v. Lincoln Elec. Co.*, No. 1:04-CV-17363, 2006 WL 1305068, at *6-7 (N.D. Ohio May 10, 2006) ("corporate statements or advertising," "corporate mission statements," and "internal corporate policies" do not undertake a duty); *Boerner*, 260 F.3d at 848-49 (manufacturer's "unilateral public statements" promising to "pursue public health research about the dangers of cigarette smoking" did not establish undertaking); *In re Welding Fume Prods.*

support for the "non-binding" guidelines in the BIO Policy cannot establish a promise to delay commercialization of Viptera simply because China had not approved it for import. The BIO Policy merely stated in general terms that commercialization should await approval in "key" markets with "functioning regulatory systems." Ex. 4 at 4. It also identified only the U.S., Canada, and Japan— not China—as key export markets with functioning regulatory systems, expressly emphasized that it was "non-binding," and left any market and trade assessment of key markets up to the discretion of each biotechnology company without any "set of detailed mandatory procedures." *Id.* at 1 n.2, 4.[28]

*Third*, any promise-based or undertaking-based theory of duty fails because LDC has not alleged that negligent performance of the undertaking either induced detrimental and reasonable reliance by LDC or increased the risk of physical harm to LDC's property. *See, e.g.*, *Bartolotta*, 411 F.2d at 119 (affirming dismissal of voluntary undertaking theory). LDC does not allege that it relied on Syngenta's statements of support for the BIO Policy or other trade guidelines or on any hypothetical undertaking by Syngenta to restrict its sales of Viptera pending Chinese approval. LDC does not allege, for example, that in the absence of Syngenta's support for industry guidelines, LDC would have tested and segregated the corn it accepted, that it would have refused to accept Viptera corn in the first place, or that it would have refrained from shipping U.S. corn to China. *See, e.g.*, *Bowers v. Federation Internationale de l'Automobile*, 489 F.3d 316, 325 (7th Cir. 2007) (voluntary-

---

*Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *2, *112 (N.D. Ohio June 4, 2010) (rejecting voluntary-undertaking theory based on "defendant's marketing messages promising to be a leader in the field of welding safety"); *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 178 (Iowa 2002) (rejecting argument that manufacturers' "statements that they would report on the results of their research into the health effects of cigarette smoking was an undertaking to render a service to its customers"); *Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 774 (W.D. Ky. 1998) ("vaguely promissory statements" and pledges of "resources to assist the scientific and public health communities with tobacco research" did not undertake a duty); *Baryo v. Philip Morris USA, Inc.*, 435 F. Supp. 2d 961, 969-70 (W.D. Mo. 2006) (no undertaking from statements that defendants were forming a research committee "to provide services to the American Public . . . and to smokers and potential smokers in particular").

[28]   *Honeycutt By & Through Phillips v. City of Wichita*, 836 P.2d 1128, 1141 (Kan. 1992) (no undertaking as a matter of law based on a school district's "policies" and "handbook" because these policies were not "a specific, mandatory set of guidelines sufficient to give rise to a duty" and "contain[ed] no set of detailed mandatory procedures," but instead "clearly leaves to the judgment of the [defendant] the determination when safety patrols are needed, while providing no criteria for that determination").

undertaking theory may proceed based on reliance "only where the plaintiff relies to its detriment on the defendant's help (by failing to perform the task itself, for instance), or where the defendant otherwise leaves the plaintiff worse off than if the defendant had done nothing"). And not only did U.S.-approved MIR162 pose no risk of physical harm to LDC's property as a matter of law, *see supra* Part IV, but it is also not enough for LDC to try to say that Syngenta failed to reduce any supposed risk of physical injury from selling Viptera seeds, because "[a] failure to decrease the risk of harm does not give rise to liability." *Osmanski v. Way*, No. A14-2117, <u>2015 WL 4508423</u>, at *6 (Minn. Ct. App. July 27, 2015).

*Fourth*, there is no allegation that Syngenta specifically promised or otherwise undertook a duty to refrain from commercializing or otherwise restrict its sales of Viptera seeds in the U.S. based on the absence of Chinese import approval. The scope of the defendant's specific undertaking limits any voluntarily assumed duty. *See, e.g.*, *Anderson v. Scheffler*, <u>811 P.2d 1125, 1229</u> (Kan. 1991) (a defendant "cannot be held liable for a task he did not agree to assume"). Courts applying Restatement (Second) of Torts §§ 323 and 324A, thus "apply a 'narrow construction'" in determining the scope of the undertaking. *Bailey v. Edward Hines Lumber Co.*, <u>719 N.E.2d 178, 184</u> (Ill. App. Ct. 1999); *see also, e.g.*, *Doe v. Hunter Oaks Apartments, L.P.*, <u>105 So. 3d 422, 428</u> (Miss. Ct. App. 2013). None of the allegations of Syngenta's statements expressing support for the BIO Policy, or for any other guideline or trade association policies, can be read as a promise to delay commercialization of Viptera simply because China had not yet approved it for import.

## VII.   Syngenta Preserves The Arguments The Court Has Already Addressed.

Out of an abundance of caution, Syngenta preserves all of its prior arguments for dismissal, including but not limited to the following: (1) Syngenta did not owe a duty of reasonable care in negligence, *see* Syngenta's MTD, <u>ECF No. 857 at 21-46</u>; MTD Reply, <u>ECF No. 950 at 4-21</u>; (2) there is no proximate cause as a matter of law, *see* Syngenta's MTD, <u>ECF No. 857 at 21-46</u>; MTD

Reply, ECF No. 950 at 21-26; (3) the stranger economic loss doctrine bars negligence claims like LDC's to the extent they seek market losses due to the alleged closure of China as an export market for U.S. corn, *see* Syngenta's MTD, ECF No. 857 at 46-56; MTD Reply, ECF No. 950 at 26-52; MTD Sur-Sur-Reply, ECF No. 963; (4) exporters like LDC lack standing to bring a Lanham Act claim against Syngenta, *see* Syngenta's MTD, ECF No. 857 at 72-75; MTD Reply, ECF No. 950 at 72-74; (5) plaintiffs cannot satisfy the elements of tortious interference, *see* Syngenta's MTD, ECF No. 857 at 65-70; MTD Reply, ECF No. 950 at 62-72; Syngenta's Opp'n to Mot. for Class Cert. at 106-08; and (6) any non-preempted theory of negligence based on a duty to conduct a limited launch fails to establish causation as a matter of law, *see* Reply in Supp. of Syngenta's Mot. for Partial Judgment on Pleadings, ECF No. 2190 at 20-28; Sur-Sur-Reply, ECF No. 2391 at 11-17.  Syngenta incorporates all of its prior arguments for dismissal solely for the purpose of preserving the arguments.  In accordance with the Court's Scheduling Order No. 1, Syngenta accepts the Court's prior rulings on these issues for purposes of this motion and therefore does not repeat these arguments in detail here.  *See* ECF No. 123 ¶ 5(h).

## CONCLUSION

For the reasons above, the Court should partially dismiss LDC's complaint with prejudice.

Dated: April 28, 2017                  Respectfully submitted,

                                       */s/ Thomas P. Schult*
                                       Thomas P. Schult (tschult@berkowitzoliver.com)
                                       Jennifer B. Wieland (jwieland@berkowitzoliver.com)
                                       Carson M. Hinderks (chinderks@berkowitzoliver.com)
                                       **BERKOWITZ OLIVER LLP**
                                       2600 Grand Boulevard, Suite 1200
                                       Kansas City, MO 64108
                                       Telephone (816) 561-7007
                                       Fax: (816) 561-1888

                                       ***Liaison Counsel for Syngenta Defendants in MDL 2591***


                                       Michael D. Jones (mjones@kirkland.com)
                                       Edwin John U (edwin.u@kirkland.com)
                                       Patrick F. Philbin (patrick.philbin@kirkland.com)
                                       Bridget K. O'Connor (bridget.oconnor@kirkland.com)
                                       Ragan Naresh (ragan.naresh@kirkland.com)
                                       Patrick Haney (patrick.haney@kirkland.com)
                                       **KIRKLAND & ELLIS LLP**
                                       655 15th Street N.W., Suite 1200
                                       Washington, D.C.  20005
                                       Telephone:  (202) 879-5000
                                       Fax:   (202) 879-5200

                                       ***Lead Counsel for Syngenta Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 28, 2017, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

*/s/ Thomas P. Schult*

Thomas P. Schult
