**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| *IN RE SYNGENTA AG MIR 162 CORN  LITIGATION* | Master File No. 2:14-MD-02591-JWL-JPO |
| THIS DOCUMENT RELATES TO: | MDL No. 2591 |
| *Louis Dreyfus Company Grains Merchandising LLC v. Syngenta AG*, No. 2:16-cv-02788-JWL-JPO | |

**SYNGENTA'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION TO PARTIALLY DISMISS FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ........................................................................................ 1

BACKGROUND .......................................................................................... 6

CHOICE OF LAW ...................................................................................... 7

ARGUMENT ............................................................................................. 10

I.    LDC's Lanham Act Claim Fails As A Matter Of Law. ....................................... 10

    A.    LDC's Lanham Act Claim Is Explicitly Limited To Statements Identified In Paragraphs 66 To 83 Of Its Complaint And Must Be Dismissed To The Extent That It Relies On An Alleged Failure To Disclose. .................................. 10

    B.    LDC Fails To Plausibly Allege Causation For Any Of The Statements. ............. 12

    C.    The Statements LDC Has Identified Are Predictions And Opinions About Future Events That Are Not Actionable As Misleading Statements Of Fact. ....................................................................................................... 18

    D.    Several Of The Statements Fail To Satisfy Additional Threshold Requirements For Actionable "Commercial Advertising Or Promotion" And For Pleading With Particularity Under Rule 9(b). ....................................... 21

II.    LDC's Claim For Fraudulent Misrepresentation Fails As A Matter Of Law. .................. 24

III.    All Claims Fail To The Extent That They Are Based On Or Seek Damages For Supposed Physical Injury. ................................................................................... 33

IV.    The Contractual ELD Bars LDC's Negligence Claim Based On Costs Due To Rejected, Delayed, Or Diverted Shipments Of U.S. Corn. ................................ 35

V.    The Court's Prior Rulings Apply To Require Partial Dismissal Of LDC's Claims. ............. 45

    A.    LDC's Negligence Claim Must Be Dismissed To The Extent That It Is Based On Failure To Warn, Instruct, Educate, Or Otherwise Disclose Information. .......... 45

    B.    LDC's Negligence Claim Must Be Dismissed To The Extent That It Is Based On Misrepresentations. ................................................................................... 48

    C.    The Petition Clause Bars Liability Based On Statements Made In Syngenta's Deregulation Petition To The USDA Or In Syngenta's *Bunge* Lawsuit. .............................................................................................. 50

D.      All Of LDC's State-Law Claims Must Be Dismissed To The Extent That They Rely On Any Claim That Syngenta Had A Duty To Segregate Corn Based On Whether It Contains The GM Trait From Viptera. ............................ 53

E.      LDC's State-Law Claims Must Be Dismissed To The Extent That They Are Based On A Voluntary Undertaking Theory. ....................................................... 55

VI.     Syngenta Preserves The Arguments The Court Has Already Addressed. ........................... 59

CONCLUSION .................................................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*456 Corp. v. United Natural Foods, Inc.*,
No. 3:09-cv-1983 (JBA), 2011 WL 87292 (D. Conn. Jan. 11, 2011).....................................30

*Adams v. King Cty.*,
192 P.3d 891 (Wash. 2008)....................................................................................................24

*Adcock v. S. Austin Marine, Inc.*,
No. 2:08-cv-263KS-MTP, 2009 WL 3633335 (S.D. Miss. Oct. 30, 2009)...........................44

*Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*,
243 P.3d 521 (Wash. 2010)....................................................................................................45

*Ahmed v. Hosting.com*,
28 F. Supp. 3d 82 (D. Mass. 2014) .......................................................................................13

*Alejandre v. Bull*,
153 P.3d 864 (Wash. 2007)....................................................................................................45

*Aliki Foods, LLC v. Otter Valley Foods, Inc.*,
726 F. Supp. 2d 159 (D. Conn. 2010)....................................................................................37

*Amity Reg'l Sch. Dist. #5 v. Atlas Const. Co.*,
No. X06CV990153388S, 2000 WL 1161095 (Conn. Super. Ct. July 26, 2000)...................43

*Anderson v. Scheffler*,
811 P.2d 1125 (Kan. 1991)....................................................................................................59

*Annett Holdings, Inc. v. Kum & Go, L.C.*,
801 N.W.2d 499 (Iowa 2011) ................................................................................................40

*Ark. Carpenters' Health & Welfare Fund v. Philip Morris Inc.*,
75 F. Supp. 2d 936 (E.D. Ark. 1999) ....................................................................................57

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................13, 31

*Bailey Farms, Inc. v. NOR-AM Chem. Co.*,
27 F.3d 188 (6th Cir. 1994) ..................................................................................................44

*Bailey v. Edward Hines Lumber Co.*,
719 N.E.2d 178 (Ill. App. Ct. 1999) .....................................................................................59

*Bartolotta v. Liberty Mut. Ins. Co.*,
    411 F.2d 115 (2d Cir. 1969) ............................................................. 56, 58

*Barton v. City of Bristol*,
    967 A.2d 482 (Conn. 2009) ................................................................ 49

*Bass v. Coupel*,
    671 So. 2d 344 (La. Ct. App. 1995) .................................................... 19

*Bayer CropScience LP v. Schafer*,
    385 S.W.3d 822 (Ark. 2011) ............................................................... 35

*BE & K Constr. Co. v. NLRB*,
    536 U.S. 516 (2002) ........................................................................... 51

*Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*,
    881 P.2d 986 (Wash. 1994) ................................................................ 45

*BNP Paribas Mortg. Corp. v. Bank of Am.*,
    949 F. Supp. 2d 486 (S.D.N.Y. 2013) ................................................ 56

*Boerner v. Brown & Williamson Tobacco Corp.*,
    260 F.3d 837 (8th Cir. 2001) ............................................................. 57

*Borough of Duryea v. Guarnieri*,
    564 U.S. 379 (2011) ........................................................................... 50

*Boule v. Hutton*,
    328 F.3d 84 (2d Cir. 2003) ............................................................ 23, 24

*Bowers v. Fed. Internationale de l'Automobile*,
    489 F.3d 316 (7th Cir. 2007) ......................................................... 44, 58

*Branscum v. Am. Cmty. Mut. Ins. Co.*,
    984 P.2d 675 (Colo. Ct. App. 1999) .................................................. 30

*C5 Med. Werks, LLC v. Ceramtec GmbH*,
    No. 14-CV-00643-RBJ, 2016 WL 4092955 (D. Colo. June 10, 2016) ................................................ 13

*California Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) ........................................................................... 50

*Capital Motor Lines v. Detroit Diesel Corp.*,
    799 F. Supp. 2d 11 (D.D.C. 2011) ..................................................... 40

*Caplinger v. Medtronic, Inc.*,
    921 F. Supp. 2d 1206 (W.D. Okla. 2013),
    *aff'd*, 784 F.3d 1335 (10th Cir. 2015) ................................................ 55

*Case Orlando Apts., Ltd. v. Fed. Nat'l Mortg. Ass'n*,
   624 F.3d 185 (5th Cir. 2010) .................................................. 8

*Casper Sleep, Inc. v. Mitcham*,
   204 F. Supp. 3d 632 (S.D.N.Y. 2016) .................................................. 11

*Catheter Connections, Inc. v. Ivera Med. Corp.*,
   No. 2:12-CV-748, 2012 WL 4341743 (D. Utah Sept. 21, 2012) .......................................... 14

*Center for Food Safety v. Vilsack*,
   718 F.3d 829 (9th Cir. 2013) .................................................. 34, 52

*Chandler v. Gene Messer Ford, Inc.*,
   81 S.W.3d 493 (Tex. Ct. App. 2002) .................................................. 44

*Chanoff v. U.S. Surgical Corp.*,
   857 F. Supp. 1011 (D. Conn. 1994), *aff'd*, 31 F.3d 66 (2d Cir. 1994) .................................................. 48

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
   168 F.3d 119 (3d Cir. 1999).................................................. 52

*Citino v. Redevelopment Agency*,
   721 A.2d 1197 (Conn. App. Ct. 1998).................................................. 24

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993).................................................. 23

*Cocona, Inc. v. Singtex Indus. Co.*,
   No. 14-cv-01593-MJW, 2014 WL 5072730 (D. Colo. Oct. 9, 2014).................................................. 15

*Colonial Imports, Inc. v. Carlton Nw., Inc.*,
   853 P.2d 913 (Wash. 1993).................................................. 48

*Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*,
   831 F. Supp. 1516 (D. Colo. 1993).................................................. 51

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014).................................................. 51

*Cottrell, Ltd. v. Biotrol Int'l, Inc.*,
   191 F.3d 1248 (10th Cir. 1999) .................................................. 18

*Dobco, Inc. v. Williams Dev. Co.*,
   No. X07CV990072512S, 2002 WL 1332227 (Conn. Super. Ct. May 17, 2002).................................................. 36

*Doe v. Hunter Oaks Apartments, L.P.*,
   105 So. 3d 422 (Miss. Ct. App. 2013) .................................................. 59

*Dorf v. City of Evansville*,
No. 11-CV-351-S, 2012 WL 1440343 (D. Wyo. Apr. 22, 2012),
*aff'd*, 531 F. App'x 836 (10th Cir. 2013) ................................................. 14

*Drill Masters-Eldorado Tool, Inc. v. PCC Specialty Prods.*,
49 F. Supp. 3d 188 (D. Conn. 2014) ................................................. 36, 42

*Duksa v. Middletown*,
376 A.2d 1099 (Conn. 1977) ................................................. 29

*Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*,
No. 12-cv-60741, 2014 WL 1329359 (S.D. Fla. Mar. 31, 2014),
*aff'd*, 797 F.3d 1248 (11th Cir. 2015) ................................................. 18, 30

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*,
476 U.S. 858 (1986) ................................................. 37, 41

*East Point Sys., Inc. v. Steven Maxim, S2k, Inc.*,
133 F. Supp. 3d 430 (D. Conn. 2015) ................................................. 20, 21, 32

*Energy Four, Inc. v. Dornier Med. Sys., Inc.*,
765 F. Supp. 724 (N.D. Ga. 1991) ................................................. 11

*Expedia, Inc. v. Priceline.com Inc.*,
No. C09-0712RSL, 2009 WL 4110851 (W.D. Wash. Nov. 23, 2009) ................................................. 11

*Feldman v. Am. Dawn, Inc.*,
849 F.3d 1333 (11th Cir. 2017) ................................................. 30

*Fleming v. Gov't Employees Ins. Co.*,
86 F. Supp. 3d 102 (D. Conn. 2015) ................................................. 43

*Fuente Cigar, Ltd. v. Opus One*,
985 F. Supp. 1448 (M.D. Fla. 1997) ................................................. 23

*Ganno v. Lanoga Corp.*,
80 P.3d 180 (Wash. Ct. App. 2003) ................................................. 56

*General Cigar Holdings, Inc. v. Altadis, S.A.*,
205 F. Supp. 2d 1335 (S.D. Fla. 2002),
*aff'd*, 54 F. App'x 492 (11th Cir. 2002) ................................................. 19

*Gordon & Breach Sci. Publishers S.A. v. Am. Institute of Physics*,
859 F. Supp. 1521 (S.D.N.Y. 1994) ................................................. 23

*Graham-Bingham Irrevocable Tr. v. John Hancock Life Ins. Co. USA*,
827 F. Supp. 2d 1275 (W.D. Wash. 2011) ................................................. 30

*Gunkel v. Renovations, Inc.*,
   822 N.E.2d 150 (Ind. 2005) ...................................................................... 41, 42, 44

*Harbinger Capital Partners LLC v. Deere & Co.*,
   632 F. App'x 653 (2d Cir. 2015) ......................................................................... 29

*HDM Flugservice GmbH v. Parker Hannifan Corp.*,
   332 F.3d 1025 (6th Cir. 2003) ............................................................................ 39

*Hininger v. Case Corp.*,
   23 F.3d 124 (5th Cir. 1994) ................................................................................ 40

*Honeycutt By & Through Phillips v. City of Wichita*,
   836 P.2d 1128 (Kan. 1992)........................................................................... 30, 58

*Hoskinson v. High Gear Repair, Inc.*,
   982 F. Supp. 2d 1210 (D. Kan. 2013).................................................................. 57

*Hutchinson v. Pfeil*,
   211 F.3d 515 (10th Cir. 2000) ............................................................................ 17

*In re Genetically Modified Rice Litig.*,
   666 F. Supp. 2d 1004 (E.D. Mo. 2009)................................................................ 35

*In re Paige*,
   106 B.R. 346 (Bankr. D. Conn. 1989) ................................................................. 30

*In re StarLink Corn Prods. Liab. Litig.*,
   212 F. Supp. 2d 828 (N.D. Ill. 2002) ............................................................. 35, 40

*In re Syngenta AG MIR 162 Corn Litig. (Funk)*,
   No. 14-md-2591-JWL-JPO, 2017 WL 2080601 (D. Kan. May 15, 2017)............... 35, 36, 45

*In re Syngenta AG MIR 162 Corn Litig.*,
   131 F. Supp. 3d 1177 (D. Kan. 2015)........... 7, 9, 10, 11, 19, 21, 22, 30, 33, 43, 46, 49, 52, 56

*In re Syngenta AG MIR 162 Corn Litig.*,
   No. 14-md-2591-JWL-JPO, 2016 WL 1312519 (D. Kan. Apr. 4, 2016) ............................. 55

*In re Syngenta AG MIR 162 Corn Litig.*,
   No. 14-md-2591-JWL-JPO, 2016 WL 4382772 (D. Kan. Aug. 17, 2016) ............... 53, 54, 55

*In re Syngenta AG MIR162 Corn Litig.*,
   __ F. Supp. 3d __, No. 14-md-2591-JWL-JPO,
   2017 WL 1250791 (D. Kan. Apr. 5, 2017).................... 2, 3, 12, 13, 15, 16, 17, 27, 48, 50, 56

*In re Syngenta Mass Tort Actions (Poletti)*,
   No. 3:15-cv-01221-DRH, 2017 WL 1277898 (S.D. Ill. Apr. 3, 2017)................................... 35

*In re Syngenta Mass Tort Actions (Tweet)*,
   No. 3:16-cv-00255-DRH, 2017 WL 2117728 (S.D. Ill. May 15, 2017) ................... 46, 49, 53

*In re Welding Fume Prods. Liab. Litig.*,
   No. 1:03-CV-17000, 2010 WL 7699456 (N.D. Ohio June 4, 2010) ...................................... 57

*Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*,
   929 N.E.2d 722 (Ind. 2010) ................................................................. 36, 37, 42

*Indy Lube Invs., L.L.C. v. Wal-Mart Stores, Inc.*,
   199 F. Supp. 2d 1114 (D. Kan. 2002) ...................................................................... 19

*Integrated Bus. Techs., LLC v. Netlink Sols., LLC*,
   No. 16-CV-048-TCK-PJC, 2016 WL 4742306 (N.D. Okla. Sept. 12, 2016) ........................ 15

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*,
   638 F. App'x 778 (10th Cir. 2016) ........................................................................ 19

*Jepson v. Gen. Cas. Co. of Wis.*,
   513 N.W.2d 467 (Minn. 1994) ............................................................................ 7, 9

*Johnson v. Cont'l Airlines Corp.*,
   964 F.2d 1059 (10th Cir. 1992) ............................................................................. 7

*Jordan v. NUCOR Corp.*,
   295 F.3d 828 (8th Cir. 2002) .............................................................................. 57

*K&N Eng'g, Inc. v. Spectre Performance*,
   No. EDCV 09-01900-VAP, 2011 WL 4387094 (C.D. Cal. Sept. 20, 2011) ........................ 11

*Khalik v. United Air Lines*,
   671 F.3d 1188 (10th Cir. 2012) ........................................................................... 21

*King v. Hilton-Davis*,
   855 F.2d 1047 (3d Cir. 1988) .............................................................................. 40

*Koch v. Koch Indus., Inc.*,
   203 F.3d 1202 (10th Cir. 2000) ........................................................................... 22

*Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*,
   24 F. Supp. 2d 755 (W.D. Ky. 1998) .................................................................... 57

*Laurent v. Flood Data Servs.*,
   766 N.E.2d 221 (Ohio Ct. App. 2001) .................................................................. 39

*Lawrence v. O&G Indus., Inc.*,
   126 A.3d 569 (Conn. 2015) ............................................................................... 36

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) .................................................................... 32

*Lexington Ins. Co., Inc. v. W. Roofing Co.*,
    316 F. Supp. 2d 1142 (D. Kan. 2004) ..................................................... 39

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ....................................................................... 12, 13

*Luscko v. S. Container Corp.*,
    408 F. App'x 631 (3d Cir. 2010) ............................................................ 30

*Manwin Licensing Int'l S.A.R.L. v. ICM Registry, LLC*,
    No. CV-11-9514 PSG, 2013 WL 1213772 (C.D. Cal. Feb. 26, 2013) .................................. 23

*Marx v. Mack Affiliates*,
    265 A.D.2d 202 (N.Y. App. Div. 1999) ................................................... 19

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
    674 F.3d 369 (4th Cir. 2012) .................................................................. 32

*McDonald v. Ford Motor Co.*,
    326 N.E.2d 252 (Ohio 1975) ................................................................. 44

*McDonald v. Smith*,
    472 U.S. 479 (1985) ............................................................................... 52

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) .................................................................. 52

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
    761 F.3d 1109 (10th Cir. 2014) .............................................................. 19

*Miller Int'l, Inc. v. Clinch Gear, Inc.*,
    No. 10-CV-01167-WDM-CBS, 2010 WL 4318806 (D. Colo. Oct. 25, 2010) ........................ 14

*Mita v. Guardsmark, LLC*,
    328 P.3d 962 (Wash. Ct. App. 2014) ...................................................... 56

*Mitchell v. Sanchez*,
    No. 14-0996-CV-ODS, 2015 WL 1393266 (W.D. Mo. Mar. 25, 2015),
    *aff'd*, 652 F. App'x 491 (8th Cir. 2016) ............................................... 14

*Montpetit v. Allina Health Sys., Inc.*,
    No. C2-00-571, 2000 WL 1486581 (Minn. Ct. App. Oct. 10, 2000) ...................... 9

*Moore v. Fenex, Inc.*,
    809 F.2d 297 (6th Cir. 1987) ................................................................. 29

*Mourad v. Marathon Petroleum Co. LP*,
  654 F. App'x 792 (6th Cir. 2016) ........................................................ 31

*Munro v. Lucy Activewear, Inc.*,
  No. 16-79, 2016 WL 5660422 (D. Minn. Sept. 29, 2016) ...................... 55

*Mutual Pharm. Co., Inc. v. Bartlett*,
  133 S. Ct. 2466 (2013) .................................................................. 54, 55

*Mylan Labs., Inc. v. Matkari*,
  7 F.3d 1130 (4th Cir. 1993) ............................................................... 11

*N.A.A.C.P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ........................................................................ 50

*New York Times v. Sullivan*,
  376 U.S. 254 (1964) ........................................................................ 52

*Nichols v. Peterson NW, Inc.*,
  389 P.3d 617 (Wash. Ct. App. 2016) ................................................ 42

*Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*,
  604 N.W.2d 91 (Minn. 2000) .......................................................... 8, 9

*Nw. Ark. Masonry, Inc. v. Summit Specialty Prods., Inc.*,
  31 P.3d 982 (Kan. Ct. App. 2001) ..................................................... 39

*Osmanski v. Way*,
  No. A14-2117, 2015 WL 4508423 (Minn. Ct. App. July 27, 2015) ...... 58

*Pacific Boring, Inc. v. Staheli Trenchless Consultants, Inc.*,
  138 F. Supp. 3d 1156 (W.D. Wash. 2015) ......................................... 45

*Pestube Sys., Inc. v. HomeTeam Pest Def., LLC.*,
  No. CIV-05-2832-PHX-MHM, 2006 WL 1441014 (D. Ariz. May 24, 2006) ...... 15

*PhotoMedex, Inc. v. Irwin*,
  601 F.3d 919 (9th Cir. 2010) ............................................................ 18

*Pine Tel. Co. v. Alcatel Lucent USA Inc.*,
  617 F. App'x 846 (10th Cir. 2015) .................................................... 30

*Pittway Corp. v. Lockheed Aircraft Corp.*,
  641 F.2d 524 (7th Cir. 1981) ............................................................. 9

*Pointe at Westport Harbor Homeowners' Ass'n v. Eng'rs Nw., Inc.*,
  376 P.3d 1158 (Wash. Ct. App. 2016) ............................................... 45

*Porous Media Corp. v. Pall Corp.*,
   201 F.3d 1058 (8th Cir. 2000) ........................................... 23

*Prairie Prod., Inc. v. Agchem Division-Pennwalt Corp.*,
   514 N.E.2d 1299 (Ind. Ct. App. 1987) ........................... 5, 39

*Precision Safety Innovations, Inc. v. Branson Ultrasonic Corp.*,
   No. CV 04-6981 GPS, 2005 WL 5801513 (C.D. Cal. Aug. 4, 2005).................. 37

*Price ex rel. Estate of Price v. City of Seattle*,
   24 P.3d 1098 (Wash. Ct. App. 2011)...................................... 56

*Proctor & Gamble Co. v. Haugen*,
   222 F.3d 1262 (10th Cir. 2000) ................................... 10, 21

*Professional Real Estate Invs., Inc. v. Col. Pictures, Inc.*,
   508 U.S. 49 (1993)............................................................ 51

*Progressive Ins. Co. v. GM Corp.*,
   749 N.E.2d 484 (Ind. 2001) ............................................ 39

*Progressive Ins. Co. v. Monaco Coach Corp.*,
   No. 1:05-CV-37-DMR-JMR, 2006 WL 839520 (S.D. Miss. Mar. 29, 2006) ........ 40

*Pulse Health LLC v. Akers Biosciences, Inc.*,
   No. 3:16-cv-01919-HZ, 2017 WL 1371272 (D. Or. Apr. 14, 2017) ................. 13

*Pursuit Partners, LLC v. UBS AG*,
   No. X05CV084013452S, 2009 WL 3286011 (Conn. Super. Ct. Sept. 8, 2009) .......... 29

*Richland Sch. Dist. v. Mabton Sch. Dist.*,
   45 P.3d 580 (Wash. Ct. App. 2002)..................................... 48

*Rickey v. Cline*,
   No. 45873-O-II, 2015 WL 9303145 (Wash. Ct. App. Dec. 22, 2015) ................. 56

*Riegel v. Medtronic, Inc.*,
   552 U.S. 312 (2008).......................................................... 55

*Rinsley v. Brandt*,
   700 F.2d 1304 (10th Cir. 1983) ......................................... 18

*Riverside Healthcare Ctr., Inc. v. Romaniello*,
   No. TTDCV106001234S, 2011 WL 2177241
   (Conn. Super. Ct. May 17, 2011).................................... 6, 47

*Rodriguez v. ECRI Shared Servs.*,
   984 F. Supp. 1363 (D. Kan. 1997)..................................... 48

*Ryan Transp., Inc. v. M & G Assocs.*,
    832 A.2d 1180 (Conn. 2003) ............................................... 47

*Sample v. Monsanto*,
    283 F. Supp. 2d 1088 (E.D. Mo. 2003) .......................................... 34, 35

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012) ................................................ 32

*Scheidt v. Klein*,
    956 F.2d 963 (10th Cir. 1992) ............................................. 14

*Schumacher v. Schumacher*,
    676 N.W.2d 685 (Minn. Ct. App. 2004) ....................................... 7, 9

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ............................................... 31

*Shipco 2295, Inc. v. Avondale Shipyards, Inc.*,
    825 F.2d 925 (5th Cir. 1987) ............................................. 40

*Solis v. Lincoln Elec. Co.*,
    No. 1:04-CV-17363, 2006 WL 1305068 (N.D. Ohio May 10, 2006) .................. 57

*Spring Motors Distributors, Inc. v. Ford Motor Co.*,
    489 A.2d 660 (N.J. 1985) ................................................. 38

*St. Paul Fire & Marine Ins. Co. v. Steeple Jac, Inc.*,
    352 N.W.2d 107 (Minn. Ct. App. 1984) ...................................... 40

*Star City Sch. Dist. v. ACI Bldg. Sys., LLC*,
    844 F.3d 1011 (8th Cir. 2017) ........................................ 3, 15, 19, 32

*State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*,
    592 N.W.2d 201 (Wis. 1999) ............................................... 39

*State v. Lombardo Bros. Mason Contractors, Inc.*,
    54 A.3d 1005 (Conn. 2012) ................................................ 36

*Summit Tech., Inc. v. High-Line Med. Instruments Co.*,
    922 F. Supp. 299 (C.D. Cal. 1996) ........................................ 11

*Sunflower Pork, Inc. v. Consol. Nutrition, L.C.*,
    No. 03-2045-JAR, 2004 WL 1212052 (D. Kan., June 1, 2004) .................... 19

*Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*,
    773 F.3d 58 (8th Cir. 2014) .............................................. 50

*Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*,
   820 F. Supp. 2d 953 (N.D. Iowa 2011) ................................................................. 51

*Tarpley v. Keistler*,
   188 F.3d 788 (7th Cir. 1999) ................................................................................ 50

*Tomka v. Hoescht Celanese Corp.*,
   528 N.W.2d 103 (Iowa 1995) ............................................................................... 40

*Trade Fin. Partners, LLC v. AAR Corp.*,
   573 F.3d 401 (7th Cir. 2009) ................................................................................ 30

*Triton Envtl., Inc. v. Dalton Enters., Inc.*,
   No. 3482647, 2005 WL 375331 (Conn. Super. Ct. Jan. 10, 2005) ........................ 43

*Tyler v. Gibbons*,
   857 N.E.2d 885 (Ill. App. Ct. 2006) ..................................................................... 49

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
   709 F. Supp. 2d 821 (C.D. Cal. 2010) .................................................................. 23

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
   898 F.2d 914 (3d Cir. 1990) ................................................................................. 11

*Ulbrich v. Groth*,
   78 A.3d 76 (Conn. 2013) ................................................................................ 38, 43

*Updike, Kelly & Spellacy, P.C. v. Beckett*,
   850 A.2d 145 (2004) ............................................................................................ 24

*Vertrue Inc. v. Meshkin*,
   429 F. Supp. 2d 479 (D. Conn. Apr. 27, 2006) ..................................................... 24

*Victory v. Smith*,
   392 S.W.3d 892 (Ark. Ct. App. 2012) .................................................................. 30

*Waters v. Autuori*,
   676 A.2d 357 (Conn. 1996) .................................................................................. 56

*Weigold v. Patel*,
   840 A.2d 19 (Conn. App. Ct. 2004) ...................................................................... 56

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*,
   516 F. Supp. 2d 270 (S.D.N.Y. 2007) .................................................................. 11

*Westby v. Gorsuch*,
   50 P.3d 284 (Wash. Ct. App. 2002) ...................................................................... 30

*Whitaker v. W. Essentials, LLC*,
    No. 1:15-CV-00048-TC, 2016 WL 3435185 (D. Utah June 17, 2016) ................................. 15

*Worldwide Pres. Servs., L.L.C. v. IVth Shea, L.L.C.*,
    No. X05CV980167154S, 2001 WL 34093945 (Conn. Super. Ct. Feb. 1, 2001) ............. 37, 43

*Wright v. Brooke Grp. Ltd.*,
    652 N.W.2d 159 (Iowa 2002) ................................................................................................ 57

*Zoller Labs., LLC v. NBTY, Inc.*,
    111 F. App'x 978 (10th Cir. 2004) ...................................................................................... 12

## Statutes And Regulations

7 C.F.R. § 340.1 ........................................................................................................................ 34

7 C.F.R. § 810.402(c)(1) ............................................................................................................ 34

7 U.S.C. § 7702(14) ................................................................................................................... 34

## Rules

Fed. R. Civ. P. 8 .................................................................................................................. 31, 32

Fed. R. Civ. P. 9(b) ........................................................................................... 15, 21, 22, 25, 31

## Other Authorities

Restatement (Second) of Torts § 551 ..................................................................................... 47, 48

Restatement (Second) of Torts § 552 cmt. a ............................................................................... 48

Restatement (Second) of Torts §§ 323 & 324A ............................................................... 56, 57, 59

## <u>INTRODUCTION</u>

Although Louis Dreyfus Co. ("LDC") has not conformed its complaint to any master complaints in this MDL, LDC primarily asserts the same causes of action—supported by largely the same allegations—that the Court has already addressed in ruling on prior motions.  Indeed, LDC not only makes similar allegations, it even incorporates wholesale many of the allegations from the Non-Producer Plaintiffs' Third Amended Master Complaint.  *See* First Amended Complaint, ECF No. 3231-1 at 2 n.2 ("FAC"); *see, e.g., id.* ¶¶ 3, 25, 36, 38, 49, 55, 59-60, 65, 85-86, 98, 100, 103.  As a result, the Court's prior rulings dismissing claims in whole or in part as a matter of law apply equally here.  In particular, three of LDC's claims—the Lanham Act claim, fraudulent misrepresentation, and negligence based on misrepresentations—necessarily fail, because the Court has already ruled that materially indistinguishable allegations fail to state a claim as a matter of law or has made rulings of law on similar claims that logically foreclose the cause of action as pled here.[1]  Where the Court has made such rulings, LDC bears the burden as a "newly added party" to "demonstrate[] why its case is distinguishable."  Scheduling Order No. 1 ¶ 5(h), ECF No. 123.  LDC fails to allege any facts to plausibly make that showing.  Indeed, even though LDC has had the benefit of all of Syngenta's discovery and the benefit of seeing Syngenta's prior motion to dismiss describing the flaws in LDC's original complaint, LDC's First Amended Complaint fails to address the defects requiring dismissal of these claims.  LDC provides no basis for the Court to allow these claims to proceed where the Court has already entered rulings foreclosing critical elements of these claims as a matter of law.

*First*, LDC fails to state a claim under the Lanham Act.  LDC bases its Lanham Act claim solely on statements made from July 2011 to December 2013, all of which relate to the status and

---

[1]   Pursuant to the Court's Scheduling Order, *see* Scheduling Order No. 1 ¶ 5(h), ECF No. 123, Syngenta does not repeat arguments that the Court has already rejected and instead incorporates those arguments by reference solely to preserve issues for appeal.  *See infra* Part VI.

expected timing of Syngenta's application for Chinese approval of MIR162.  The FAC fails to allege causation for any of these statements.  LDC explicitly alleges the same theory of harm as the now-dismissed Lanham Act claim—namely, that farmers (purchasers of Viptera seeds) "read and were influenced by [each of the statements] and that the impact of the [statements] was great enough to cause the embargo that allegedly caused the price drop in this country."  *In re Syngenta AG MIR162 Corn Litig.*, __ F. Supp. 3d __, No. 14-md-2591-JWL-JPO, 2017 WL 1250791, at *3 (D. Kan. Apr. 5, 2017) ("Summ. J. Order"); FAC at 21 (asserting that "Syngenta [d]isseminated [f]alse and [m]isleading [i]nformation to Viptera [s]eed [p]urchasers [i]n [a]n [e]ffort to [i]ncrease [s]ales of MIR162").  LDC fails to present a single factual allegation to support any of the steps in that causal chain.  To make such a causal theory plausible at the pleading stage would require factual allegations showing at least that: (1) growers relied on the each of the statements about the timing of Chinese approval on which LDC bases its Lanham Act claim, and (2) it was "increased sales" of Viptera seeds attributable to reliance on those statements, FAC at 21—as opposed to Syngenta's prior widespread commercialization in 2011—that produced a sufficient volume of Viptera corn in the U.S. corn supply for MIR162 to end up in shipments to China.  The complaint would thus have to offer facts plausibly showing that farmers relied on Syngenta's statements about the timing of Chinese approval in buying more Viptera seeds *and* that LDC's "injuries would not have occurred but for increased sales traced to" these statements.  Summ. J. Order, 2017 WL 1250791, at *3.  But LDC's sole allegations on causation are conclusory assertions—made solely "[o]n information and belief'—Syngenta's statements were made to influence, and did influence, purchasing decisions by U.S. corn farmers" and that LDC's "damages were proximately caused by Syngenta due to its Misrepresentations."  FAC ¶¶ 123, 125.   Such conclusory assertions, devoid of any facts and merely reciting the required element of causation, cannot sustain a claim.

Moreover, LDC's causal theory for the Lanham Act claim does not come to the Court on a

clean slate.  In addressing an indistinguishable Lanham Act claim, the Court has already held that any alleged misrepresentations from the summer of 2011 or later *cannot* be the cause of any eventual Chinese embargo and alleged drop in the price of corn.  As the Court has explained, by the summer of 2011 "Syngenta had been selling Viptera for many months and planting for the 2011 season had been completed" and thus "under plaintiffs' own theory of liability here (under which contamination of the entire corn supply through cross-pollination and commingling was inevitable without additional safeguards), there was already more than enough corn containing MIR162 in the system to cause the alleged trade disruption."  Summ. J. Order, 2017 WL 1250791, at *3.  The same analysis applies here. LDC also asserts that the spread of Viptera was inevitable absent safeguards, but its Lanham Act claim rests solely on alleged misrepresentations from July 2011 and later which, under the Court's holding, all come too late to support a plausible causation theory.  LDC offers no factual allegations to distinguish this case—such as facts showing that later alleged misrepresentations did play some particular role in triggering the embargo.  Thus, the Court's prior causation analysis applies and dooms the Lanham Act claim.

LDC's complaint also fails to establish that Syngenta's predictions regarding Chinese approval contain false statements of *fact*.  As the Court has recognized, predictions about future events are generally not actionable statements of fact.  There is a limited exception where "the statement is false and the person making the representation or prediction knows it to be false at the time it is made"— which "requires actual knowledge of falsity."  *Star City Sch. Dist. v. ACI Bldg. Sys., LLC*, 844 F.3d 1011, 1016-17 (8th Cir. 2017).  LDC does not make any factual allegations even purporting to raise a plausible inference that the speakers making these predictions actually did not expect approval to come in March 2012.  Instead, the facts alleged in the FAC are equally consistent with the predictions being good-faith projections that simply ended up being incorrect.  The complaint fails to cross the line from merely alleging facts that could *possibly* set out a claim (with the addition of further facts) and a

complaint that *plausibly* states a claim on its face.

*Second*, LDC tries to repackage alleged misrepresentations into a new claim for fraudulent misrepresentation. Among other defects, that claim also founders on causation. To the extent LDC intends to suggest that it relied on Syngenta's statements by taking actions that, in turn, influenced farmers to buy more Viptera, there are no factual allegations to support that causal chain and that theory also suffers from the same flaw that dooms the Lanham Act claim. LDC relies solely on statements in July 2011 and January 2012—*after* (under LDC's own allegations) enough Viptera had been planted to ensure its distribution through the corn supply and to trigger the later embargo. To the extent LDC asserts that its reliance on Syngenta's statements led LDC to ship U.S. corn containing Viptera to China in 2013 (thus leading to particular losses on those shipments when they were rejected), that claim also fails for lack of causation. When LDC made contracts and decided to ship corn to China in 2013, it could not have reasonably relied on predictions from 2011 and 2012 that Viptera would be approved in March 2012. Those outdated predictions had been proved wrong more than a year earlier after the first quarter of 2012 passed without approval.

In addition, as with LDC's Lanham Act claim, the statements on which LDC relies for its fraud claim are solely *predictions* about future Chinese approval. The fraud claim thus also fails to allege any misrepresentations of *fact*.

*Third*, the contractual ELD bars LDC's negligence claim. To protect the ability of parties linked by contracts to allocate risks by contract, the contractual ELD bars claims in tort for purely economic loss and instead relegates parties to the allocation of economic risk that they have reached in their agreements. Despite LDC's bald assertion to the contrary, FAC ¶ 20, the allegations in the FAC make clear that LDC *is* linked to Syngenta by a chain of contracts: LDC contracts with grain elevators that, in turn, have contracts with farmers who, in turn, have contracts with Syngenta for corn seed. LDC asks the Court to upset the bargains and allocations of risk that have been struck in this

chain of contracts and to reach back up the chain to Syngenta in tort to "recover economic losses in the form of lost profits when the alleged economic loss flows from the failure of a product to perform as it was expected." *Prairie Prod., Inc. v. Agchem Division-Pennwalt Corp.*, 514 N.E.2d 1299, 1304-05 (Ind. Ct. App. 1987). That is exactly what the contractual ELD prevents. In addition, it is well settled that the contractual ELD applies whether or not the parties are in direct privity, and thus applies equally to remote purchasers of finished or integrated products (such as LDC's purchases of corn grown from Viptera seed) who attempt to sue the maker of an input (such as Syngenta). The contractual ELD thus bars LDC's claim.

The Court's prior analysis with respect to the contractual ELD on the Non-Producer Plaintiffs' claims was limited to the observation that Louisiana does not apply the ELD and the holding that, under Minnesota and Mississippi law, the contractual ELD is limited to claims about defective products and does not apply to remote purchasers (*i.e.,* those who did not purchase directly from the defendant). *See* MTD Order 46-47. That analysis does not apply here. Connecticut law (which applies here) follows the majority rule and applies the contractual ELD to bar the claims of any entity connected to the defendant in a chain of contracts, including remote purchasers, and to bar claims for economic loss even when they are not based on the concept of a "defect" found in product-liability cases.

*Fourth*, LDC purports to base its negligence claim on alleged misrepresentations and failures to warn or disclose. *See* FAC ¶¶ 86-87, 89, 112, 114. This Court has already held as a matter of law that misrepresentations and failures to disclose *cannot* be the basis for liability on a general negligence claim. Instead, to rely upon misrepresentations or failures to disclose, a plaintiff must adequately plead facts supporting the elements of the separate torts of negligent misrepresentation and negligent nondisclosure. Here, LDC does not even attempt to assert claims for negligent misrepresentation or negligent failure to disclose, and the allegations in the complaint could not satisfy the elements of those

torts in any event.  Among other things, LDC does not allege that Syngenta is in the business of providing information for the guidance of others in their business transactions as required for negligent misrepresentation.  Nor does LDC allege that Syngenta and LDC were in a business transaction giving rise to a fiduciary relationship with Syngenta, as required for negligent nondisclosure.  *Riverside Healthcare Ctr., Inc. v. Romaniello*, No. TTDCV106001234S, 2011 WL 2177241, at *1-2 (Conn. Super. Ct. May 17, 2011) (no liability for "negligent nondisclosure, except where a fiduciary duty arose").  Accordingly, as with the Producer Plaintiffs' claim, the Court should dismiss LDC's negligence claim to the extent it relies on misrepresentations or failures to disclose as the basis for liability.

## BACKGROUND

Plaintiff LDC is an international agribusiness that, among other things, "operate[s] interior and export grain elevators, and buy[s], sell[s] and export[s] U.S. grains, including corn, intended for shipment to buyers in China."  FAC ¶ 13.  LDC alleges (1) direct damages both for its U.S. corn shipments that were rejected by China allegedly due to the presence of MIR162, *id.* ¶¶ 102-104, and for other U.S. corn shipments that were delayed or redirected because of the Chinese rejections, *id.* ¶¶ 104-107, and "increased expenses associated with the delay and diversion of the affected corn shipments," *id.* ¶ 107; and (2) indirect damages for market losses and lost profits associated with the "closure of the China export market," *id.* ¶¶ 108-111.  LDC asserts four causes of action: negligence, false advertising under the Lanham Act, fraudulent misrepresentation, and tortious interference.  *See id.* ¶¶ 112-146.

In October 2016, LDC initiated this case in the U.S. District Court for the District of Minnesota. The case was subsequently transferred to this MDL proceeding, *see* Conditional Transfer Order 74, ECF No. 1, Case No. 2:16-cv-02788-JWL-JPO.  LDC has not conformed its complaint to any of the master complaints.  *See* FAC at 2 n.2.  Syngenta moved to dismiss LDC's original complaint, and LDC

responded by filing a First Amended Complaint.

## <u>CHOICE OF LAW</u>

Minnesota's choice-of-law rules apply because this case was originally filed in the District of Minnesota. *See Johnson v. Cont'l Airlines Corp.*, 964 F.2d 1059, 1063 n.5 (10th Cir. 1992) (MDL court applies the choice-of-law rules of the State where the case was originally filed); *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1188 (D. Kan. 2015) ("MTD Order") (same). Minnesota looks to five factors to determine which State's law applies: "(1) predictability of result; (2) maintenance of interstate order; (3) simplification of judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law." *Schumacher v. Schumacher*, 676 N.W.2d 685, 690 (Minn. Ct. App. 2004). Based on information in the Complaint, these factors point to Connecticut law as the governing law.

First, as the Minnesota court has explained, the predictability of result factor often "has little bearing on a tort case," Order at 15, *In re Syngenta Litig.*, No. 27-CV-15-3785 (Hennepin Cty., Minn. Apr. 7, 2016) ("Minn. MTD Order") (Ex. 1), because predictability of result "is not of great importance in situations" where a person is injured as a result of an unplanned event that makes the location of the injury fortuitous, *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 470 (Minn. 1994). Here, no single State has a particularly strong connection to Syngenta's alleged activity in selling Viptera seeds, which occurred throughout the United States, *see, e.g.*, FAC ¶¶ 3, 61-62. Syngenta would thus expect that its "business-related . . . activity," *Schumacher*, 676 N.W.2d at 690, would be governed by each of the States where the sales occurred. The same is true of LDC's activity in (1) purchasing and exporting U.S. corn containing MIR162 to China to the extent that LDC seeks damages for shipments allegedly rejected by China for the presence of MIR162, *see* FAC ¶¶ 101-107, and (2) exporting U.S. corn generally to the extent that LDC seeks damages for the alleged closure of the Chinese market to all U.S. corn shipments, *see id.* ¶¶ 108-111. LDC "purchases or receives corn from a number of states

across the country, and exported such corn to China," *id.* ¶ 24, and would thus expect that its purchase and export of U.S. corn would be governed by each of the States where the purchases and exports occurred.[2]  The location of each party's relevant business activity is thus not determinative.  Moreover, although the complaint alleges that most of LDC's affected exports to China originated from Seattle, Washington, *see* FAC ¶ 105, that activity is at most relevant to LDC's claim of direct damages resulting from its rejected shipments—not its claim of lost profits from closure of the Chinese market.  The more important consideration is that both of those financial injuries were felt at LDC's headquarters in Connecticut.[3]  *See infra* pp.8-9; *cf.* Minn. MTD Order 15 (Ex. 1) ("This factor does not weigh in favor of Minnesota law or the home state law.").

The second factor, which requires the Court to weigh each State's governmental interest, *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 95 (Minn. 2000), favors applying the law of Connecticut where LDC operated its business and allegedly suffered financial harm.  *See* FAC ¶ 13 (alleging that LDC has its headquarters in Wilton, Connecticut, and that "[a]ll damages complained of herein were suffered by LDC directly and/or by virtue of an assignment of claims from LDC Asia"); *see also, e.g.*, Restatement (Second) of Conflicts § 145(2) cmt. f (general rule is that "[t]he effect of [a] loss, which is pecuniary in nature, . . . will normally be felt most severely at the plaintiff's headquarters or principal place of business"); *cf. Case Orlando Apts., Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 191 (5th Cir. 2010) ("[F]inancial injuries occur[] in the states where

---

[2]    Similarly, the predictability-of-results factor is indeterminate for Syngenta's two predictions of Chinese import approval of Viptera, which LDC alleges as the basis for its fraud claim.  The July 7, 2011 conference call occurred between numerous Syngenta and LDC representatives, FAC ¶ 90, and the complaint does not allege where any of those individuals were calling from or which of the Syngenta representatives supposedly made the prediction.  Similarly, the "U.S. Grains Council conference call on January 17, 2012" involved representatives from Syngenta, LDC, and the U.S. Grains Council, and the complaint does not allege where any of those individuals were calling from or the identity of the Syngenta representative.  *Id.* ¶ 92.

[3]    As explained throughout the Argument section, the law relevant to Syngenta's arguments for dismissal is the same in Washington and Connecticut, and thus LDC's claims must be dismissed regardless of whether Washington law applies to part of its claims.

plaintiffs maintain their principal places of business."); *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 528 (7th Cir. 1981) ("The harm that [plaintiff] suffered and for which it seeks to be compensated was purely economic and as such was sustained in Illinois, where [plaintiff's] principal place of business is located . . . .").

The third factor "is not . . . significant" here because no single State's law on the limited issues raised by this motion is more difficult to apply. *Jepson*, 513 N.W.2d at 472.

Fourth, "Minnesota's interest in allowing recovery for persons injured within its boundaries" does not extend to LDC, which has its headquarters in Connecticut and not Minnesota. *Montpetit v. Allina Health Sys., Inc.*, No. C2-00-571, 2000 WL 1486581, at *3 (Minn. Ct. App. Oct. 10, 2000). In general, other factors being equal, the state where the injury occurred has the strongest governmental interest, and its law should be applied. *Nodak Mut. Ins. Co.*, 604 N.W.2d at 96. At least at the pleadings stage, LDC's allegations identify only one state—Connecticut, where LDC is headquartered—as the location where LDC felt its alleged economic loss, as explained above. As a result, Connecticut has an "interest in allowing recovery" for one of its residents. *Montpetit*, 2000 WL 1486581, at *3.

Because the other factors favor LDC's home State of Connecticut, the Court need not consider the fifth factor. *See Schumacher*, 676 N.W.2d at 691-92.

As a result, the only significant factors that can be discerned from the allegations are the maintenance of the interstate order and competing States' interests, both of which—at least based on the information in the complaint—tend to point to Connecticut where LDC is headquartered and where any alleged economic injury would be felt. Syngenta therefore generally cites Connecticut precedent along with other exemplar cases from other jurisdictions, because—given the limited and narrowly focused issues raised on this motion—the legal principles governing the common law claims at issue would be similar in all potentially relevant States. *Cf., e.g.*, MTD Order, 131 F. Supp. 3d at 1188 ("The Court agrees that, under *any* applicable choice-of-law rule, each plaintiff's state-law claims would be

governed by the plaintiff's state of residence . . . .") (emphasis added); Minn. MTD Order 13 (Ex. 1)

("[T]he substantive law of each Plaintiff's home state applies to the Plaintiffs' common law claims.").

Syngenta believes, however, that a final choice-of-law analysis will have to await discovery, which

will shed more light on issues such as where relevant business activities took place.

## ARGUMENT

I.    **LDC's Lanham Act Claim Fails As A Matter Of Law.**

    A.    **LDC's Lanham Act Claim Is Explicitly Limited To Statements Identified In Paragraphs 66 To 83 Of Its Complaint And Must Be Dismissed To The Extent That It Relies On An Alleged Failure To Disclose.**

As an initial matter, LDC affirmatively bases its Lanham Act claim solely on alleged

statements from July 2011 to December 2013 that are identified in paragraphs 66 to 83 of LDC's

complaint, all of which relate to the status and expected timing of Syngenta's application for Chinese

import approval of MIR162. *See* FAC ¶ 120 ("As detailed in paragraphs 66-83 above, Syngenta made

statements in U.S. commerce in the commercial advertising and/or promotion of its corn products

containing MIR162, including Viptera seed (the 'Misrepresentations').").  LDC does not allege any

other statements as the basis for its Lanham Act claim and makes no attempt to allege facts showing

that any other statements satisfy the Tenth Circuit's four-part definition of "commercial advertising or

promotion" as necessary to state a false advertising claim under the Lanham Act.  *See* MTD Order,

131 F. Supp. 3d at 1224; *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000).

In addition, the First Amended Complaint withdraws the March 2014 "Plant With Confidence" fact

sheet and April 2012 Earnings Call as bases for the Lanham Act claim.  The Court should thus hold

that the Lanham Act claim is "properly considered as relying only on" the statements identified in

paragraphs 66 to 83.  *See, e.g.*, MTD Order, 131 F. Supp. 3d at 1224 (limiting Lanham Act claim solely

to specific statements alleged).[4]

To the extent LDC alleges general omissions or failures to disclose as a basis for the Lanham Act claim, the Court should dismiss such a theory. For example, LDC alleges that "from 2011 and through 2013, Syngenta consistently failed to disclose the status of its submissions to China, or the multiple issues and concerns that were raised by the Chinese government during the approval process." FAC ¶ 80. But it is settled that "[a] simple failure to disclose is not a violation of the Lanham Act because the absence of any statement is neither 'false' nor a 'representation.'" *Expedia, Inc. v. Priceline.com Inc.*, No. C09-0712RSL, 2009 WL 4110851, at *3 (W.D. Wash. Nov. 23, 2009). Because "[t]he [Lanham] Act imposes no affirmative duty of disclosure," "a claim cannot be based on the failure to disclose a fact" unless it involves an omission that makes an affirmative statement misleading or untrue. *Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 638 (S.D.N.Y. 2016).[5] LDC's Lanham Act claim should therefore be dismissed to the extent that it is based on alleged general omissions or a failure to disclose information untethered to any affirmative statements that were rendered false or misleading by the alleged omission.[6]

---

[4]    Unlike the Producer and Non-Producer Plaintiffs' Lanham Act claim, LDC's claim does not rely on statements in Syngenta's 2007 petition to the USDA for deregulation of MIR162 or on the request form for biosafety certificates. *See* FAC ¶ 52 (describing Deregulation Petition). In any event, this Court's dismissal of both the Deregulation Petition and the Request Form as a basis for the prior Lanham Act claim would apply equally to any similar claim raised by LDC. *See* MTD Order, 131 F. Supp. 3d at 1224-25; *id.* at 1226-27.

[5]    *See also, e.g.*, *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 921 (3d Cir. 1990) ("While it has been stated that a failure to disclose facts is not actionable under § 43(a), it is equally true that a statement is actionable under § 43(a) if it is affirmatively misleading, partially incorrect, or untrue as a result of failure to disclose a material fact."); *Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, 516 F. Supp. 2d 270, 286 (S.D.N.Y. 2007); *Energy Four, Inc. v. Dornier Med. Sys., Inc.*, 765 F. Supp. 724, 731 (N.D. Ga. 1991) (same); *K&N Eng'g, Inc. v. Spectre Performance*, No. EDCV 09-01900-VAP (DTBx), 2011 WL 4387094, at *18 (C.D. Cal. Sept. 20, 2011) (collecting cases and concluding that "the case law indicates Spectre cannot bring a claim under the Lanham Act based on K & N's omission of a fact from its product packaging").

[6]    *See, e.g.*, *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138-39 (4th Cir. 1993) (affirming dismissal of Lanham Act claim based on theory that defendant failed to disclose lack of government approval, absent affirmative misrepresentation that the drug had been approved); *Summit Tech., Inc. v. High-Line Med. Instruments Co.*, 922 F. Supp. 299, 306 (C.D. Cal. 1996) ("[A] Lanham Act claim alleging that the defendant had failed to disclose FDA non-approval could not stand.").

### B.     LDC Fails To Plausibly Allege Causation For Any Of The Statements.

LDC also has not plausibly alleged that any of Syngenta's statements from July 2011 to December 2013 *caused* LDC injury.  *See Zoller Labs., LLC v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004).  As both the Supreme Court and this Court have explained, under the Lanham Act, "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014); Summ J. Order, 2017 WL 1250791, at *2 (citing *Lexmark*).  To show proximate cause, a "plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing *directly* from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff."  *Lexmark*, 134 S. Ct. at 1391.  LDC, as a downstream purchaser of harvested corn grain, does not compete with Syngenta, making it necessarily more difficult for LDC to allege causation for a Lanham Act claim.  As the Supreme Court recognized, "a plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation."  *Id.* at 1392.

Because the only theories of injury that LDC asserts are that China's rejection of U.S. corn led to (1) market losses and lost profits from closure of China as an export market and lower corn prices, and (2) expenses from the rejection of LDC's own U.S. corn shipments to China, *see* FAC ¶¶ 101-11, LDC necessarily alleges the same theory of causation that the Producer Plaintiffs asserted—namely, that the relevant purchasing public for Viptera seeds, "farmers[,] read and were influenced by [each of the statements] and that the impact of the [statements] was great enough to cause the embargo," which led to LDC's injury (both from the alleged general drop in the price of corn and from expenses related to rejected shipments).  Summ. J. Order, 2017 WL 1250791, at *3.  The First Amended Complaint does not even come close to alleging facts sufficient to plausibly allege causation under that theory.

*First*, as an initial matter, even if the complaint were examined on a clean slate—as if this were

the first time that a Lanham Act claim had been presented in this litigation—it is deficient on its face because there is not a single factual allegation to support any of the steps in that causal chain. *See, e.g.*, *Lexmark*, 134 S. Ct. at 1391 n.6 (holding that "like any other element of a cause of action, [proximate cause] must be adequately alleged at the pleading stage in order for the case to proceed"). To plausibly alleged causation, LDC would have to present factual allegations showing at least that: (1) growers relied on the statements about the timing of Chinese approval on which LDC bases its Lanham Act claim, and (2) the incremental sales of Viptera seeds attributable to that reliance were the critical factor that produced a sufficient volume of Viptera corn in the U.S. corn supply for MIR162 to end up in shipments to China. The complaint would thus have to offer facts plausibly showing that farmers relied on Syngenta's statements about the timing of Chinese approval in buying more Viptera seeds *and* that LDC's "injuries would not have occurred but for increased sales traced to" each of the statements. Summ. J. Order, 2017 WL 1250791, at *3.

LDC's complaint does not contain any factual allegations at all on that score. Instead, to fill out the causal chain, "the Court would have to infer [several] facts not alleged in [the] [c]omplaint," which the Court "may not" do "in analyzing whether there is a causal connection" sufficient to support a Lanham Act claim. *C5 Med. Werks, LLC v. Ceramtec GmbH*, No. 14-CV-00643-RBJ, 2016 WL 4092955, at *4 (D. Colo. June 10, 2016). That alone makes the allegations "insufficient to demonstrate causation." *Id.* LDC's sole allegations on causation are a conclusory assertion (made solely on "information and belief" to boot) that the challenged statements were *intended* to influence farmers' purchases, *see* FAC ¶ 123), and a conclusory assertion simply stating the causal theory, without alleging any facts to support it, *id.* ¶ 125. That is not enough under the plausibility pleading standard mandated by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and courts consistently dismiss Lanham Act claims for failure to "plead[] facts that . . . demonstrate proximate causation." *Ahmed v. Hosting.com*, 28 F. Supp. 3d 82, 91 (D. Mass. 2014); *see also, e.g.*, *Pulse Health LLC v. Akers Biosciences, Inc.*, No.

3:16-cv-01919-HZ, 2017 WL 1371272, at *8 (D. Or. Apr. 14, 2017); *Mitchell v. Sanchez*, No. 14-0996-CV-ODS, 2015 WL 1393266, at *2 (W.D. Mo. Mar. 25, 2015), *aff'd*, 652 F. App'x 491 (8th Cir. 2016). The allegation based solely on "information and belief" that "Syngenta's statements were made to influence" purchasing decisions, FAC ¶ 123, is insufficient precisely because the complaint does not allege any facts even suggesting that the status of Chinese import approval was material to a significant portion of farmers' seed purchasing decisions when each of the statements was made in 2011 to 2013.

Moreover, LDC cannot rely on "information and belief" pleading. Such pleading is permissible only "when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992). Whether and to what extent third-party farmers relied on any of the statements LDC identifies when they were deciding to purchase Viptera seeds is not "peculiarly within [Syngenta's] knowledge." Moreover, LDC's complaint does not make any factual allegations to support the belief that farmers relied upon Syngenta's statements about expected Chinese approval in determining whether to purchase and plant Viptera seeds or to support the belief that reliance on those statements was critical for driving sales of Viptera to the level needed to allegedly result in the Chinese embargo. Courts in the Tenth Circuit routinely hold that such "information and belief" pleading without any factual allegations to support the asserted belief are deficient as a matter of law.[7] Indeed, the

---

[7]    *See, e.g.*, *Miller Int'l, Inc. v. Clinch Gear, Inc.*, No. 10-CV-01167-WDM-CBS, 2010 WL 4318806, at *2 (D. Colo. Oct. 25, 2010) (allegations provided "upon information and belief" with "no facts from which one could discern what information has led [plaintiff] to believe" that wrongful conduct has occurred are "the type of speculative, conclusory allegations that are insufficient to state a claim"); *Catheter Connections, Inc. v. Ivera Med. Corp.*, No. 2:12-CV-748, 2012 WL 4341743, at *1 (D. Utah Sept. 21, 2012) (dismissing patent infringement claim based on "information and belief" allegation that defendant was making infringing product); *Dorf v. City of Evansville*, No. 11-CV-351-S, 2012 WL 1440343, at *4 (D. Wyo. Apr. 22, 2012) (dismissing claim where "the 'facts' alleged upon information and belief are so generic and vague as to encompass a wide range of conduct," some of which would not be actionable), *aff'd*, 531 F. App'x 836 (10th Cir. 2013).

information-and-belief allegations are especially inappropriate given that Rule 9(b)'s heightened pleading standard applies to LDC's Lanham Act claim. District courts in the Tenth Circuit agree that "Rule 9(b) applies to false-advertising claims under the Lanham Act . . . insofar as the factual averments allege intentional or knowing misrepresentations." *Cocona, Inc. v. Singtex Indus. Co.*, No. 14-cv-01593-MJW, 2014 WL 5072730, at *8 (D. Colo. Oct. 9, 2014) (collecting cases).[8] Because LDC's Lanham Act claim is based on statements that predict the timing of a future event (Chinese approval of Viptera), that claim is actionable only if LDC can establish that Syngenta had "actual knowledge" that its statements were false. *E.g.*, *Star City Sch. Dist. v. ACI Bldg. Sys., LLC*, 844 F.3d 1011, 1016-17 (8th Cir. 2017); *see also infra* Part I.C. As a result, LDC must plead that Syngenta's predictions were intentionally fraudulent, and Rule 9(b) applies. And "[t]he Tenth Circuit has made it clear that Rule 9 cannot be circumvented with the 'on information and belief' phrase without giving at least the factual basis for the belief." *Whitaker v. W. Essentials, LLC*, No. 1:15-CV-00048-TC, 2016 WL 3435185, at *3 (D. Utah June 17, 2016).

*Second*, and more importantly, LDC's Lanham Act claim does not come to the Court on a clean slate. The Court has already rejected materially the same Lanham Act theory for lack of causation as a matter of law when it was presented by the Producer Plaintiffs. *See* Summ. J. Order, 2017 WL 1250791, at *3. Under the Court's orders, the burden is now on LDC to *allege particular facts* showing why its claim is different and the Court's prior analysis does not equally apply here.[9]

---

[8]    *Accord Integrated Bus. Techs., LLC v. Netlink Sols., LLC*, No. 16-CV-048-TCK-PJC, 2016 WL 4742306, at *4 (N.D. Okla. Sept. 12, 2016) (following the "persuasive . . . decision" in *Cocona*); *see also, e.g.*, *Pestube Sys., Inc. v. HomeTeam Pest Def., LLC.*, No. CIV-05-2832-PHX-MHM, 2006 WL 1441014, at *5 (D. Ariz. May 24, 2006).

[9]    *See* Sched. Order No. 1 ¶ 5(h), ECF No. 123 ("[A]ll of the court's subsequent orders, both procedural and substantive . . . will apply to all cases that later are consolidated in the MDL docket, including any tag-along cases or other cases transferred to this court after the date of this order, *unless* a party shows good cause to the contrary, by filing a formal motion and supporting brief, within 14 days after the docketing of that case in this court. The court does not intend to revisit issues that have already been decided just because a newly added party disagrees with the court's reasoning or result. But the court would entertain motions filed under this show-cause provision if a newly added party demonstrates why its case is distinguishable.").

LDC fails to carry that burden.

In particular, the Court has already recognized that, in the context of this litigation, Lanham Act claims like the Producer Plaintiffs' and LDC's rest on an unprecedented view of causation under the Lanham Act under which injury is triggered once a threshold amount of Viptera hits the market. As the Court has explained, causation requires alleging (and later proving) "both that farmers read and were influenced by" alleged misrepresentations from Syngenta "and that the impact of the [misrepresentations] was great enough to cause the embargo that allegedly caused the price drop in this country." Summ. J. Order, 2017 WL 1250791, at *3. But as the Court has already explained, that theory of causation is not viable when based on any statements made in August 2011 or later, because by the summer of 2011 "Syngenta had been selling Viptera for many months and planting for the 2011 season had been completed" and thus "under plaintiffs' own theory of liability here (under which contamination of the entire corn supply through cross-pollination and commingling was inevitable without additional safeguards), there was already more than enough corn containing MIR 162 in the system to cause the alleged trade disruption." *Id.*

Although the Court reached that conclusion on summary judgment, the same analysis applies to LDC's claim on this motion to dismiss because LDC has not carried its burden of even *alleging* facts to show that its claim is somehow different or that different facts should govern the causation analysis. The earliest alleged misrepresentation LDC identifies occurred in July 2011, *see* FAC ¶ 67, which is also *after* purchasing and planting for the entire 2011 growing season had already occurred. Indeed, the FAC itself alleges that purchases would have occurred in the fall of 2010 to early spring 2011 and that planting occurred "in or around the spring of 2011"—that is, long before any alleged misrepresentations in July 2011. FAC ¶ 62. The FAC contains no factual allegations whatsoever to contradict the Court's prior conclusion that the very same theory asserted by LDC here—namely, that contamination of the corn supply was "inevitable without additional safeguards"—logically forecloses

any claim of causation based on statements *after* the 2011 planting season.  Indeed, even though Syngenta pointed out this same fatal flaw in LDC's original complaint, the FAC does not add any allegations asserting that volumes of Viptera planted in 2011 (before any alleged misrepresentations) were *insufficient* to trigger the Chinese embargo, or that particular incremental sales in 2012 or 2013 were *necessary* to cause the spread of Viptera in the amounts needed to cause the embargo.  The FAC is silent on all these critical points.  Instead, the most the FAC does on this score is to drop the allegation from LDC's original complaint that in 2011 Viptera was sold "to approximately 12,000 corn producers with a projected yield estimated in September 2011 of 250 million bushels."  Compl. ¶ 2.  But simply attempting to withdraw an admission that affirmatively forecloses causation does not cure the deficiency in the complaint.  LDC still has not affirmatively alleged any facts plausibly suggesting why the Court's prior causation analysis does not equally foreclose causation in this case.[10]

*Third*, any alleged statements that occurred *after* "China began rejecting all corn from the U.S. that contained MIR162" in November 2013, FAC ¶ 102—such as statements in December 2013 about the issues raised by China with respect to the Viptera application, *id.* ¶ 81—could not possibly have caused losses that were allegedly triggered by the rejected shipments in November.  Statements in December 2013 or later would have the potential only for affecting sales of Viptera for the *next* planting cycle in the spring of 2014 and thus could not possibly have caused the presence of Viptera in the corn supply a year earlier in 2013.

*Fourth*, and finally, all of these deficiencies in LDC's complaint are particularly telling given that LDC has had the benefit of all the discovery that had taken place in these coordinated actions when

---

[10]   LDC cannot invoke a presumption of causation.  As the Court has explained, a "presumption of causation arises only 'when the defendant has explicitly compared its product to the plaintiff's or the plaintiff is an obvious competitor with respect to the misrepresented product.'"  Summ. J. Order, 2017 WL 1250791, at *2 (quoting *Hutchinson v. Pfeil*, 211 F.3d 515, 522 (10th Cir. 2000)).  There is no allegation that Syngenta's statements compared Viptera to some product of LDC's or that LDC competes with Syngenta.  Thus, no presumption of causation applies.  *See, e.g.*, *Hutchinson*, 211 F.3d at 522 (where plaintiff "has no product in competition with" the defendant's product, there is no presumption of injury).

it drafted and filed both its original complaint in October 2016 and its amended complaint in June 2017.  In addition, LDC was alerted to these same deficiencies by Syngenta's prior motion to dismiss, and LDC has had an opportunity to address those deficiencies in its amended complaint.  There is certainly no justification for the Court to allow a Lanham Act claim that has already been dismissed as a matter of law when raised by the Producer Plaintiffs to go forward and require re-opening depositions and undergoing discovery on the basis of LDC's complaint when—despite having access to complete discovery so far—LDC has not offered any better allegations of causation and has not even attempted to address the defects in causation the Court has already found.

## C.    The Statements LDC Has Identified Are Predictions And Opinions About Future Events That Are Not Actionable As Misleading Statements Of Fact.

The Lanham Act claim also must be dismissed because the statements LDC has identified are all merely *predictions* about the timing of a future government action (approval of Viptera) and are not actionable statements of *fact* as required to state a Lanham Act claim.  *See, e.g.*, *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999).  "Whether a given statement constitutes an assertion of fact or an opinion is a question of law to be determined by the court."  *Rinsley v. Brandt*, 700 F.2d 1304, 1309 (10th Cir. 1983).  It is well settled that predictions are not actionable because they are not representations of *fact*.  As a result, Syngenta's predictions about the timing of Chinese approval are not actionable unless there are factual allegations plausibly showing that the statements were *subjectively* "known at the time by the speaker to be false" or that the speaker "lack[ed] a good faith belief in the truth of the statement."  *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, No. 12-cv-60741, 2014 WL 1329359, at *18 (S.D. Fla. Mar. 31, 2014), *aff'd*, 797 F.3d 1248 (11th Cir. 2015); *see also, e.g.*, *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 931 (9th Cir. 2010) (similar).[11]  This Court has already

---

[11]    This approach is consistent with the Tenth Circuit's approach to misrepresentations under the Securities Act and under state law governing fraud and negligent misrepresentation, both of which the Tenth Circuit has looked to in

explained the same rule, holding that predictions of Chinese approval can "constitute misrepresentations of fact" only insofar as they implicitly represent "Syngenta's present expectations" and only if the speaker did not actually expect approval to come as indicated in the statement.  MTD Order, 131 F. Supp. 3d at 1227.  Applying this rule, courts routinely hold that statements predicting future government action, like these, are non-actionable opinions as a matter of law.  *See, e.g.*, *Marx v. Mack Affiliates*, 265 A.D.2d 202, 203 (N.Y. App. Div. 1999) ("[D]efendants' optimistic projection that governmental approvals for the site plan would be secured shortly when, in fact, they were not secured for over a year, provides no basis for an action for fraud.  This was no more than a prediction or opinion, not a misrepresentation of fact.").[12]

While the FAC identifies a series of statements in which Syngenta predicted that Chinese approval would come in late March of 2012, *see* FAC ¶¶ 67-71, 74, 75, it contains no factual allegations even purporting to raise a plausible inference that the speakers making these predictions *subjectively* did not genuinely believe in the predicted March 2012 approval date.  There are no factual allegations plausibly suggesting the key element necessary for a prediction to become actionable as a false statement—namely, "actual knowledge of falsity."  *Star City Sch. Dist. v. ACI Bldg. Sys., LLC*, 844 F.3d 1011, 1016-17 (8th Cir. 2017) ("A statement of future events may constitute fraud if the statement is false and the person making the representation or prediction knows it to be false at the

---

interpreting the Lanham Act. *See, e.g.*, *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 788 (10th Cir. 2016); *cf. MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1119-21 (10th Cir. 2014) (prediction in offering statement that company expected a rebound in its portfolio was an opinion, not a statement of fact, and therefore could not be proven false or misleading); *Indy Lube Invs., L.L.C. v. Wal-Mart Stores, Inc.*, 199 F. Supp. 2d 1114, 1123 (D. Kan. 2002) (it is "well settled that a negligent misrepresentation claim cannot be based on a future event"); *Sunflower Pork, Inc. v. Consol. Nutrition, L.C.*, No. 03-2045-JAR, 2004 WL 1212052, at *15 (D. Kan., June 1, 2004) ("[A] negligent misrepresentation claim may only be based on a 'misrepresentation of pre-existing or present fact.'"); *see infra* pp.14-15, 20 & n.9, 24 (collecting cases).

[12]  *See also, e.g.*, *General Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1357 (S.D. Fla. 2002) (statements "about the effect that a lifting of the Cuban embargo restrictions would have on the trademark rights of Plaintiff" are not actionable false statements of fact), *aff'd*, 54 F. App'x 492 (11th Cir. 2002); *Bass v. Coupel*, 671 So. 2d 344, 351 (La. Ct. App. 1995) (promise that a "subdivision would be approved by the Iberville Parish Police jury" cannot support a fraud claim).

time it is made."). There are no particularized factual allegations, for example, plausibly suggesting that the predictions "were contradicted by or inconsistent with information available to [the defendant] at the time they were made," *East Point Sys., Inc. v. Steven Maxim, S2k, Inc.*, 133 F. Supp. 3d 430, 437 (D. Conn. 2015) (dismissing fraud claim based on predictions), and were so contrary to the information available that the speakers could not have subjectively believed what they were saying.

Instead, the FAC merely identifies *challenges* or *difficulties* that Syngenta faced in meeting the March 2012 timeline—such as the need to complete "in-country studies" and a "rat study" in time to meet a November 2011 filing deadline. FAC ¶ 72.[13] But a plaintiff cannot turn predictions into actionable false statements simply by pointing to circumstances that the plaintiff believes makes the the statements *objectively* unreasonable. That is insufficient to meet the subjective bad-faith requirement for asserting a fraud claim based on predictions. "So long as the projections were consistent with data reasonably available to [Syngenta], and there is no particularized allegation that they were not," the complaint fails to plausibly allege that predictions about future Chinese government action were false statements. *East Point Sys., Inc.*, 133 F. Supp. 3d at 436-37. In fact, the FAC expressly acknowledges that, if Syngenta met the November 2011 filing deadline (which it did), approval by March 2012 "was possible." FAC ¶ 73. LDC simply quibbles that, in its view—with the benefit of hindsight—March approval was not the most likely outcome and should not have been "expected." *Id.* As a matter of law, that is not enough to allege subjective bad faith.

Tellingly, the FAC itself acknowledges that it does not even attempt to allege facts plausibly suggesting *subjective* knowledge of the falsity of the predictions about Chinese approval. The most the FAC asserts is that, when Syngenta made the alleged predictions in July and August 2011 as

---

[13] The allegation that the Chinese government raised questions about Syngenta's application in *June 2012*, FAC ¶ 79, is particularly irrelevant to all the statements identified in paragraphs 67 through 75. Questions raised in June 2012 cannot possibly show the requisite bad faith as to alleged predictions made any time before June 2012.

identified in paragraphs 67 through 71, it "should have known that approval by March or April 2012 was not a *reasonable expectation*." FAC ¶ 72 (emphasis added). But allegations that Syngenta's predictions did not meet a standard of objective reasonableness are, as a matter of law, not sufficient. Instead, LDC must allege facts plausibly raising an inference of subjective knowledge of falsity. By its own terms, the FAC does not even pretend to reach that standard.

Given the lack of any allegations sufficient to show subjective bad faith, it is—at a minimum— equally possible based on the allegations in the FAC that the predictions LDC has identified were good-faith projections about an uncertain process that ended up being incorrect. As a result, the FAC fails to cross the line from merely alleging facts that could *possibly* set out a claim (with the addition of further facts) and a complaint that *plausibly* states a claim on its face. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (complaint must contain sufficient factual allegations to "nudge his claims across the line from conceivable to plausible in order to survive a motion to dismiss"); *see, e.g.*, *East Point Sys., Inc.*, 133 F. Supp. 3d at 437 (applying the general rule against treating predictions as actionable statements of fact and refusing to "allow plaintiffs to proceed with allegations based on 'fraud by hindsight'"). That is not sufficient for the Lanham Act claim to survive.

### D.   Several Of The Statements Fail To Satisfy Additional Threshold Requirements For Actionable "Commercial Advertising Or Promotion" And For Pleading With Particularity Under Rule 9(b).

Several of the individual statements identified as a basis for LDC's Lanham Act claim are not actionable "commercial advertising or promotion" and are not pled with the particularity required by Rule 9(b). Under the Tenth Circuit's four-part test, a representation qualifies as "commercial advertising or promotion" only if it is "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services[;]" and (4) "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Proctor & Gamble Co.*, 222 F.3d at 1273-74; MTD

Order, 131 F. Supp. 3d at 1224.  As explained above, *see supra* pp.14-15, Rule 9(b) applies to LDC's

Lanham Act allegations and requires dismissal unless the complaint alleges, for each underlying

statement, "the time, place and contents of the false representation, the identity of the party making the

false statements and the consequences thereof."  MTD Order, 131 F. Supp. 3d at 1227 (quoting *Koch*

*v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).

      1.  The assertion that Syngenta made a statement to NGFA that NGFA included in a newsletter.

*See* FAC ¶ 68.  There are no factual allegations plausibly showing that this statement to the NGFA was

disseminated to farmers and was made for the purpose of influencing Viptera seed purchasers.  The

FAC alleges that the NGFA is "the national trade association of grain elevators, feed and feed

ingredient manufacturers, grain and oilseed processors, biofuel producers, exporters, livestock and

poultry integrators, and firms providing products and services to the industry."  FAC ¶ 68 & n.6.  The

Court has already held that allegations of similar statements to "resellers and exporters" "do not state

a plausible claim that statements . . . were intended to influence Syngenta's customers to buy seed from

Syngenta" and that because the audience of resellers and exporters "would comprise a different group,

the complaints do not state a plausible claim that [a statement] was sufficiently disseminated among

(and not just available to) the relevant segment of the public, namely Syngenta's customers."  MTD

Order, 131 F. Supp. 3d at 1226-27 (dismissing biosafety certificate request form as basis for Lanham

Act claim).  LDC's single-sentence allegation in a footnote that "[o]n information and belief, many

grain elevators are cooperatively owned by corn farmers," FAC ¶ 68 n.6, is insufficient as a matter of

law.  Not only is information and belief pleading insufficient to meet Rule 9(b)'s heightened pleading

standard, *see supra* pp.14-15, but also this information is not peculiarly within Syngenta's knowledge

and there is no factual basis alleged to support it, *see supra* pp.14-15. More importantly, even accepting

the allegation that "many" grain elevators are cooperatively owned by corn farmers, that assertion does

not suffice to establish that Syngenta *widely disseminated* its statement to the NGFA to corn farmers.

<u>2.  The assertion that Syngenta "disseminat[ed] an information packet on August 22, 2011" by sending it "to our regular news media distribution" and "post[ing]" it on "company websites."  FAC ¶ 71 (third bullet point).</u>  Distributing information to general news media—even industry-specific media—does not constitute dissemination to the purchasing public absent specific allegations that the audience consists of the relevant purchasing public.  *See, e.g.*, *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 830 (C.D. Cal. 2010) (rejecting statement made to "SwimNews.com, [] a general news publication about the sport of swimming, providing news about swim meets, specific swimmers and coaches, controversies in the swimming community, and other relevant news," because "[i]ts intended audience is not swimsuit manufacturers or vendors"); *Fuente Cigar, Ltd. v. Opus One*, 985 F. Supp. 1448, 1455 (M.D. Fla. 1997)( "[A] competitor's statements made to a general news organization like the *New York Times* might not be actionable because they are not aimed specifically at the contested market.").[14]  There are no factual allegations that making this information available on Syngenta's corporate website and in the "regular news media" either resulted in the statement being widely disseminated to corn farmers or was intended to influence their purchases of Viptera corn seed.  Moreover, there is no indication that such speech proposed a commercial transaction so as to become commercial speech.  *See, e.g.*, *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 422 (1993) (commercial speech is "speech which does no more than propose a commercial transaction").

---

[14]   *See also, e.g.*, *Porous Media Corp. v. Pall Corp.*, 201 F.3d 1058, 1059 (8th Cir. 2000) (holding that press releases "did not constitute commercial advertising or promotion as required by the Lanham Act"); *Manwin Licensing Int'l S.A.R.L. v. ICM Registry, LLC*, No. CV-11-9514 PSG (JCGx), 2013 WL 1213772, at *7 (C.D. Cal. Feb. 26, 2013) (press release not actionable because it "did not propose any commercial transaction"); *Boule v. Hutton*, 328 F.3d 84, 91–92 (2d Cir. 2003) (the Lanham Act does not cover an "article, and the [speaker's] statements quoted in that article," because the article "addresses a matter of public concern" and it is "not commercial speech" outside the protection of the First Amendment); *Gordon & Breach Sci. Publishers S.A. v. Am. Institute of Physics*, 859 F. Supp. 1521, 1544-45 (S.D.N.Y. 1994) (dismissing Lanham Act claim based on "letter to the editor" and a "press release" because they "fall too close to core First Amendment values to be considered 'commercial advertising or promotion' under the Lanham Act" and thus are "exclude[d] from [the Lanham Act]'s scope").

3. Mr. Minehart's statement to "a Reuters reporter relaying the message of expected approval by March 2012." FAC ¶ 75. For the same reasons, this allegation of a statement made to a reporter of a general news publication does not plausibly show wide disseminated to potential purchasers of Viptera seeds or that that the statement was intended to influence Syngenta's customers to buy Viptera seeds. *See also Boule*, 328 F.3d at 91-92 (Lanham Act "does not cover a response to an unsolicited inquiry by a magazine reporter seeking comment on a topic of public concern").

## II.     LDC's Claim For Fraudulent Misrepresentation Fails As A Matter Of Law.

LDC's attempt to repackage its basic Lanham Act theory as a common-law fraud claim also fails as a matter of law. For its fraudulent misrepresentation claim to survive dismissal, LDC must allege facts plausibly establishing the following five elements: "(1) that the defendant made a fraudulent misrepresentation of or concealed a material fact; (2) that the statement (or omission) was false and was known by the defendant to be false or was made with a reckless indifference to its truth; (3) that the statement (or omission) was made in order to induce the plaintiff to act in reliance on it; (4) that the plaintiff did so act, with justifiable or reasonable reliance on the representation and (5) that the plaintiff was injured as a result of the reliance." *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 497-98 (D. Conn. 2006) (citing *Updike, Kelly & Spellacy, P.C. v. Beckett*, 850 A.2d 145 (2004), and *Citino v. Redevelopment Agency*, 721 A.2d 1197 (Conn. App. Ct. 1998)).[15] LDC fails to plausibly allege several of these elements as a matter of law.

*First*, LDC's fraudulent misrepresentation claim should be limited to just two statements. The FAC explicitly lists only two statements as the basis for the claim: (1) "[s]tatements by Syngenta

---

[15]     Similar elements are required to state a claim for fraud under Washington law. *See Adams v. King Cty.*, 192 P.3d 891, 902 (Wash. 2008) ("The elements of [] fraud include: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.").

representatives . . . to LDC representatives . . . during a conference call on or about July 7, 2011, that Syngenta fully expected Chinese approval of MIR162 for import by the 2012 U.S. planting season," and (2) "[a] statement by a representative of Syngenta during a January 17, 2012 U.S. Grains Council conference call, which LDC representatives attended, where the Syngenta representative expressed confidence that MIR162 would receive Chinese approval by the end of March[] 2012." FAC ¶ 129. Indeed, the fraud count expressly *excludes* reliance on all of the statements described in paragraphs 66 to 83 that are the basis for the Lanham Act claim. *See id.* ¶ 127 ("LDC hereby realleges and incorporates paragraphs 1-60 and 84-111 as though set forth fully herein."). Under Rule 9(b), the fraud claim cannot be based on any other statements not expressly identified as the basis for the fraud count.

*Second*, the FAC fails plausibly to allege causation. As an initial matter, to the extent LDC intends to suggest that Syngenta's statements caused LDC to take actions (such as refraining from putting up signs rejecting Viptera corn) that, in turn, affected farmers' decisions about buying Viptera seed, its theory of causation fails for the same reasons that the Lanham Act claim fails. *See supra* Part I.B. The fraud claim, like the Lanham Act claim, is based solely on alleged misrepresentations that were made *after* Syngenta had widely sold Viptera to farmers in 2011 and *after* farmers had already planted Viptera in spring 2011. *See* FAC ¶ 62 (alleging that "for the 2011 growing season farmers likely purchased corn seed around or between the fall of 2010 to early spring 2011" and "planted [] seed in or around the spring of 2011"); *see supra* pp.15-17. LDC bases the fraud claim solely on statements in July 2011 and January 2012. FAC ¶ 129. For the same reasons explained in connection with the Lanham Act claim, under the Court's prior causation analysis and LDC's own allegations, those statements came after enough Viptera had already been planted to ensure that Viptera would be present in the corn supply in sufficient quantities to trigger the later Chinese embargo. As a result, nothing about those statements (or LDC's reliance on them) could have caused the embargo. And as with the Lanham Act claim, the FAC does not include any factual allegations to suggest why the

Court's prior causation analysis should not apply here.  In addition, LDC's causation theory here is even *more* attenuated than under the Lanham Act claim, because it adds an additional link in the causal chain.  Rather than asserting that Syngenta's statements directly influenced farmers' purchases, the theory under the fraud claim is that Syngenta's statements caused LDC to take some actions that, *in turn*, influenced farmers' purchases.  But the FAC does not allege *any* facts to support that theory.  It does not contain a word describing how LDC's actions or statements about Syngenta's product supposedly affect farmers' purchasing decisions, what percentage of corn farmers deal directly with LDC (and thus might care what LDC thinks), what percentage of *those* farmers were influenced by LDC's actions, or how that fractional percentage of corn farmers' purchasing decisions was pivotal in causing the presence of Viptera in the corn supply at levels sufficient to trigger the Chinese embargo.  In short, the Court's prior analysis rejecting causation on the Producer Plaintiffs' Lanham Act claim applies *a fortiori* to this aspect of LDC's fraud theory.

LDC's theory of causation also fails to the extent LDC alleges that it relied on statements from Syngenta by "(1) continuing to negotiate and enter into contracts for the shipment of U.S. corn to Chinese purchasers in 2012 and 2013; (2) discontinuing its testing of its U.S. corn shipments for the MIR162 trait; and (3) purchasing corn from areas of the U.S. where MIR162 contamination was a possibility for shipment to, among other locations China."  FAC ¶ 131.

Such a theory cannot support LDC's claims of market losses allegedly resulting from the general closure of the Chinese market, *see id.* ¶¶ 108-11, because LDC's alleged reliance on Syngenta's statements in making its own U.S. corn shipments to China was not a necessary part of the causal chain leading to the Chinese embargo.  Under LDC's own allegations, even if LDC had not relied on any alleged misstatements from Syngenta and had refrained from shipping Viptera corn to China, the same market losses would have occurred.  The FAC alleges that other exporters were shipping to China and had their shipments rejected, *see, e.g.*, FAC ¶¶ 13 n.4, 102-03, 110, and does not allege any facts

suggesting how, given these other shipments, the same closure of the Chinese market would not have occurred even if LDC had not shipped U.S. corn containing Viptera to China.  The Court has already recognized the same point in analyzing causation as a matter of law in other contexts.  *See* Summ. J. Order, 2017 WL 1250791, at *11 (rejecting Syngenta's superseding cause defense as to exporter Cargill and ADM on the ground that Syngenta did not explain "why, given the fact that others shipped corn to China, the same [market-loss] injuries to plaintiffs would not have occurred if Cargill and ADM had not shipped to China").[16]  In fact, the FAC affirmatively alleges that "[i]n November 2013, China began rejecting all corn from the U.S. that contained MIR162"—approximately a month before any LDC shipments were rejected.  FAC ¶¶ 102-04.  Thus, at a minimum, LDC's fraud claim must be dismissed insofar as it seeks recovery of market losses allegedly resulting from the closure of the Chinese market because, on the facts alleged on the face of the complaint, the same market closure and same alleged market price effects would have occurred even if LDC had not relied on any supposed misrepresentations from Syngenta.

Lastly, to the extent LDC claims it was injured in the form of specific costs resulting from delay, rejection, or redirection of its own corn shipments, the FAC fails to plausibly allege that reasonable reliance on any misrepresentations from Syngenta caused those injuries as well.  Here, the timing set out in the FAC refutes any theory of reasonable reliance.  The two statements on which the fraud claim is based involve predictions that China would approve Viptera by late March 2012.  *See* FAC ¶ 129.  But the FAC affirmatively alleges that those predictions had already been proved incorrect by no later than the end of the first quarter of 2012 when China had not approved Viptera.  *See* FAC ¶ 77.  LDC could not have reasonably relied on those outdated July 2011 and January 2012 predictions when it decided to "negotiate and enter into contracts for the shipment[s] of U.S. corn to Chinese

---

[16]    Syngenta expressly reserves and does not waive its objections to this ruling.

purchasers," *id.* ¶ 131(1), that were later rejected or diverted beginning in December 2013.  LDC affirmatively alleges that it would have made the contracts for those rejected shipments in the spring or summer of 2013—that is, long after the predictions of approval in March 2012 had been proved incorrect.  *See* FAC ¶ 62 (alleging that in 2011, LDC "typically entered into contracts with their customers in or around the spring or summer of 2011, then exported corn to those customers in or around fall 2011," and that "this same timeline would apply in the subsequent 2012 and 2013 growing seasons").  Likewise, for purposes of 2013 purchases and the shipments that ended up being rejected, LDC could not reasonably have based its decisions to "discontinu[e] its testing of its U.S. corn shipments for the MIR162 trait" and to "purchas[e] corn from areas of the U.S. where MIR162 contamination was a possibility for shipment to . . . China," *id.* ¶ 131(2)-(3), on Syngenta's predictions of March 2012 approval.  Again, once the first quarter of 2012 had "passed without Syngenta obtaining its 'expected' approval," *id.* ¶ 79, any alleged predictions to LDC had been proven wrong, and LDC had no basis to reasonably rely on those predictions.

*Third*, the fraud claim fails as a matter of law to the extent that it purports to rely on omissions or nondisclosure.  LDC alleges that Syngenta "failed to disclose, suppressed, and concealed in 2011 that it would not have import approval from China from the 2011-2012 crop year (*i.e.*, the period covering September 1, 2011–August 31, 2012) and, in 2011 to 2013, that it would not have import approval from China for the 2012-2013 and 2013-2014 crop years."  FAC ¶ 132.  LDC also alleges that Syngenta "failed to disclose" other matters relating its Chinese application for approval of Viptera, *see id.* ¶¶ 132-33, and the fact that there was not "an effective system in place for the isolation of Viptera or Duracade and the very high likelihood that MIR162 would move into export channels where it was not approved, causing market disruption."  *Id.* ¶ 133.  But any such fraudulent omission or concealment theories fail as a matter of law.

Liability for fraudulent nondisclosure applies only "between parties to a business transaction,"

*Moore v. Fenex, Inc.*, 809 F.2d 297, 303 n.2 (6th Cir. 1987), and thus "[m]ere nondisclosure . . . does not amount to fraud." *Duksa v. Middletown*, 376 A.2d 1099, 1101 (Conn. 1977). There is no free-floating duty to disclose information outside the context of a transaction. *See, e.g.*, *Moore*, 809 F.2d at 303 n.2 (finding "no case . . . where a party has been held liable for fraudulent nondisclosure that had no direct dealings with the plaintiff"); *Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653, 656-57 (2d Cir. 2015) (affirming dismissal of fraudulent omissions claim where the "[c]omplaint does not allege that [plaintiff] engaged in commercial dealings with defendants, or that defendants had a fiduciary relationship with [plaintiff]," and "[plaintiff] was not engaged in business negotiations with any of the defendants"). Even where there is a transaction, only transactions in limited situations give rise to a duty to disclose. "When dealing with a claim of fraud based on material omissions, it is settled that the duty to disclose arises only when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Pursuit Partners, LLC v. UBS AG*, No. X05CV084013452S, 2009 WL 3286011, at *11 (Conn. Super. Ct. Sept. 8, 2009). Where the "parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *Id.* There are no allegations that Syngenta and LDC ever entered into any transaction at all, much less that they did so having a "fiduciary or other similar relation of trust and confidence between them." *Id.* To the contrary, LDC affirmatively alleges that "LDC has no contractual relationships with Syngenta pertaining to the purchase, transport, or export of corn[,] [n]or does it have any contractual relationships with Syngenta that otherwise relate or refer to Viptera seed or MIR162." FAC ¶ 20. LDC's fraud theory therefore cannot be supported by a theory of pure omissions or nondisclosure.

*Fourth,* none of Syngenta's statements predicting Chinese import approval for MIR162 is an

actionable false statement of *fact*.  *See Phillips*, 922 A.2d at 1104.[17]  The predictions on which LDC

bases its fraud claim are not actionable statements of fact for the same reasons described above in

addressing the Lanham Act claim: predictions of future events are not actionable unless there are

factual allegations showing that the statements were subjectively "known at the time by the speaker to

be false" or that the speaker "lack[ed] a good faith belief in the truth of the statement."  *Duty Free*

*Ams., Inc.*, 2014 WL 1329359, at *18, *aff'd*, 797 F.3d 1248 (11th Cir. 2015); MTD Order, 131 F. Supp.

3d at 1227; *see supra* pp.18-19.   Courts routinely apply this rule to bar fraud claims based on

predictions of future government approval.  *See supra* p.19 & note 12 (collecting cases).   This

fundamental common law rule applies to fraud claims under Connecticut law.[18]

　　　For the same reasons explained above in addressing the Lanham Act claim, LDC's complaint

does not contain any factual allegations plausibly showing that the speakers making each of the

predictions concerning March 2012 approval acted in bad faith or without a genuine belief in the

prediction.  *See supra* Part I.C.  The complaint fails to allege that the speakers of these two statements

actually knew in July 2011 that Syngenta did not expect Chinese approval in March 2012 or in January

---

[17]　The same basic principles apply under the common law of other States, including Washington.  *See, e.g.*, *Graham-Bingham Irrevocable Tr. v. John Nat. Hancock Life Ins. Co. USA*, 827 F. Supp. 2d 1275, 1285 (W.D. Wash. 2011) ("Statements about future performance are not representations of existing fact and generally will not support a claim of fraud or misrepresentation.  A representation that something will be done in the future cannot be true or false at the time it is made.  Moreover, failure to make forecasts about future events is not actionable."); *Westby v. Gorsuch*, 50 P.3d 284, 291 (Wash. Ct. App. 2002) ("A representation of an existing fact must exist independently of (1) any future acts or actions on the part of the party making the statement; (2) the occurrence of any other particular event in the future; and (3) the particular future uses of the person to whom the statement is made."); *see also, e.g.*, *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1345 (11th Cir. 2017) (affirming dismissal of fraud claim and explaining that "[f]raud cannot be predicated upon statements which are promissory in nature as to future acts unless there was a present intention not to perform or present knowledge that the future event will not occur"); *Pine Tel. Co. v. Alcatel-Lucent USA Inc.*, 617 F. App'x 846, 859-60 (10th Cir. 2015); *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009); *Luscko v. S. Container Corp.*, 408 F. App'x 631, 635 (3d Cir. 2010); *Victory v. Smith*, 392 S.W.3d 892, 894 (Ark. Ct. App. 2012); *Branscum v. Am. Cmty. Mut. Ins. Co.*, 984 P.2d 675, 680 (Colo. Ct. App. 1999).

[18]　*See, e.g.*, *In re Paige*, 106 B.R. 346, 350 (Bankr. D. Conn. 1989) ("There can be no statement of fact as to a future event."); *cf. 456 Corp. v. United Nat. Foods, Inc.*, No. 3:09-cv-1983 (JBA), 2011 WL 87292, at *3-4 (D. Conn. Jan. 11, 2011) (dismissing fraud claim under Connecticut law because "even though these promises were representations of fact, without a present intent not to fulfill the promises, they could not be *mis*representations of fact," and the complaint did not allege "sufficient factual matter to plausibly suggest that at the time Defendants promised to support the Program they intended not to fulfill the promise") (emphasis in original).

2012 that Syngenta did not actually have "confidence" that approval was still on track for March 2012. LDC's complaint alleges only that "multiple issues" had arisen with Syngenta's application. *Id.* ¶ 80. But fraud law does not require companies "to take a gloomy, fearful or defeatist view of the future," and permits them, "subject to what current data indicates . . . to be confident about their stewardship and the prospects of the business they manage." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994) (affirming dismissal of Connecticut fraud claim). There are no particularized allegations that Syngenta subjectively had no basis for its expectation of approval in March 2012 or did not actually expect approval in March 2012. At most, LDC's complaint alleges only that there was *other* information that LDC believes made Syngenta's expectation unreasonable. But as explained above, a plaintiff cannot make predictions of future events actionable simply by pleading that the plaintiff believes the predictions to have been *objectively* unreasonable. The plaintiff must be able to plead facts plausibly suggesting that the speaker *subjectively* knew that it did not expect approval in March 2012. *See supra* Part I.C. The fraud claim must therefore be dismissed.

*Fifth*, the complaint does not plausibly allege facts showing that Syngenta had the requisite fraudulent intent when it made each of the two statements. While Rule 9(b) permits intent to be "alleged generally," the pleading standard under Rule 8 still applies and still requires the complaint to allege facts plausibly showing fraudulent intent. As the Supreme Court explained in *Iqbal*, as used in Rule 9(b), the term "'generally' is a relative term." 556 U.S. at 686. This language in "Rule 9 merely excuses a party from pleading . . . intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8" requiring plausible factual pleading. *Id.* at 686-87; *see, e.g.*, *Mourad v. Marathon Petroleum Co. LP*, 654 F. App'x 792, 798 (6th Cir. 2016) ("While Rule 9(b) clearly dictates that allegations regarding a defendant's mental state are not subject to the heightened pleading requirements imposed on claims for fraud or mistake, Appellants fail to recognize that pleadings regarding the conditions of a person's mind, including malice and

31

intent, remain bound by the plausibility requirement of Rule 8."); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) (similar); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) (similar).  As a result, a complaint asserting a fraud claim under Connecticut law "must allege facts giving rise to a strong inference of fraudulent intent, which may include facts showing that the defendant(s) had both motive and opportunity to commit fraud, or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *East Point Sys., Inc.*, 133 F. Supp. 3d at 434 (dismissing Connecticut fraud claims for, among other things, inadequate pleading of fraudulent intent) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).

As explained above, LDC's fraud claim is based on predictions concerning when China would approve Viptera for import, and predictions are not actionable misrepresentations of fact unless LDC pleads facts plausibly suggesting that the speakers subjectively knew that their predictions were false. *See supra* Part I.C.  Because this "exception requires actual knowledge of falsity," LDC is required to plausibly allege facts showing that the speaker of each statement "kn[ew] it to be false at the time it is made." *Star City Sch. Dist.*, 844 F.3d at 1016; *see supra* Part I.C.  Just as with the Lanham Act claim, the FAC fails to allege that the speakers of the two statements underpinning the fraud claim actually knew in July 2011 that Syngenta did not expect Chinese approval in March 2012 or in January 2012 that Syngenta did not actually have "confidence" that approval was on track for March 2012.  *See supra* Part I.C.  Indeed, the failure to allege any facts showing motive led the court overseeing Cargill's parallel litigation against Syngenta to dismiss Cargill's parallel fraud claim with prejudice.  *See* Ex. 2 (Judgment at 15-16, *Cargill, Inc. v. Syngenta AG*, No. 67601 (40th Jud. Dist. Ct., La. June 13, 2016)) (dismissing fraud claim "due to the requisite missing intent").

III.   **All Claims Fail To The Extent That They Are Based On Or Seek Damages For Supposed Physical Injury.**

Any theory of liability or damages based on supposed physical injury must be dismissed, because the complaint alleges only economic losses.

*First*, to the extent LDC relies on a so-called "indirect" damages theory—that it lost profits because of the supposed closure of the Chinese export market and the alleged effect on the price of *all* U.S. corn, *see* FAC ¶¶ 108-111—that is the same market-loss theory that this Court has already held is "not derived from [any] physical harm." MTD Order, 131 F. Supp. 3d at 1194. The Court's rationale with respect to Producer Plaintiffs' claims applies equally to LDC's claims. Under the "indirect" damage theory, LDC "suffered the same injury (the same lower prices) whether or not [its] corn was contaminated by Viptera." *Id.* The claim is thus not based on physical injury at all.

*Second*, to the extent that LDC asserts that it suffered "direct" damage because MIR162 corn was present in some of its U.S. corn shipments to China (which allegedly resulted in costs for rejected, delayed, or diverted shipments), *see* FAC ¶¶ 101-107, that is also insufficient to plausibly allege any *physical harm* to LDC's corn or other property and still amounts to a claim solely for economic losses. As a threshold matter, to the extent that LDC asserts it had Viptera corn in its shipments of U.S. corn to China, that means that LDC purchased corn containing Viptera. That places LDC's claims squarely in the contractual ELD analysis addressed below, and LDC cannot sidestep the ELD on the theory that it is asserting physical injury because it plainly has not asserted any physical effect on property *other than* the corn that it purchased. *See infra* Part III.

In addition, the mere presence of MIR 162 corn in some of LDC's U.S. corn shipments could not qualify as physical *damage* to its property in any event, because Viptera was fully approved by the U.S. government. Any corn produced from Viptera could be sold for the same uses and at the same price as all other corn because, upon federal deregulation of MIR162, corn grown from Viptera was a

lawful part of the U.S. corn supply under the USDA's broad regulatory definition of "[y]ellow corn."[19] LDC's only complaint is that, due to Chinese import rules, it incurred expenses from rejected, delayed, and diverted U.S. corn shipments to China, which were sold on elsewhere. *See* FAC ¶¶ 101-111. That is the paradigm of pure economic loss.

As *Sample v. Monsanto* held in identical circumstances, there is no physical injury "*even if* GM seeds were 'commingled' with non-GM seeds" precisely because commingling did not render the crop unfit for human consumption and thus did not cause physical harm. *Sample v. Monsanto*, 283 F. Supp. 2d 1088, 1093 & n.2 (E.D. Mo. 2003) (emphasis added). The court in *Hoffman* considered similar allegations about "contamination" of canola with an approved GM trait and reached the same result. *See Hoffman I*, 2005 SK.C. LEXIS 330, *aff'd*, *Hoffman II*, 2007 SK.C. LEXIS 194. There, the plaintiffs claimed that GM canola had cross-pollinated with their non-GM crops, which they hoped to sell at a premium as organic crops and on the European market. The court held that, where a GM seed has been approved for human consumption, "the alleged damage is not of physical harm . . . , but arises from the alleged inability to meet the requirements of organic certifiers or of foreign markets for organic canola." *Hoffman I*, 2005 SK.C. LEXIS 330 ¶ 72.

Indeed, the USDA's decision deregulating a GM trait like Viptera is itself a determination that the trait "cross-pollinat[ing] with and alter[ing] the genetic structure of other plants . . . [is not] a plant pest harm" because it does "not constitute physical damage or injury to other plants." *Center for Food Safety v. Vilsack*, 718 F.3d 829, 840 (9th Cir. 2013); *cf. id.* at 835 (explaining that USDA regulates "organisms that cause physical harm to plants through injury, damage, or disease"); *see also* 7 U.S.C. § 7702(14); 7 C.F.R. § 340.1. In approving Viptera, the USDA concluded that Viptera did not pose a risk of physical harm. *See also Ctr. for Food Safety*, 718 F.3d at 841 (economic losses due to cross-

---

[19]   *See* 7 C.F.R. § 810.402(c)(1) (defining "yellow corn" as "[c]orn that is yellow-kerneled," including "yellow kernels of corn with a slight tinge of red," and that "contains not more than 5.0 percent of corn of other colors").

pollination of GM crops with non-GM crops "are not the result of plant pest harms" because they are not the result of physical injury).  As the Southern District of Illinois recently held, "Viptera[TM] was fully deregulated by the U.S. Department of Agriculture in April 2010, meaning that it could be sold without restriction within the United States, including for human consumption," and thus the "Court cannot agree with plaintiffs' implications that Viptera corn is harmful to health."  *In re Syngenta Mass Tort Actions (Poletti)*, No. 3:15-cv-01221-DRH, 2017 WL 1277898, at *12 (S.D. Ill. Apr. 3, 2017).

Cases finding physical harm in the context of *unapproved* GM traits are irrelevant.  As *StarLink* explained, crops are "damaged when they are pollinated" by corn with an unapproved trait (like StarLink) because it "renders what would otherwise be a valuable food crop unfit for human consumption."  *In re StarLink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 841 (N.D. Ill. 2002).  The fact that rendering crops unfit for human consumption may constitute physical "harm" says nothing about the situation here, in which MIR162 was fully approved.  In fact, *Sample* distinguished *StarLink* on exactly that basis.  *See Sample*, 283 F. Supp. 2d at 1093 n.2.[20]

## IV.    The Contractual ELD Bars LDC's Negligence Claim Based On Costs Due To Rejected, Delayed, Or Diverted Shipments Of U.S. Corn.

To the extent that LDC bases its negligence claim on damages for U.S. corn shipments that were rejected, delayed, or diverted allegedly because of the presence of MIR162 corn in those particular shipments, *see* FAC ¶¶ 101-07, the contractual ELD bars that claim.  As the Court has already held, the contractual ELD bars a negligence claim by a reseller of Viptera *seeds* who alleged that "because of Syngenta's commercialization of Viptera and Duracade, [he] was unable to sell Syngenta's seeds at the same prices or volume."  *In re Syngenta AG MIR 162 Corn Litig. (Funk)*, No. 14-md-2591-JWL-JPO, 2017 WL 2080601, at *13 (D. Kan. May 15, 2017).  As the Court explained,

---

[20]    *Bayer CropScience LP v. Schafer*, 385 S.W.3d 822, 833 (Ark. 2011), and *In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1013 (E.D. Mo. 2009), are distinguishable on the same basis because the GM Rice cases involved an unapproved trait.

the seed reseller was "essentially suing to recover for disappointed expectations of profits from the purchase of Syngenta's seeds" and was alleging that "the seeds did not work for the purpose for which they were sold to [the reseller], i.e., to be resold," which amounts to an "economic loss" within the scope of the contractual ELD. *Id.* The same rule under the contractual ELD applies equally to remote purchasers of finished or integrated products (such as LDC's purchases of corn containing Viptera) who attempt to sue the maker of an input (such as Syngenta). The contractual ELD thus applies here and bars LDC's claim.

The contractual ELD bars unintentional tort claims for economic losses arising from the assertion that goods do not have the value or the qualities that a purchaser expected. The "long established common law rule . . . is that in the absence of privity of contract between the plaintiff and [the] defendant, or of an injury to the plaintiff's person or property, a plaintiff may not recover in negligence for a purely economic loss." *Lawrence v. O&G Indus., Inc.*, 126 A.3d 569, 578 (Conn. 2015) (alteration in original); *see also, e.g.*, *Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 728 (Ind. 2010). That rule reflects the fundamental point that "[t]he common law duty to avoid causing purely economic loss arises only in the context of a breach of contract," and "[b]ecause no duty to refrain from activity which results in mere economic injury attaches[] but for the existence of a contract, the injured party is limited to contractual remedies." *Dobco, Inc. v. Williams Dev. Co.*, No. X07CV990072152S, 2002 WL 1332227, at *1 (Conn. Super. Ct. May 17, 2002).[21]

Indeed, the Connecticut legislature has adopted by statute the rule that purely economic loss may not be recovered through tort by a commercial party such as LDC. Connecticut General Statute

---

[21] *See also State v. Lombardo Bros. Mason Contractors, Inc.*, 54 A.3d 1005, 1040 n.41 (Conn. 2012) ("The economic loss doctrine is a [common-law] rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property.") (alteration in original); *Drill Masters-Eldorado Tool, Inc. v. PCC Specialty Prods.*, 49 F. Supp. 3d 188, 204 (D. Conn. 2014) (same).

52-572n(c) provides that "[a]n action for commercial loss caused by a product may be brought *only* under, and shall be governed by, title 42a, the Uniform Commercial Code." As Connecticut courts have explained, this statute reflects a "legislative policy determination that a distinction exists between a claim for commercial loss sustained by a commercial party and claims for personal injury, death or property damage" and provides a "further foundation" for the economic loss doctrine under Connecticut law. *Worldwide Pres. Servs., L.L.C. v. IVth Shea, L.L.C.*, No. X05CV980167154S, 2001 WL 34093945, at *8-9 (Conn. Super. Ct. Feb. 1, 2001). "[T]he clear language of section 52-572n(c)" establishes "that a legal action for recovery of commercial losses may be brought only under Connecticut's version of the UCC, not under a negligence theory." *Precision Safety Innovations, Inc. v. Branson Ultrasonic Corp.*, No. CV 04-6981 GPS (PLAx), 2005 WL 5801513, at *8 (C.D. Cal. Aug. 4, 2005). Because this case "involves pure economic loss, precisely the type of loss recoverable only through principles of contract law," "section 52-572n(c) precludes" LDC's claim "as it[] states a common law negligence claim for the recovery of commercial loss." *Id.* at *9.

The contractual ELD, like the stranger rule, precludes the open-ended liability that would result if a manufacturer could be held liable for the spreading economic consequences of some failure of its product to meet a purchaser's economic expectations. It forecloses "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Charlier*, 929 N.E.2d at 730. It also preserves the distinct roles of tort and contract law. Tort law is concerned with duties to prevent physical harm. By contrast, claims that a "product has not met the customer's expectations" or "that the customer has received 'insufficient product value'" are the concern of "express and implied warranties." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872 (1986); *see also, e.g.*, *Aliki Foods, LLC v. Otter Valley Foods, Inc.*, 726 F. Supp. 2d 159, 165 (D. Conn. 2010) ("[E]conomic losses resulting from a product failure are barred because they do not implicate the safety concerns of tort law."). Restricting parties to their contract remedies prevents tort law from swallowing

37

contract law and preserves the ability of parties to allocate risks by contract and first-party insurance.

Here, any claim by LDC for economic losses resulting from the alleged presence of MIR162 in its own U.S. corn shipments is barred by the contractual ELD. LDC's fundamental claim is that it was disappointed when the corn it purchased yielded a product (commingled U.S. corn) that could not successfully be imported into China. That is a paradigmatic claim for economic loss by a purchaser disappointed that the goods he purchased do not have the qualities and value he had hoped for.

The policies behind the ELD also apply with particular force here, because LDC could have protected against losses through provisions in its contracts for purchasing corn, including by seeking warranties that the corn it bought would be suitable for export to China. Similarly, LDC could have protected itself in its contracts for *selling* the corn to Chinese purchasers by allocating any risk of rejection to the purchaser. LDC apparently chose to do neither. As the Connecticut Supreme Court has stated, LDC was "free to allocate the risks, insure against potential losses, and adjust the contract price as [it] deemed most wise," and thus there is "no reason to extricate" LDC from its bargains. *Ulbrich v. Groth*, 78 A.3d 76, 94 (Conn. 2013). Allowing LDC recovery in tort would permit it to avoid the terms of the bargain it made (and the limited warranties it received) when it purchased corn, as well as avoiding whatever limited warranties grain elevators received when they purchased corn from farmers and that farmers received when they purchased seed from Syngenta. Allowing LDC to reach back through that chain of contracts, ignoring the limited warranties at each step in the chain, to impose tort liability on Syngenta would eliminate incentives for exporters like LDC (and everyone else in the chain) to rely on contracts to address risks related to export approvals and prevent the entire system of contracts in the industry from ever developing to address such economic risks. That is exactly the result the contractual ELD is designed to avoid.[22] The contractual ELD is premised on the

---

[22] *See, e.g.*, *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 489 A.2d 660, 674 (N.J. 1985) ("the absence of

view that "commercial entities [are] quite capable of bargaining for express warranties" and courts should not permit tort actions to remove incentives to do so. *Lexington Ins. Co., Inc. v. W. Roofing Co.*, 316 F. Supp. 2d 1142, 1149 (D. Kan. 2004).

LDC cannot avoid this result by merely asserting that it "has no contractual relationships with Syngenta pertaining to the purchase, transport, or export of corn." FAC ¶ 20. It is well settled that the contractual ELD applies even where there is no direct contractual privity between the parties if they are connected by a chain of contracts. Multiple cases have applied the contractual ELD even where the plaintiff purchased a product from an intermediary (not directly from the defendant)[23] and where the plaintiff purchased a finished good that contained the defendant's product as an input (and thus the plaintiff did not purchase simply the defendant's product at all). As the Iowa Supreme Court has explained, "[w]hen parties enter into a chain of contracts, even if the two parties at issue have not actually entered into an agreement with each other, courts have applied the 'contractual economic loss rule' to bar tort claims for economic loss, on the theory that tort law

---

privity between a remote supplier and an ultimate purchaser should not preclude the extension to the purchaser of the supplier's warranties made to the manufacturer," and the law thus "restrict[s] parties that are part of a single distributive chain to the U.C.C. in a suit for economic loss arising out of a commercial transaction"); *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 592 N.W.2d 201, 208-09 (Wis. 1999) ("[E]ven in the absence of privity, the economic loss doctrine bars a remote commercial purchaser from recovering economic losses from a manufacturer under tort theories of strict liability and negligence."); *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 592 N.W.2d 201, 208-09 (Wis. 1999) ("even in the absence of privity, the economic loss doctrine bars a remote commercial purchaser from recovering economic losses from a manufacturer under tort theories of strict liability and negligence," because any other result would the manufacturer "would be stripped of its ability to limit liability by contract" in accordance with its rights under the U.C.C.).

[23]   *See also, e.g.*, *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025 (6th Cir. 2003) (applying contractual ELD to bar claim by purchaser against remote manufacturer where there was no contractual privity); *Nw. Ark. Masonry, Inc. v. Summit Specialty Prods., Inc.*, 31 P.3d 982, 988-89 (Kan. Ct. App. 2001) (explaining that "consumers are not typically in privity of contract with the manufacturer when they purchase products from retailers or wholesalers," but that "[n]evertheless, the economic loss rule applies"); *Progressive Ins. Co. v. GM Corp.*, 749 N.E.2d 484, 489-90 (Ind. 2001) (applying ELD even though purchasers did not buy cars directly from General Motors); *Prairie Prod., Inc. v. Agchem Div.—Pennwalt Corp.*, 514 N.E.2d 1299, 1301, 1304-05 (Ind. Ct. App. 1987) (applying ELD to claim against a "remote manufacturer" where plaintiff purchased from an intermediary); *Laurent v. Flood Data Servs.*, 766 N.E.2d 221, 226-27 (Ohio Ct. App. 2001) (applying ELD to bar claim by homeowners against third party service provider which contracted with the homeowners' bank even though that the homeowners "did not have a contractual relationship" with the third party, and explaining that the ELD is a "general rule applicable to situations in which privity of contract is lacking").

should not supplant a consensual network of contracts." *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 501-02, 504 (Iowa 2011). Any other rule would produce the anomalous result that those purchasing directly from the defendant *could not* recover in tort for economic losses, but those who happened to purchase from intermediaries *could*. As the Third Circuit has explained, that is not the law and the contractual ELD bars a claim against the manufacturer of a component part in the finished product purchased by the plaintiff even though the plaintiff did not purchase that input directly from the defendant. As that court put it, there is "no principled basis for affording the purchaser of a defective product greater relief against the manufacturer of a component part . . . than against the manufacturer of the assembled defective product." *King v. Hilton-Davis*, 855 F.2d 1047, 1051 (3d Cir. 1988). Just as a claim against the seller of the finished product is barred by the ELD, so is a claim against the remote component maker. Nothing in the situation of a remote component supplier could justify "permitting a tort recovery that will allow a purchaser to reach back up the production and distribution chain, thereby disrupting the risk allocations that have been worked out in the transactions comprising that chain." *Id.* at 1054; *see also, e.g.*, *StarLink*, 212 F. Supp. 2d at 839-40 (if the ELD did not apply to a remote purchaser, "then manufacturers would become liable for economic expectations of secondary purchasers"); *Tomka v. Hoescht Celanese Corp.*, 528 N.W.2d 103, 108 (Iowa 1995) (refusing to allow recovery of purely economic losses "to non-privity buyers" because doing so "would seriously hamper the ability of remote sellers to disclaim warranties as allowed by the Uniform Commercial Code").[24]

---

[24] This is the rule generally applied across jurisdictions. *See, e.g.*, *Hininger v. Case Corp.*, 23 F.3d 124, 127 (5th Cir. 1994) (under Texas law, consumers cannot recover economic losses in tort in action against a supplier of a component part in the product the consumer purchased); *accord Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925 (5th Cir. 1987) (suit against designer of steering mechanism in ship) *Progressive Ins. Co. v. Monaco Coach Corp.*, No. 1:05-CV-37-DMR-JMR, 2006 WL 839520, at *3 (S.D. Miss. Mar. 29, 2006) (suit against maker of water heater in motor home); *Capital Motor Lines v. Detroit Diesel Corp.*, 799 F. Supp. 2d 11, 17 (D.D.C. 2011) (suit against maker of engine in a motor coach); *St. Paul Fire & Marine Ins. Co. v. Steeple Jac, Inc.*, 352 N.W.2d 107 (Minn. Ct. App. 1984) (suit against maker of defective gear box incorporated into window washing unit).

Thus, it is well settled that the contractual ELD applies where a plaintiff sues the maker of a component or ingredient (like Viptera seed) in a purchased product (like harvested corn).  Indeed, the U.S. Supreme Court's seminal decision on the contractual ELD involved exactly such a scenario—a charterer sued the manufacturer of the turbines in a vessel.  *See Transamerica Delaval, Inc.*, 476 U.S. at 860-61.  Even though the charterer had not purchased the turbines (or anything else) directly from the defendant, the Supreme Court held that the ELD applied.  *See id.* at 871-72.  As courts have explained, the ELD applies where the plaintiff purchases a "finished product that includes a component supplied by the defendant where the purchaser had no dealings with the defendant."  *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 155-56 (Ind. 2005).  As *Gunkel* explained, the "central theory" behind the ELD is that "the law should permit the parties to a transaction to allocate the risk that an item sold . . . does not live up to expectations" *Id.* at 155.  As a result, where "a component is sold . . . as a part of the finished product, the consequences of its failure [*i.e.,* the failure of the component to meet expectations] are fully within the rationale of the economic loss doctrine"—that is, the purchaser could bargain for guarantees about the product it is purchasing, including all components in it.  *Id.* Here, corn seed is a component or input that directly affects the qualities of the finished product (harvested corn), and the rationale of the contractual ELD fully applies because LDC could have bargained for some guarantees about the GM traits of the corn it was purchasing.

And LDC's bald legal conclusion that it was not connected to Syngenta "by a 'chain' of contracts," *id.* ¶ 20, is transparently unavailing.  On the face of the complaint, there is an obvious chain of contracts.  Syngenta sells seed to farmers, FAC ¶¶ 21, 54, 62, farmers sell harvested corn grown from the seed to grain elevators (including LDC), FAC ¶ 13,[25] and grain elevators sell to

---

[25]    Although LDC cautiously asserts (on "information and belief") that it was "less 'farmer facing' than certain members of the grain trade" in that it "typically" did not purchase corn directly from farmers, FAC ¶ 20, those limited assertions make clear that LDC *did* purchase at least *some* corn directly from farmers.  And that makes sense, because

LDC, FAC ¶ 20.  That is all that is required for the contractual ELD to apply.

LDC also cannot sidestep the ELD by claiming physical injury to property.  *See supra* Part III. As explained above, contact with U.S.-approved Viptera cannot be characterized as causing physical "damage."  Moreover, physical injury suffices to avoid the contractual ELD only where where the purchased product "causes personal injury or damage to property *other than* the product . . . itself." *Indianapolis-Marion Cty. Pub Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010); *see, e.g.*, *Drill Masters-Eldorado Tool, Inc.*, 49 F. Supp. 3d at 203 (economic loss doctrine under Connecticut law bars "recovery of economic losses unaccompanied by physical injury to persons or other property"); *Nichols v. Peterson NW, Inc.*, 389 P.3d 617, 624 (Wash. Ct. App. 2016) (Washington law "distinguishe[s] between economic losses that would be limited to only the [property itself] and losses related to persons and other property," and a defendant owes a tort duty only to avoid "unreasonable risks" of "property and personal injuries beyond the scope of the economic losses associated with the [product] itself"); *see also, e.g.*, *Gunkel*, 822 N.E.2d at 154 (ELD "permits tort recovery only for personal injury or damage to 'other property'").  Where the only injury is to the good itself, the ELD applies.  Here, LDC is complaining about injury to the corn it purchased—namely, that the corn it bought and exported to China contained MIR162.  That involves no injury to *other* property; it simply involves the GM traits in Viptera corn remaining in the corn throughout LDC's export process.

The two rationales the Court has previously identified for refusing to apply the contractual ELD under three *other* States' laws (Louisiana, Minnesota, and Michigan) are inapplicable here.[26] First, the Court held that Minnesota's unique statutory codification of the ELD did not apply because

---

LDC affirmatively alleges that, in the relevant period, it "operat[ed] *interior* and export grain elevators."  FAC ¶ 13 (emphasis added).

[26]   Syngenta preserves its arguments that the contractual ELD applies under those States' laws, but takes the Court's prior rulings as a given for purposes of this motion.

the grain elevators at issue had not purchased Syngenta's own product—Viptera *seed*—directly from Syngenta. *See* MTD Order, 131 F. Supp. 3d at 1206-07. Instead, (like LDC here) they had purchased harvested corn from other intermediaries. *See id.* Under Connecticut law and the majority common-law approach, however, it is settled the ELD applies to remote purchasers who did not purchase directly from the defendant *and* applies where the defendant made only a component or ingredient incorporated into the product purchased by the plaintiff (like seed incorporated into harvested corn).

Second, the Court held that the contractual ELD under Mississippi and Minnesota law did not apply because plaintiffs had not asserted that Viptera was "defective" and the ELD in those two States applies solely to product defect claims. MTD Order, 131 F. Supp. 3d at 1207. That holding also does not reflect Connecticut law or the majority rule. The plaintiffs in *Ulbrich* made the same argument that the contractual ELD "applies only to the delivery of defective goods that have been sold pursuant to the [Uniform Commercial Code]," but the Connecticut Supreme Court rejected that argument. 78 A.3d at 97; *see also, e.g.*, *Akl v. Trumbull Ins. Co.*, No. MMXCV136010186, 2014 WL 1345257, at *4 (Conn. Super. Ct. Mar. 13, 2014) (explaining that "[i]n 2013 the Supreme Court released its decision in *Ulbrich*[], clarifying that [the economic loss doctrine] was not limited only to sales [of goods] covered by Article 2 of the UCC," and applying ELD to bar claims for "negligent failure to settle" against insurer). *Fleming v. Gov't Employees Ins. Co.*, 86 F. Supp. 3d 102, 108 (D. Conn. 2015) (same); *see also, e.g.*, *Triton Envtl., Inc. v. Dalton Enters., Inc.*, No. 3482647, 2005 WL 375331, at *5 (Conn. Super. Ct. Jan. 10, 2005) (applying ELD to service contracts).[27] So, too, have other courts in major corn-producing states where LDC is likely to have purchased corn for export. For example, as the

---

[27]   *See also, e.g.*, *Worldwide Preservation Servs., L.L.C. v. IVth Shea, L.L.C.*, No. X05CV980167154S, 2001 WL 34093945, at *4 (Conn. Super. Ct. Feb. 1, 2001) (rejecting the plaintiff's argument that the ELD under Connecticut law "is only limited to the sale of goods"); *Amity Reg'l Sch. Dist. #5 v. Atlas Const. Co.*, No. X06CV990153388S, 2000 WL 1161095, at *2 (Conn. Super. Ct. July 26, 2000) ("While the present case does not involve the sale of goods under the UCC, the analysis and application of the economic loss rule are equally applicable.").

Seventh Circuit has made clear, the ELD bars claims based on any product or service that did not meet the plaintiff's economic expectations, and applies even where those unmet expectations have no relationship whatsoever to the notion of "defect" found in product liability cases.  *See Bowers v. Fed. Internationale de l'Automobile*, 489 F.3d 316, 325 (7th Cir. 2007) (contractual ELD bars negligence claim by spectators of a race "that was not up to snuff" because racing federation barred teams from using certain tires and thus fewer than all advertised drivers participated).  Likewise, the Indiana Supreme Court has made clear that the "central theory" behind the ELD is that "the law should permit the parties to a transaction to allocate . . . risk" by contract.  *Gunkel*, 822 N.E.2d at 155.  Nothing in that rationale restricts the ELD to product "defect" claims.  As *Gunkel* explained, "[c]onstruction claims are not necessarily based on defective goods or products, but nonetheless are subject to the economic loss doctrine."  *Id.*[28]  Whether or not a claim meets a particular definition for asserting a "defect" is irrelevant; instead, the majority rule is that, "[i]n general, a claim that a product or service did not perform as expected is best left to contract law remedies."  *Id.*[29]

Here, LDC asserts solely disappointed commercial expectations and its claim is at the heart of the ELD.  If LDC could escape the ELD simply by avoiding the word "defect," artful pleading would gut the doctrine.  In any event, the substance of LDC's claim is that Viptera seed was not fit for its ordinarily intended purposes, and that is, in essence, a defect claim.[30]  As this Court held

---

[28]  *See also*, *e.g.*, *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994) (rejecting the argument that the ELD "extends only to damages caused by *defective products*" and explaining that it applies whenever the plaintiff "purchased products which proved inadequate for [his] purposes, causing [him] lost profits") (emphasis in original); *Adcock v. S. Austin Marine, Inc.*, No. 2:08-cv-263KS-MTP, 2009 WL 3633335, at *5 (S.D. Miss. Oct. 30, 2009) (applying ELD where plaintiff complained, not that a product was defective, but that plaintiff was sent the *wrong* product)

[29]  *Gunkel* also made clear that the contractual ELD is not limited to "sale of goods" cases, and the "concepts" behind the doctrine "apply equally in other contexts"—such as contracts for services.  *Gunkel*, 822 N.E.2d at 155.  Given that holding, it would make no sense to restrict the ELD to a particular *type of claim* (product defect) arising solely in cases about goods.

[30]  *See*, *e.g.*, *Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493 (Tex. Ct. App. 2002) (breach of warranty of fitness for ordinary purpose is a "defect"); *McDonald v. Ford Motor Co.*, 326 N.E.2d 252, 254 (Ohio 1975) (same).

in *Funk*, a seed reseller alleging negligence on the theory that "because of Syngenta's commercialization of Viptera and Duracade, [the reseller] was unable to sell Syngenta's seeds at the same prices or volume" is alleging that "the seeds did not work for the purpose for which they were sold to [the reseller], i.e., to be resold." *Funk*, 2017 WL 2080601, at *13. That theory is indistinguishable from LDC's here: LDC is alleging negligence on the theory that Syngenta's commercialization of Viptera and Duracade made LDC unable to export U.S. corn containing MIR162 to China and thus that the seeds did not work for the purpose for which they were sold— that is, to produce corn that could be exported to China.[31]

## V.     The Court's Prior Rulings Apply To Require Partial Dismissal Of LDC's Claims.

The Court has also previously issued several rulings dismissing certain theories of liability that are also raised by LDC. Those holdings apply equally here, and the burden is on LDC to show why the Court's prior rulings should not be applied here. *See* Sched. Order No. 1 ¶ 5(h), ECF No. 123.

### A.     LDC's Negligence Claim Must Be Dismissed To The Extent That It Is Based On Failure To Warn, Instruct, Educate, Or Otherwise Disclose Information.

LDC bases its negligence claim in part on allegations that Syngenta "[f]ail[ed] to educate or

---

[31]    Washington law applies the same principles to bars economic loss claims by remote purchasers like LDC, but now calls this rule the "independent duty doctrine." "The independent duty doctrine, previously known as the economic loss rule, bars recovery in tort for economic losses suffered by parties to a contract unless the breaching party owed a duty in tort independent of the contract." *Pointe at Westport Harbor Homeowners' Ass'n v. Eng'rs Nw., Inc.*, 376 P.3d 1158, 1192 (Wash. Ct. App. 2016). The doctrine reflects the same "policy reasons for limiting the duties between contracting parties" as the ELD, including that contract and warranty law "is designed to protect contracting parties' expectation interests and to provide incentives for parties to negotiate toward the risk distribution that is desired or customary." *Pacific Boring, Inc. v. Staheli Trenchless Consultants, Inc.*, 138 F. Supp. 3d 1156, 1167 (W.D. Wash. 2015); *see also Alejandre v. Bull*, 153 P.3d 864, 868 (Wash. 2007) ("Permitting parties to sue in tort when the deal goes awry rewrites the agreement by allowing a party to recoup a benefit that was not part of the bargain."). By contrast, the "safety risks of physical damage . . . are at the foundation of tort law," *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 243 P.3d 521, 529 (Wash. 2010), and thus "tort law is a superfluous and inapt tool for resolving purely commercial disputes." *Pacific Boring, Inc.*, 138 F. Supp. 3d at 1167. Like the majority rule of the contractual ELD, Washington's independent duty doctrine is not limited to the sale of defective goods and applies where the parties have indirect contractual relationships but no direct privity. *See, e.g.*, *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 881 P.2d 986, 988, 990-92 (Wash. 1994) (barring negligence claim for lost profits and economic losses brought by general contractor against architect, engineering company, and construction inspector, "none of whom were in privity of contract with the general contractor"); *see also Pacific Boring, Inc.*, 138 F. Supp. 3d at 167 ("*Berschauer* is still good law in Washington[.]").

assist farmers in planting their seeds to avoid cross-pollination" and "[f]ail[ed] to adequately warn and instruct farmers on the dangers of contamination by MIR162 and at least the substantial risks that planting Viptera would lead to loss of the Chinese market."  FAC ¶ 114 (eighth and ninth bullet points). Similarly, LDC also alleges that Syngenta acted negligently by "[a]ctively frustrat[ed] LDC's efforts to avoid purchasing corn containing the MIR162 genetic trait," *id.*, by (among other things) "refus[ing] to provide" information about "where MIR162 had been sold and planted" without certain conditions (such as a nondisclosure agreement), *id.* ¶ 89.  LDC's attempt to base liability on its negligence claim on alleged failures to warn or disclose are barred by two of the Court's prior rulings in the Producer Plaintiffs' cases, which apply equally here.  LDC makes no attempt to satisfy its burden to explain why there should be a different outcome here.  *See* Sched. Order No. 1 ¶ 5(h), ECF No. 123.

*First*, these failure-to-warn theories are preempted by FIFRA, as this Court has held and every other court in the Viptera litigation to consider the question has agreed.  *See* MTD Order, 131 F. Supp. 3d at 1208.[32]  As this Court explained in dismissing similar allegations by the Producer and Non-Producer Plaintiffs, a negligence claim based on "Syngenta's failure to warn farmers of risks in growing Viptera . . . is reasonably interpreted to include a claim that Syngenta failed to warn purchasers of its products."  *Id.*  "Because such warnings might ordinarily be included in materials accompanying the products," the complaint "include[s] a claim that seeks to impose a labeling requirement not found among FIFRA's statutory requirements."  *Id.*  That ruling is equally applicable here.

*Second*, alleged failures to warn or disclose information cannot serve as the basis for a general negligence claim.  This Court recently "agree[d] with Syngenta" on this point and granted Syngenta judgment as a matter of law on the Kansas Class's parallel attempt to base negligence for economic

---

[32]  *In re Syngenta Mass Tort Actions (Poletti)*, No. 3:15-cv-01221-DRH, 2017 WL 1277898, at *10 (S.D. Ill. Apr. 3, 2017); *In re Syngenta Mass Tort Actions (Tweet)*, No. 3:16-cv-00255-DRH, 2017 WL 2117728, at *10 (S.D. Ill. May 15, 2017); Minn. MTD Order 31-32 (Ex. 1); Order 5-6, *TCE, LLC d/b/a POET Biorefining-Coon Rapids*, No. EQCV039491 (Carroll Cty. Dist. Ct., Iowa Jan. 31 2017) (Ex. 4).

losses on any alleged failure to warn or disclose.  6/15/2017 Trial Tr. 1389:6-15 (Ex. 3).  As this Court explained, "including a failure to warn or a failure to disclose specific information as a part of the general negligence claim would be tantamount to allowing a claim for negligent omission or negligent non-disclosure."  *Id.*  That would have been impermissible both because "Kansas has not recognized such a cause of action" and "even if Kansas had," the plaintiffs could not satisfy the "additional requirements" for such a claim under Restatement (Second) of Torts § 551.  *Id.*  This Court thus "rul[ed] as a matter of law that plaintiffs may not include a failure to warn or failure to disclose particular information as a part of the allegedly negligent conduct on which they seek to base liability." *Id.* at 1389:16-21.

The same is true here.  The Connecticut Supreme Court and other Connecticut courts have dismissed general negligence claims that are based on allegations of failure to disclose.  *See Ryan Transp., Inc. v. M & G Assocs.*, 832 A.2d 1180, 1183, 1185 (Conn. 2003) (affirming rejection of negligence claim alleging that commercial cotenant "failed to inform the plaintiff of the prior arson attempt" and holding that the defendant "had no duty to protect the plaintiff by notifying it of the prior arson attempt" where plaintiff had no "relationship with [defendant] beyond that of their commercial cotenancy"); *Riverside Healthcare Ctr., Inc. v. Romaniello*, No. TTDCV106001234S, 2011 WL 2177241, at *1-2 (Conn. Super. Ct. May 17, 2011) (relying on *Ryan Transp., Inc.* and granting motion to dismiss "[c]ommon-law negligence claim" that was based on "negligent nondisclosure" theory that nursing home "fail[ed] to give [certain insurance coverage] advice merely based on the plaintiff's status as a nursing home").  Connecticut courts have identified "no caselaw where a party incurred liability for a negligent nondisclosure, except where a fiduciary duty arose."  *Riverside Healthcare Ctr.*, 2011 WL 2177241, at *2. By contrast, LDC does not allege that it entered into any transaction with Syngenta or that it had any fiduciary relationship with Syngenta.  *See supra* p.29.  Moreover, permitting LDC's nondisclosure allegations to proceed would recognize an unprecedented duty for one business to

47

publicly disclose confidential sales information to other participants in the market, *see* FAC ¶ 89. Because Connecticut courts do not recognize a negligent nondisclosure claim on the facts alleged here, there is no basis to permit LDC to base its negligence claim on failure to warn.[33]

### B.  LDC's Negligence Claim Must Be Dismissed To The Extent That It Is Based On Misrepresentations.

In the Producer Plaintiffs' case, the Court has already dismissed as a matter of law negligence claims that are "based in whole or in part on any alleged misrepresentation, including any misrepresentation made in the deregulation petition or the *Bunge* suit." Summ. J. Order, 2017 WL 1250791, at *3. As the Court explained, "[t]he law sets forth certain requirements for liability based on negligence with respect to representations, and plaintiffs may not circumvent those requirements by basing an ordinary negligence claim on alleged misrepresentations." *Id.*; *Rodriguez v. ECRI Shared Servs.*, 984 F. Supp. 1363, 1368 (D. Kan. 1997) ("to hold otherwise would allow plaintiff to circumvent the more stringent requirements of the torts of defamation, negligent misrepresentation, and tortious interference"). That conclusion flows from the more stringent requirements imposed upon the tort of negligent misrepresentation, which the Restatement makes clear exist "because of the extent to which misinformation may be . . . circulated, and the magnitude of the losses" that may follow, and to limit the scope of a defendant's duty to use reasonable care in making statements or providing information to others. Restatement (Second) of Torts § 552 cmt. a; *see, e.g.*, *Chanoff v. U.S. Surgical Corp.*, 857

---

[33]   Washington law similarly does not recognize negligent failure to warn for pecuniary loss outside of narrow circumstances not alleged here. *See, e.g., Colonial Imports, Inc. v. Carlton Nw., Inc.*, 853 P.2d 913, 916 (Wash. 1993) (following Restatement (Second) of Torts s 551, holding that a duty to disclose exists only "between parties to 'a business transaction' and further "circumscribes this liability to situations involving the provision of business advice," and rejecting liability for failure to disclose where "neither [of the parties] was in any sense a party to the same business transaction" and the defendant "was not in the business of giving financial advice"); *Richland Sch. Dist. v. Mabton Sch. Dist.*, 45 P.3d 580, 586 (Wash. Ct. App. 2002) (explaining that failure to disclose "under Section 551 invokes the duty only in terms of a business transaction" and "[l]iability is further limited" to transactions involving "quasi-fiduciary relationship[s]," and rejecting liability where the parties were not parties to a "business transaction involving a quasi-fiduciary relationship between a seller and buyers").

F. Supp. 1011, 1022 (D. Conn. 1994) ("Connecticut follows the common law elements of negligent misrepresentation as set forth in the Restatement (Second) of Torts § 552."), *aff'd*, 31 F.3d 66 (2d Cir. 1994); *Barton v. City of Bristol*, 967 A.2d 482, 493-94 (Conn. 2009) (same).  Every other court in the Viptera litigation to consider this question has also agreed with this Court that misrepresentations may not serve as the basis for a general negligence claim.[34]

As in the Producer Plaintiffs' case, LDC bases its negligence claim in part on alleged misrepresentations but does not assert a negligent misrepresentation claim.[35]  Nor could LDC satisfy the requirements for the tort of negligent misrepresentation.  LDC does not allege any facts showing, for example, that Syngenta is in the business of providing information for the guidance of others or that any statements Syngenta supposedly provided about Viptera and Duracade were supplied for the guidance of business transactions by exporters such as LDC.  To the contrary, LDC alleges that Syngenta is *not* in the business of providing information because it is only a product "develop[er]" and manufacturer.  FAC ¶ 24 (alleging that "Syngenta develops and commercializes genetically engineered seeds for sale in the U.S."); *see, e.g.*, MTD Order, 131 F. Supp. 3d at 1229 (dismissing negligent misrepresentation theory under parallel circumstances by exporter Trans Coastal); *Tyler v. Gibbons*, 857 N.E.2d 885, 888-89 (Ill. App. Ct. 2006) (dismissing negligent-misrepresentation claim against provider of "chemical products and equipment to agricultural producers" because it was not in the

---

[34]    *See also* Order on Syngenta's Mot. for Partial Judgment on Pleadings at 14-15, *In re Syngenta Litig.*, No. 27-cv-15-3785 (District Ct. Hennepin Cty., Minn, March 21, 2017) ("Minn. Preemption Order") (Ex. 7) (agreeing that "Plaintiffs are thus precluded from asserting claims for negligence on the basis of misrepresentations"); *Tweet*, 2017 WL 2117728, at *13 ("Syngenta is correct when it argues that plaintiffs cannot rely on evidence of misrepresentations as a basis of support for their negligence claims.").

[35]    *See* FAC ¶ 114 (alleging, as a basis for its negligence claim, that Syngenta "[a]ctively furstrat[ed] LDC's efforts to avoid purchasing corn containing the MIR162 genetic trait or commingled with and/or contaminated with corn containing the trait"); *id.* ¶¶ 86-87 (alleging that this "active[] frustrat[ion]" included alleged misrepresentations to "third-party industry farmers that LDC had agreed to accept corn containing MIR162 when promoting their product" but that "LDC had never agreed to this"); *id.* ¶¶ 90-93 (alleging that this active frustration included Syngenta's alleged predictions of March 2012 approval to LDC in the July 7, 2011 and January 17, 2012 conference calls); *id.* ¶ 112 ("realleg[ing] and incorporat[ing] paragraphs 1-111 as though set forth fully herein" as a basis for its negligence claim); *id.* ¶ 114.

business of providing information).  The Court should thus apply its prior holding that liability for a

general negligence claim cannot be based on misrepresentations and dismiss any negligence claim to

the extent LDC purports to base such a claim on alleged misrepresentations.

> ### C.    The Petition Clause Bars Liability Based On Statements Made In Syngenta's Deregulation Petition To The USDA Or In Syngenta's *Bunge* Lawsuit.

LDC appears to base its negligence theory in part on Syngenta's lawsuit against exporter

Bunge[36] and on statements in Syngenta's petition to the USDA for deregulation of MIR162.[37]  But as

the Court has held, any theory of liability based on the *Bunge* lawsuit must be dismissed because it is

a constitutionally protected form of petitioning under the First Amendment's Petition Clause and

cannot serve as the basis for liability.  *See* 5/12/2017 Hr'g Tr. at 57:9-24 (Ex. 5); *see, e.g.*, *N.A.A.C.P.*

*v. Claiborne Hardware Co.*, 458 U.S. 886 (1982); *Tarpley v. Keistler*, 188 F.3d 788 (7th Cir. 1999).

The Petition Clause also provides an additional ground for dismissing any claim based on alleged

misrepresentations in Syngenta's Deregulation Petition to the USDA.[38]

*Bunge* Lawsuit.  Lawsuits (like the *Bunge* lawsuit) are a protected form of petitioning, and

neither the fact of bringing a lawsuit nor statements made in the course of the litigation can be used as

the basis for liability in tort.[39]  The Court has previously agreed with Syngenta that any attempt to base

---

[36]    *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58 (8th Cir. 2014).

[37]    *See* FAC ¶¶ 29, 94-95 (pointing to the *Bunge* lawsuit as a way in which "Syngenta [a]cted to [f]rustrate LDC's [i]ndependent [a]ttempts to [a]void [p]urchasing" corn containing MIR162); *id.* ¶ 52 (alleging that "[i]n its deregulation petition, Syngenta stated that there would be no adverse effects either within or outside the U.S.  Syngenta also indicated that application for approval of the new GM trait was 'in process' in several export markets, including China." (quoting Order on Syngenta's Exception of No Cause of Action at 4, *Cargill, Inc. v. Syngenta*, No. 67061 (40th Jud. Dist. Ct., La. June 15, 2016))).

[38]    Although Syngenta has raised the Petition Clause before, the Court has not yet squarely ruled on immunity under the Petition Clause with respect to the Deregulation Petition in addressing Syngenta's prior motions, though the Court has granted Syngenta's unopposed motion in limine to exclude evidence of misrepresentations in the Deregulation Petition on the ground that it is is constitutionally protected petitioning.  *See* 5/12/2017 Hr'g Tr. 48:20-24 (Ex. 5); *see also* Summ. J. Order, 2017 WL 1250791, at *3 (noting that "Syngenta argues that such representations are protected by the Constitution's Petition Clause," but not reaching the question because the Court concluded that "alleged misrepresentations cannot be part of the conduct the reasonableness of which the jury determines" on a negligence claim).

[39]    *See, e.g.*, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 397 (2011); *California Motor Transp. Co. v. Trucking*

liability on the *Bunge* lawsuit (even using the lawsuit as "evidence of recklessness going towards entitlement to punitive damages") would be "equivalent to basing a claim on the lawsuit." 5/12/2017 Hr'g Tr. 57:10-12 (Ex. 5). As the Court explained, any such attempt to base liability, damages, or punitive damages on the *Bunge* lawsuit would "implicate the First Amendment's right to petition clause" and would not be permitted." *Id.* This immunity can be overcome only if LDC alleges facts plausibly raising an inference that the lawsuit was both "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and that the litigant acted subjectively with an intent merely to use the process of the lawsuit itself to harm others (as opposed to seeking a favorable outcome from the lawsuit)." *Professional Real Estate Invs., Inc. v. Col. Pictures, Inc.*, 508 U.S. 49, 60 (1993); *see also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525-26 (2002). LDC does not allege that Syngenta's *Bunge* lawsuit was either "objectively baseless" or subjectively intended as an abuse of process. Indeed, LDC could not make such a claim, given that the district court in *Bunge* expressly recognized that Syngenta's suit was *not* baseless and went out of its way to "encourage Syngenta, as the losing party, to consider an immediate appeal" because the court "recogniz[ed] that judges might differ on" the court's decision. *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 820 F. Supp. 2d 953, 992 n.11 (N.D. Iowa 2011). As a result, dismissal foreclosing any claim in this case basing liability on the *Bunge* lawsuit is warranted. *See, e.g.*, *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1525 (D. Colo. 1993).

Deregulation Petition. Similar analysis also forecloses any reliance on the the Deregulation Petition as a basis for liability. The Deregulation Petition is a paradigmatic petition seeking government action beneficial to the petitioner. *See, e.g.*, *BE & K Constr. Co.*, 536 U.S. at 525. Speech in such a petition is protected even if it is inaccurate or alleged to be a misrepresentation, and "neither

---

*Unlimited*, 404 U.S. 508, 510 (1972); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1350 (Fed. Cir. 2014).

inadvertent misrepresentations, nor misrepresentations lacking any ascertainable effect on the proceedings," are actionable. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841, 843 (7th Cir. 2011) (statements were immunized under the Petition Clause, even "assum[ing] that all of the statements challenged . . . were in fact false"); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124, 128-29 (3d Cir. 1999) (dismissing state tort claims and holding that immunity applies where defendant's petition was not a sham, despite containing alleged misrepresentations); *see also McDonald v. Smith*, 472 U.S. 479, 487 (1985) (Brennan, J., concurring). "The First Amendment requires that we extend substantial 'breathing space' to such expression, because a rule imposing liability whenever a statement was accidently or negligently incorrect would intolerably chill 'would-be critics of official conduct ... from voicing their criticism.'" *McDonald*, 472 U.S. at 486-487 (Brennan, J., concurring) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 272, 279 (1964)); *see also, e.g.*, *Mercatus*, 641 F.3d at 847. An exception to immunity under the Petition Clause could apply "only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding" before the USDA, *Mercatus*, 641 F.3d at 841, 843; *see also Cheminor*, 168 F.3d at 124.

The complaint does not allege that either part of this two-prong test is satisfied. Statements to the USDA about export markets or expected economic effects of commercializing Viptera could not have been material as a matter of law because the USDA "has no power to regulate the adverse economic effects that could follow [a GM trait's] deregulation." *Center for Food Safety v. Vilsack*, 718 F.3d 829, 841 (9th Cir. 2013); MTD Order, 131 F. Supp. 3d at 1192 (holding that the USDA's approval did not "extend[] to the area of the financial impacts in the market of any decision by Syngenta regarding commercialization of the products"). Further, as explained above, predictions about future events—such as future economic effects—are generally not actionable unless the speaker subjectively knew the prediction to be false at the time or lacked a good faith belief in the truth of the statement.

*See supra* Part I.C.  LDC does not plausibly allege that Syngenta lacked a good faith basis in 2007 when the Deregulation Petition was submitted to the USDA for Syngenta's prediction of Chinese approval of MIR162 or the future economic effects of commercialization.

### D. All Of LDC's State-Law Claims Must Be Dismissed To The Extent That They Rely On Any Claim That Syngenta Had A Duty To Segregate Corn Based On Whether It Contains The GM Trait From Viptera.

The Court has already agreed with Syngenta that "the GSA preempts any claim against Syngenta based on a duty to make sure that Viptera is kept segregated from other corn" and explained that any claim against Syngenta "based on a duty to assist in the channeling or segregation of corn (through contract requirements, education, inspection, or tracing the product through the supply chain) is preempted." *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL-JPO, 2016 WL 4382772, at *11 (D. Kan. Aug. 17, 2016) ("Rule 12(c) Order").  Every court in the Viptera litigation to consider that question has agreed and similarly has dismissed theories preempted by the GSA.[40]

Like the Producer Plaintiffs' and Phipps' Plaintiffs' negligence claims that the Court held partially preempted under the GSA, LDC's negligence claim similarly asserts that Syngenta had a duty to ensure that corn grown from Viptera would be kept out of export channels. *See, e.g.*, FAC ¶ 114 (alleging that Syngenta "s[old] Viptera and/or Duracade to thousands of corn farmers with knowledge that they lacked the mechanisms, experience, ability and/or competence to effectively isolate those products to their home states").  Although LDC apparently acknowledges the GSA's preemptive effect on its claims by noting in a footnote that its claims about "stewardship practices relate only to pre-harvest stewardship practices," *id.* at  2 n.3, the complaint *also* still alleges that Syngenta was negligent by being "unwilling to provide any testing kits for the parties from whom LDC purchased corn" and failing to "assist[] with genetic trait testing." FAC ¶ 100; *id.* ¶ 112 (incorporating this allegation into

---

[40] *Poletti*, 2017 WL 1277898, at *8-9; *Tweet*, 2017 WL 2117728, at *8-9; Minn. Preemption Order at 9-11, 15 (Ex. 7); *TCE* MTD Order 4-5 (Ex. 4).

LDC's negligence claim).  But requiring Syngenta to assist LDC in testing corn for the presence of Viptera is exactly a requirement to assist in inspecting corn that is preempted by the Grain Standards Act.  *See* Rule 12(c) Order, 2016 WL 4382772, at *11 (holding that the GSA preempts a "requirement [that] would require testing or inspection or description of the corn as Viptera- or Duracade-free"); *id.* (holding that "any claim based on a duty *to assist in the channeling or segregation of corn* (through contract requirements, education, inspection, or tracing the product through the supply chain) is preempted" (emphasis added)).  For the avoidance of doubt, the Court should make clear that its ruling on Syngenta's motion for partial judgment on the pleadings, *see id.*, equally constrains the scope of LDC's claims here.

The Court should also hold that the GSA equally preempts all of LDC's state-law claims, not just its negligence claim, to the extent the claims rely on imposing a duty on Syngenta that is preempted under the GSA.[41]  Judge Sipkins in Minnesota has held that the GSA's express preemption clause "applies equally to" all of a plaintiffs' state-law causes of action.  *See* Minn. Preemption Order 15 (Ex. 7) ("The GSA preempts any portions of these claims that impose a duty requiring the inspection or description of corn according to the presence of MIR162 as a condition of shipment or sale of the corn in interstate or foreign commerce.").  As the Supreme Court has explained, the scope of preemption does not depend on the particular labels that state law uses to describe a cause of action. Instead, preemption depends on whether liability under state law "signals the breach of a duty" and how the duty imposed by state law "can be satisfied."  *Mutual Pharm. Co., Inc. v. Bartlett*, 133 S. Ct. 2466, 2473-74 (2013).  A court must analyze preemption with respect to each of the plaintiff's

---

[41]   The Court previously refrained from addressing the scope of GSA preemption with respect to claims other than negligence in the Producer Plaintiffs' complaint solely because the Court interpreted Syngenta's motion for partial judgment on the pleadings as limited to the Producer Plaintiffs' negligence claim.  *See* Rule 12(c) Order, 2016 WL 4382772, at *8 n.7.

particular theories as to how the defendant could have "escape[d] liability." *Id.* at 2475.  If a particular theory would impose a requirement that is prohibited under federal law, then that theory for establishing liability is preempted.  *Id.*  This Court has twice taken the same approach.[42]

LDC asserts that Syngenta was under legal duties that constrained Syngenta's conduct under a variety of causes of action—negligence, tortious interference, and fraudulent misrepresentation.  All of these claims are equally preempted to the extent they would impose duties requiring the testing, inspection, description, segregation, or channeling of harvested corn based on the characteristic whether it contains the MIR162 trait.  As the Supreme Court has explained, regardless of the particular form of action, "common-law liability is premised on the existence of a legal duty, and a tort judgment therefore establishes that the defendant has violated a state-law obligation" to carry out the actions required to avoid liability.  *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008).  Such obligations constitute state-imposed "requirements" that are preempted under federal laws—like the GSA—that expressly prohibit States from "requiring" particular actions.  *Id.*  Courts have consistently held that negligence, tortious interference, and fraudulent misrepresentation claims rest upon state-imposed duties that may be preempted under federal law.[43]  All of LDC's state-law claims are thus preempted to the same extent by the GSA.

### E.    LDC's State-Law Claims Must Be Dismissed To The Extent That They Are Based On A Voluntary Undertaking Theory.

In addressing the claims of the Kansas Class, the Court has already rejected as a matter of law the theory that a voluntary undertaking can provide an "alternative basis for a duty" supporting claims

---

[42]   *See* Rule 12(c) Order, 2016 WL 4382772, at *3-4, *8-9; *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL-JPO, 2016 WL 1312519, at *3 (D. Kan. Apr. 4, 2016) ("Third-Party MTD Order").

[43]   *See, e.g.*, *Riegel*, 552 U.S. at 324 (negligence claims preempted); *Munro v. Lucy Activewear, Inc.*, No. 16-79 (JRT/KMM), 2016 WL 5660422, at *9 (D. Minn. Sept. 29, 2016) (tortious interference claim preempted); *Caplinger v. Medtronic, Inc.*, 921 F. Supp. 2d 1206, 1219 (W.D. Okla. 2013) (fraud claim preempted), *aff'd*, 784 F.3d 1335 (10th Cir. 2015).  Although LDC's fraudulent misrepresentation claim relies on only two statements predicting Chinese import approval of MIR162 in March 2012 and does not currently seem to assert any preempted duty involving the inspection or description of corn, Syngenta includes it here out of an abundance of caution.

against Syngenta.  Summ. J. Order, 2017 WL 1250791, at *4.  The exact same analysis applies here and similarly requires rejecting the theory of voluntary undertaking.  Like the Kansas Class, LDC alleges that Syngenta is liable because it supposedly breached duties that it assumed by issuing press releases or adopting corporate policies supporting certain industry guidelines or by making promises in other public statements.  *See* FAC ¶¶ 38-40, 46-49.  That theory must be dismissed for four reasons.[44]

*First*, under the Restatement (Second) of Torts, liability for voluntary undertakings "requires a showing of physical harm and is not satisfied by pure economic loss."  *BNP Paribas Mortg. Corp. v. Bank of Am.*, 949 F. Supp. 2d 486, 518 (S.D.N.Y. 2013).  Connecticut applies that rule.  *See, e.g.*, *Waters v. Autuori*, 676 A.2d 357, 363, 364 (Conn. 1996) (dismissing voluntary-undertaking "claim for commercial loss" because "[s]uch a claim does not fall within the confines of 'physical harm' as that term is used in § 324A," and explaining that "[t]he Restatement's express limitation on the type of injury that may constitute 'physical harm' within § 324A is fully in accordance with our own case law"); *Bartolotta v. Liberty Mut. Ins. Co.*, 411 F.2d 115, 119 (2d Cir. 1969) (similar, applying Connecticut law); *see also* Restatement (Second) of Torts §§ 323 & 324A; *see generally Weigold v. Patel*, 840 A.2d 19, 28 (Conn. App. Ct. 2004) (applying Restatement).[45]  As this Court held in addressing the claims of the Kansas class, a voluntary-undertaking theory fails as a matter of law "because plaintiffs have not sought to recover for physical harm."  Summ. J. Order, 2017 WL 1250791,

---

[44]   Although the Court originally stated that it was not necessary to rule on voluntary undertaking at the pleadings stage, *see* MTD Order, 131 F. Supp. 3d at 1191 n.6, the Court subsequently made clear that any voluntary undertaking theory is an "alternative basis for a duty" and subject to dismissal as a matter of law.  Summ J. Order, 2017 WL 1250791, at *4.  It is thus appropriate to rule on LDC's voluntary-undertaking theory on this motion.  *See id.* at *5 (similarly "reject[ing] plaintiffs' argument that Syngenta may not seek summary judgment" on plaintiffs' "alternative theory" of limited launch).

[45]   Washington law likewise relies on and is consistent with Sections 323 and 324A of the Restatement (Second) of Torts.  *See, e.g.*, *Rickey v. Cline*, No. 45873-O-II, 2015 WL 9303145, at *6 (Wash. Ct. App. Dec. 22, 2015); *Mita v. Guardsmark, LLC*, 328 P.3d 962, 967 (Wash. Ct. App. 2014); *Ganno v. Lanoga Corp.*, 80 P.3d 180, 317 (Wash. Ct. App. 2003); *see also, e.g.*, *Price ex rel. Estate of Price v. City of Seattle*, 24 P.3d 1098, 1104 (Wash. Ct. App. 2011) ("Where failure to exercise reasonable care increases the risk of harm to those whom the rescuer is trying to assist, the rescuer may be liable for *physical* damage thereby caused.") (emphasis added).

at *4.  The same is true here: LDC does not allege any physical harm to its own property, and as explained above, any such theory fails as a matter of law.  *See supra* Part III.

*Second*, Syngenta's policies, press statements, and other "unilateral public statements" do not constitute undertakings as a matter of law.  *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 849 (8th Cir. 2001).  An undertaking requires that the defendant "must have agreed to perform a certain act and have assumed the performance of that act."  *Jordan v. NUCOR Corp.*, 295 F.3d 828, 838 (8th Cir. 2002); *see also Hoskinson v. High Gear Repair, Inc.*, 982 F. Supp. 2d 1210, 1223 (D. Kan. 2013) ("Such undertakings are not commonly found.").  Courts applying the Restatement (Second) of Torts §§ 323 and 324A have thus universally refused to find an undertaking based on general corporate statements and policies.[46]  Likewise, Syngenta's corporate statements expressing support for the "non-binding" guidelines in the BIO Policy (or other guidelines) cannot establish a promise to delay commercialization of Viptera simply because China had not approved it for import.  *Cf.* FAC ¶¶ 38-49.  The BIO Policy merely stated in general terms that commercialization should await approval in "key" markets with "functioning regulatory systems."  Ex. 6 at 4.  It also identified only the U.S., Canada, and Japan—not China—as key export markets with functioning regulatory systems, expressly emphasized that it was "non-binding," and left any market and trade assessment of key

---

[46]   *See, e.g.*, *Ark. Carpenters' Health & Welfare Fund v. Philip Morris Inc.*, 75 F. Supp. 2d 936, 944-45 (E.D. Ark. 1999) ("This Court finds no Arkansas case even remotely suggesting that one can assume the sort of 'special responsibility' plaintiff describes simply by placing advertisements or issuing corporate statements."); *Solis v. Lincoln Elec. Co.*, No. 1:04-CV-17363, 2006 WL 1305068, at *6-7 (N.D. Ohio May 10, 2006) ("corporate statements or advertising," "corporate mission statements," and "internal corporate policies" do not undertake a duty); *Boerner*, 260 F.3d at 848-49 (manufacturer's "unilateral public statements" promising to "pursue public health research about the dangers of cigarette smoking" did not establish undertaking); *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *2, *112 (N.D. Ohio June 4, 2010) (rejecting voluntary-undertaking theory based on "defendant's marketing messages promising to be a leader in the field of welding safety"); *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 178 (Iowa 2002) (rejecting argument that manufacturers' "statements that they would report on the results of their research into the health effects of cigarette smoking was an undertaking to render a service to its customers"); *Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 774 (W.D. Ky. 1998) ("vaguely promissory statements" and pledges of "resources to assist the scientific and public health communities with tobacco research" did not undertake a duty).

markets up to the discretion of each biotechnology company without any "set of detailed mandatory procedures." *Id.* at 1 n.2, 4.[47]

*Third*, any promise-based or undertaking-based theory of duty fails because LDC has not alleged that negligent performance of the undertaking either induced detrimental and reasonable reliance by LDC or increased the risk of physical harm to LDC's property. *See, e.g.*, *Bartolotta*, 411 F.2d at 119 (affirming dismissal of voluntary undertaking theory). LDC does not allege that it relied on Syngenta's statements of support for the BIO Policy or other trade guidelines or on any hypothetical undertaking by Syngenta to restrict its sales of Viptera pending Chinese approval. LDC does not allege, for example, that in the absence of Syngenta's support for industry guidelines, LDC would have tested and segregated the corn it accepted, that it would have refused to accept Viptera corn in the first place, or that it would have refrained from shipping U.S. corn to China. *See, e.g.*, *Bowers v. Federation Internationale de l'Automobile*, 489 F.3d 316, 325 (7th Cir. 2007) (voluntary-undertaking theory may proceed based on reliance "only where the plaintiff relies to its detriment on the defendant's help (by failing to perform the task itself, for instance), or where the defendant otherwise leaves the plaintiff worse off than if the defendant had done nothing"). And not only did U.S.-approved MIR162 pose no risk of physical harm to LDC's property as a matter of law, *see supra* Part III, but it is also not enough for LDC to try to say that Syngenta failed to reduce any supposed risk of physical injury from selling Viptera seeds, because "[a] failure to decrease the risk of harm does not give rise to liability." *Osmanski v. Way*, No. A14-2117, 2015 WL 4508423, at *6 (Minn. Ct. App. July 27, 2015).

*Fourth*, there is no allegation that Syngenta specifically promised or otherwise undertook a

---

[47]   *Honeycutt By & Through Phillips v. City of Wichita*, 836 P.2d 1128, 1141 (Kan. 1992) (no undertaking as a matter of law based on a school district's "policies" and "handbook" because these policies were not "a specific, mandatory set of guidelines sufficient to give rise to a duty" and "contain[ed] no set of detailed mandatory procedures," but instead "clearly leaves to the judgment of the [defendant] the determination when safety patrols are needed, while providing no criteria for that determination").

duty to refrain from commercializing or otherwise to restrict its sales of Viptera seeds in the U.S. based on the absence of Chinese import approval.  The scope of the defendant's specific undertaking limits any voluntarily assumed duty.  *See, e.g.*, *Anderson v. Scheffler*, 811 P.2d 1125, 1229 (Kan. 1991) (a defendant "cannot be held liable for a task he did not agree to assume").  Courts applying Restatement (Second) of Torts §§ 323 and 324A, thus "apply a 'narrow construction'" in determining the scope of the undertaking.  *Bailey v. Edward Hines Lumber Co.*, 719 N.E.2d 178, 184 (Ill. App. Ct. 1999); *see also, e.g.*, *Doe v. Hunter Oaks Apartments, L.P.*, 105 So. 3d 422, 428 (Miss. Ct. App. 2013).  None of the allegations of Syngenta's statements expressing support for the BIO Policy, or for any other guideline or trade association policies, can be read as a promise to delay commercialization of Viptera simply because China had not yet approved it for import.

## VI. Syngenta Preserves The Arguments The Court Has Already Addressed.

Out of an abundance of caution, Syngenta preserves all of its prior arguments for dismissal, including but not limited to the following: (1) Syngenta did not owe a duty of reasonable care in negligence, *see* Syngenta's MTD, ECF No. 857 at 21-46; MTD Reply, ECF No. 950 at 4-21; Syngenta's Post-Trial Mot., ECF No. 3344 at 9-30; (2) there is no proximate cause as a matter of law, *see* Syngenta's MTD, ECF No. 857 at 21-46; MTD Reply, ECF No. 950 at 21-26; Syngenta's Post-Trial Mot., ECF No. 3344 at 30-42; (3) the stranger economic loss doctrine bars negligence claims like LDC's to the extent they seek market losses due to the alleged closure of China as an export market for U.S. corn, *see* Syngenta's MTD, ECF No. 857 at 46-56; MTD Reply, ECF No. 950 at 26-52; MTD Sur-Sur-Reply, ECF No. 963; Syngenta's Post-Trial Mot., ECF No. 3344 at 10-23; (4) exporters like LDC lack standing to bring a Lanham Act claim against Syngenta, *see* Syngenta's MTD, ECF No. 857 at 72-75; MTD Reply, ECF No. 950 at 72-74; (5) plaintiffs cannot satisfy the elements of tortious interference, *see* Syngenta's MTD, ECF No. 857 at 65-70; MTD Reply, ECF No. 950 at 62-72; Syngenta's Opp'n to Mot. for Class Cert. at 106-08; and (6) any non-preempted theory of negligence

59

based on a duty to conduct a limited launch fails to establish causation as a matter of law, *see* Reply in Supp. of Syngenta's Mot. for Partial Judgment on Pleadings, ECF No. 2190 at 20-28; Sur-Sur-Reply, ECF No. 2391 at 11-17; Syngenta's Post-Trial Mot., ECF No. 3344 at 65-66.  Syngenta incorporates all of its prior arguments for dismissal solely for the purpose of preserving the arguments.  In accordance with the Court's Scheduling Order No. 1, Syngenta accepts the Court's prior rulings on these issues for purposes of this motion and therefore does not repeat these arguments in detail here. *See* ECF No. 123 ¶ 5(h).

## **CONCLUSION**

For the reasons above, the Court should partially dismiss LDC's complaint with prejudice.


Dated: August 11, 2017                    Respectfully submitted,

                                          */s/ Thomas P. Schult*
                                          Thomas P. Schult (tschult@berkowitzoliver.com)
                                          Jennifer B. Wieland (jwieland@berkowitzoliver.com)
                                          **BERKOWITZ OLIVER LLP**
                                          2600 Grand Boulevard, Suite 1200
                                          Kansas City, MO 64108
                                          Telephone (816) 561-7007
                                          Fax: (816) 561-1888

                                          *Liaison Counsel for Syngenta Defendants*


                                          Michael D. Jones (mjones@kirkland.com)
                                          Edwin John U (edwin.u@kirkland.com)
                                          Patrick F. Philbin (patrick.philbin@kirkland.com)
                                          Bridget K. O'Connor (bridget.oconnor@kirkland.com)
                                          Ragan Naresh (ragan.naresh@kirkland.com)
                                          Patrick Haney (patrick.haney@kirkland.com)
                                          **KIRKLAND & ELLIS LLP**
                                          655 15th Street N.W., Suite 1200
                                          Washington, D.C.  20005
                                          Telephone:  (202) 879-5000
                                          Fax:   (202) 879-5200

                                          *Lead Counsel for Syngenta Defendants*

## CERTIFICATE OF SERVICE

I certify that on August 11, 2017, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

*/s/ Thomas P. Schult*
Thomas P. Schult